RECEIVED
SDNY PRO SE OFFICE

2021 MAY 28  AM 11: 07     2021 MAY 28  AM 11: 07 Page 2

✎AO 241
(Rev. 10/07)

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF**
**HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| United States District Court | District: Southern |
|---|---|

| Name (under which you were convicted): Charles Little aka Clifton Little | Docket or Case No.: 309/12 |
|---|---|

| Place of Confinement : Washington Correctional Facility | Prisoner No.: 14A0447 |
|---|---|

| Petitioner (include the name under which you were convicted) Charles Little aka Clifton Little | v. | Respondent (authorized person having custody of petitioner) Superintendent Tynon |
|---|---|---|

| The Attorney General of the State of New York |
|---|

**PETITION**

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    Supreme Court, Bronx County
    265 E. 161st Street
    Bronx, NY 10451

    (b) Criminal docket or case number (if you know): 309/12

2.  (a) Date of the judgment of conviction (if you know): June 13, 2013

    (b) Date of sentencing: January 17, 2014

3.  Length of sentence: 12 years with 5 years post-release supervision

4.  In this case, were you convicted on more than one count or of more than one crime?     ☐ Yes  ☑ No

5.  Identify all crimes of which you were convicted and sentenced in this case:

    Penal Law 160.15(4) - Robbery First Degree (Display what appears to be a weapon)

6.  (a) What was your plea? (Check one)

    ☑ (1)  Not guilty        ☐ (3)  Nolo contendere (no contest)

    ☐ (2)  Guilty            ☐ (4)  Insanity plea

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?   *N/A*

(c) If you went to trial, what kind of trial did you have? (Check one)

☑ Jury   ☐ Judge only

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☑ Yes   ☐ No

8. Did you appeal from the judgment of conviction?

☑ Yes   ☐ No

9. If you did appeal, answer the following:

(a) Name of court: *The Supreme Court, Appellate Division, First Department*

(b) Docket or case number (if you know): ~~████████~~ *4250-4251  Ind. No. 309/12*

(c) Result: *Affirmed*

(d) Date of result (if you know): *June 13, 2017*

(e) Citation to the case (if you know): *People v. Little, 151 A.D. 3d 531 [1st Dep't 2017]*

(f) Grounds raised: *Defendant was denied his constitutional right to represent himself by trial court's failure to hold an inquiry and instead force counsel on an unwilling defendant who requested on three court dates to represent himself; Defendant denied a right to a fair trial due to improper remarks by prosecution during summation; Defendant's conviction was against the weight of evidence because the testimony of a single inebriated stranger of a different race unsupported by any forensic evidence was insufficient to properly identify him; Excessive Sentence*

(g) Did you seek further review by a higher state court?   ☑ Yes   ☐ No

If yes, answer the following:

(1) Name of court: *Court of Appeals of the State of New York*

(2) Docket or case number (if you know): *309/12*

(3) Result: *Denied Leave*

(4) Date of result (if you know): *September 8, 2017*

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☑ No

(7) Result: Denied

(8) Date of result (if you know): June 7, 2019

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application,

or motion?

(1) First petition:   ☐ Yes   ☑ No

(2) Second petition:   ☐ Yes   ☑ No

(3) Third petition:   ☑ Yes   ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

With both petitions (1st and 2nd), my appellate counsel on direct appeal told me that it would not be in my best interest to go forth in my direct appeal with the issues even though leave was granted and they appeals was consolidated and by this information being given to me I withdraw the appeals of both motions which now I know was wrong based on the law.

12.   For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUND ONE:** Petitioner was denied the right to self-representation by trial court's failure to hold an inquiry and instead force counsel on defendant after defendant stated he did not want no attorney and wanted to proceed with the case against him pro se.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

On October 5, 2012, petitioner orally moved the court to proceed pro se. The trial court informed petitioner that an inquiry had to happen, that the inquiry is a long one and it would not do an inquiry right now. The matter was then adjourned by the court to October 15, 2012 for an inquiry as to whether petitioner was capable of representing himself or not capable of representing himself in which then new counsel will be appointed. On October 15, 2012, petitioner's case went before a different judge in the same court part. Petitioner's appearance was waived by a court assigned counsel, Cesar Gonzalez and adjourned by the court without an inquiry as to whether petitioner could represent himself or not. (SEE ATTACHMENT)

(b) If you did not exhaust your state remedies on Ground One, explain why:

AO 241
(Rev. 10/07)

Page 7

(c)     **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?        ☑ Yes     ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes     ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?        ☐ Yes     ☐ No

(4) Did you appeal from the denial of your motion or petition?        ☐ Yes     ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

AO 241
(Rev. 10/07)

Page 8

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One: *Asked for leave to the New York Court*

*of Appeals and was denied leave.*

**GROUND TWO:** Petitioner denied the right to effective assistance of counsel due to counsel's failure to
consult with or hire an expert on eyewitness identification or seek to introduce expert
testimony about the unreliability of eyewitness identifications

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Petitioner's conviction rests on the cross-racial single eyewitness testimony of
Jonathan Lopez, a 21year-old White Hispanic man, who found petitioner's I.D. cards, one
of which had a photograph of Petitioner, a black man, in the backseat of his car approx.
9 ½ hours after the robbery. Mr. Lopez fell asleep in the same car for approx. 9 ½ immed-
iately following the gun point robbery where he (Lopez) alleged petitioner had taken his
car keys and had a gun, testified at trial that he felt no need to give police a description
of the perpetrator because he found petitioner's ID card in his car. (SEE ATTACHMENT)

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?  ☐ Yes  ☑ No

(2) If you did **not** raise this issue in your direct appeal, explain why:

*The question of counsel's ineffectiveness was dehor the record and unpreserved for*
*appellate review.*

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes  ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: *CPL 440.10 Motion to Vacate Judgment of Conviction*

Name and location of the court where the motion or petition was filed:
*Supreme Court, Bronx County*
*265 East 161st Street*
*Bronx, NY 10451*

Docket or case number (if you know):  *309/12*

Date of the court's decision:  *June 7, 2019*

AO 241
(Rev. 10/07)

Page 9

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☑ No

(4) Did you appeal from the denial of your motion or petition? ☑ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☑ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:
*Supreme Court, Appellate Division, First Department*

Docket or case number (if you know): ~~309/12 (1323°)~~ *2019-5494*

Date of the court's decision: *March 2, 2021*

Result (attach a copy of the court's opinion or order, if available):
*People v. Little, 192 A.D. 3d 408, ~~142 N.Y.S. 3d 62~~ 142 N.Y.S. 3d 62, 2021 N.Y. Slip. Op. 01235*

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you :
have used to exhaust your state remedies on Ground Two *Asked for leave to the Court of Appeals in New York and was denied on May 10, 2021*

**GROUND THREE:** *Petitioner was denied the right to hearing to assess the reliability of his actual innocence claim where petitioner proffered evidence pointing to an alternative perpetrator.*

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

*" SEE ATTACHMENT "*

✎AO 241
(Rev. 10/07)

(b) If you did not exhaust your state remedies on Ground Three, explain why?

(c)     **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☐ Yes   ☑ No

(2) If you did not raise this issue in your direct appeal, explain why:

*The facts supporting this ground were not record based, dehors the record and un-preserved for appellate review, as well as, discovered during the direct appeal phase.*

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes   ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: *CPL 440.10 Motion to Vacate the Judgment of Conviction*

Name and location of the court where the motion or petition was filed:
*Supreme Court, Bronx County
265 East 161st Street
Bronx, NY 10451*
Docket or case number (if you know): *309/12*

Date of the court's decision: *June 7, 2019*

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?     ☐ Yes   ☑ No
(4) Did you appeal from the denial of your motion or petition?     ☑ Yes   ☐ No
(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☑ Yes   ☐ No
(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:
*Supreme Court, Appellate Division, First Department*

Docket or case number (if you know): *2019-5494*

Date of the court's decision: *March 2, 2021*

Result (attach a copy of the court's opinion or order, if available):

*People v. Little, 192 A.D. 3d 408, 142 N.Y.S. 3d 62, 2021 N.Y. Slip. Op. 01235*

AO 241
(Rev. 10/07)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three: Asked for leave to the Court of Appeals

in New York and was denied on May 10, 2021.

**GROUND FOUR:** Petitioner is Actually Innocent of the offense for which he[was] convicted and no jury would have convicted him beyond a reasonable doubt had they heard the new evidence petitioner acquired after trial.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

On July 10, 2013, petitioner's trial attorney, Maria Tobia, Esq., explained to the trial court that Crystal Sanchez-Moore made a statement that proved petitioner's innocence. The statement is as follows: "Tristan McCall had asked Ms. Sanchez how my client was holding up. Tristan started discussing the circumstances of the crime petition has been convicted of. Tristan McCall told Ms. Sanchez about a double finger ring. And that the ring was hard to take off Jonathan Lopez hand so he had to pull it and caused hurt to Jonathan Lopez. Ms. Sanchez said that Tristan McCall told her that on Sept. 18-19 he was at Sin City watching the Floyd Mayweather Fight, that he tucked his braids under a hat...
"SEE ATTACHMENT"

(b) If you did not exhaust your state remedies on Ground Four, explain why:

The trial court and appellate courts have not honored collectively that any and all evidence can prove actual innocence and as such petitioner's otherwise avenues of exhaustion with New York State is unavailable.

(c)    **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☐ Yes    ☑ No

(2) If you did not raise this issue in your direct appeal, explain why:

Evidence of Petitioner's innocence was obtained during a re-investigation by petitioner's appellate lawyers, Conviction Integrity Unit of Bronx District Attorney's office and after trial.

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes    ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

✎AO 241                                                                                     Page 12
(Rev. 10/07)

Name and location of the court where the motion or petition was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):



(3) Did you receive a hearing on your motion or petition?                    ❒ Yes      ❒ No

(4) Did you appeal from the denial of your motion or petition?               ❒ Yes      ❒ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ❒ Yes      ❒ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):




(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:




(e)      **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four:

AO 241
(Rev. 10/07)

Page 13

13.   Please answer these additional questions about the petition you are filing:

(a)   Have all grounds for relief that you have raised in this petition been presented to the highest state court

having jurisdiction?   ☐ Yes   ☑ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

presenting them: Ground Four. There is a conflict among the departments of the Appellate Division in what evidence is required to prove actual innocence and the Court of Appeals have refused to answer this question.

(b)   Is there any ground in this petition that has not been presented in some state or federal court?  If so,

ground or grounds have not been presented, and state your reasons for not presenting them: Ground Four. Petitioner was represented by Mandy Jaramillo, Esq. who drafted and filed a CPL 440.10 motion. Unbeknown to petitioner said attorney did not raise clearly that petitioner was actually innocence because said attorney felt the requesting a hearing on actual innocence was the better approach.

14.   Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction

that you challenge in this petition?   ☐ Yes   ☑ No

If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues

raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy

of any court opinion or order, if available.

15.   Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for

the judgment you are challenging?   ☐ Yes   ☑ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the

raised.

AO 241
(Rev. 10/07)

16.     Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: *There was no preliminary hearing held in my case.*

(b) At arraignment and plea:

(c) At trial: *Maria Tobia, Esq.*

(d) At sentencing: *Maria Tobia, Esq.*

(e) On appeal: *Matthew Wasserman, Esq.*

(f) In any post-conviction proceeding: *Mandy Jaramillo, Esq., Office of the Appellate Defender, 11 Park Place, Suite 1601, NY, NY 10007*

(g) On appeal from any ruling against you in a post-conviction proceeding: *Mandy Jaramillo, Esq.*

17.     Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?          ☐ Yes     ☑ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?          ☐ Yes     ☐ No

18.     TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

AO 241
(Rev. 10/07)

(2)    The time during which a properly filed application for State post-conviction or other collateral review
with respect to the pertinent judgment or claim is pending shall not be counted toward any period of
limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: *A New trial or hearing or full exoneration.*

or any other relief to which petitioner may be entitled.

_____
~~Signature of Attorney (if any)~~

*Petitioner Pro Se*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for
Writ of Habeas Corpus was placed in the prison mailing system on _*May 19, 2021*_ (month, date, year).

Executed (signed) on _*May 19, 2021*_ (date).

_____
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

<u>Supporting Facts for Ground One (continued)</u>

On the next court date, October 17, 2012, petitioner appeared before the court, no inquiry was held and no mention of petitioner's request to represent himself.

On November 20, 2012, petitioner again for the second time moved the court to represent himself. After Mr. Gonzalez asked to be relieved, the court asked petitioner if he wanted a new attorney and petitioner answered "No, I don't want no attorney..." The court told petitioner that before he waives his right to an attorney the court wanted petitioner to speak to another lawyer. Petitioner requested to speak to the court three separate times. The court ignored petitioner's first two request to speak and the third request the court responded by telling petitioner we are done for today. The case was adjourned to November 27, 2012.

On November 27, 2012, without petitioner's knowledge the court assigned attorney Maria Tobia. Maria Tobia asked to adjourn petitioner's case. Petitioner asked to speak to the court, then moved for a third time to represent himself, stating "I asked on the last court date for self-representation under my sixth amendment right of the constitution... she [Maria Tobia] put in a notice of appearance to represent me as counsel which I do not want. I want to invoke my sixth amendment right..." The court replied, "You do have the right to represent yourself. However it's not what's called an unqualified right, and in order to protect your rights I need to discuss <u>this decision</u> with you at greater length. So... I will take it up with you on the next date." The court adjourned the case instructing petitioner to give Ms. Tobia the opportunity to speak with him in the interim.

On the next court date, December 12, 2012, the court did not discuss petitioner's request for self-representation at greater length like the court promised petitioner. Ms. Tobia stated on record at this court appearance that she had been appointed to represent petitioner because petitioner had asked for new counsel and was appearing today with petitioner's consent as his attorney. She continued, "I believe he would like me to continue doing that." The court never asked petitioner if he abandon his request to represent himself. Nor did the court directly ask petitioner if he wanted Ms. Tobia to represent him at this court date, or at any subsequent court date. Petitioner never stated anything about abandoning his request or giving Ms. Tobia consent to appear on his behalf as his attorney. ▓▓▓▓▓▓▓▓▓▓▓

<u>SUPPORTING FACTS FOR GROUND TWO</u>

Mr. Lopez testified that the robber was real taller and bigger than 5'4" tall. He also testified that he was threatened with a gun that he will be killed and the robber kept the gun aimed at his head and face throughout the incident that felt like forever. Mr. Lopez testified, during the robbery the only form of lighting came from the dashboard, the car radio screen and streetlights outside his car. Mr. Lopez testified that he was nervous, heart was beating irregular, he was shaking and terrified during the robbery. He did not seek assistance. He did not go back to Sin City to have the police called. He testified that he couldn't really think straight with a gun being pointed at him. Mr. Lopez testified that after being robbed at gun point in his car he fell asleep for 9½ hours.

Mr. Lopez with petitioner's ID that he found in the back seat of his car bearing petitioner's photograph that he looked at for a quick couple of minutes went to the 40th Precinct met with Officer Russo and told him that the man depicted on the card had robbed him 9½ hours ago. Mr. Lopez testified that he handed police petitioner's ID card and told police the robber was male black and that he didn't give police any further description because he seen the perpetrator in the picture on the card he turned over to police. Officer Russo used petitioner's ID card and made a photo array. Officer Russo testified that he kept petitioner's photo ID card visible on the folder during the photo array. Just 15-20 minutes after walking into the precinct with petitioner's photo ID card in hand, Mr. Lopez identified a photograph contained in Officer Russo's photo array as petitioner being the robber.

On May 20-'21 Russo testified at a Huntley/Wade/Dunaway Hearing. After testimony of this witness, petitioner's counsel, Maria Tobia, Esq., the same attorney that petitioner objected to representing him, argued to the court that Mr. Lopez's possession of petitioner's photo ID card created a suggestive situation that in fact influenced Mr. Lopez's decision to pick petitioner as the robber.

SUPPORTING  FACTS  FOR  GROUNDS

TWO, THREE and FOUR

ON THE NEXT FOLLOWING PAGES
CONTINUED ...

13.     Mr. Little reserves the right to supplement this motion upon the discovery of additional evidence that supports his legal claims.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

14.     Jonathan Lopez stated that he was robbed at gunpoint of his wallet, phone, keys, and jewelry, while getting into the driver's seat of his parked car around 1 a.m., on September 18, 2011, after leaving Sin City, a strip club in the South Bronx. *See* Ex. 12 (Felony Complaint), at A. 37-38; *see also* T. 500-01.

15.     Charles Little was arrested and taken into custody at or around 12 p.m. on January 3, 2012, inside of a bodega in the Bronx. *See* Ex. 5 (NYPD Arrest Report), at 7-8; H. 15-17. He was subsequently placed into a lineup and identified as the perpetrator by Mr. Lopez. H. 15-17, 27. A felony complaint was drafted and executed on January 3, 2012. *See* Ex. 12, at A. 37-38.

### A. The Robbery

16.     Complainant Jonathan Lopez went to Sin City, a strip club in the South Bronx, on the evening of September 17, 2011, to celebrate his friend's twenty-second birthday. T. 500-01. Mr. Lopez testified that at about 1 a.m., on September 18, 2011, he left Sin City and found his way back to his car, which was parked about a ten minute walk away. T. 519, 577. He said he had parked on a darkly lit block, with no one around. T. 516, 521, 545. He was not familiar with the area. T. 527, 540, 547, 561.

17.     Mr. Lopez testified at trial that he sat in his car with the doors unlocked while he talked on the phone with his girlfriend for about twenty minutes.

T. 559. According to Mr. Lopez, he then suddenly had a premonition that "something is about to happen." T. 525, 564. He told his girlfriend he would call her back, but he did not lock the doors. T. 564-65. Mr. Lopez stated that a man then opened his unlocked car door, sat down in the back seat and pointed a gun at him. T. 526.

18.     Mr. Lopez, however, told a different story to the police and prosecution immediately after the incident occurred. In the felony complaint, Mr. Lopez swore that he was approached by a man "*as [he] was getting into* the driver's seat of his [car]," and that the man took out a pistol and told Mr. Lopez to give him everything. Ex. 12 (Felony Complaint), at A. 37 (emphasis added). Similarly, Officer Anthony Russo, at the suppression hearing and at trial, testified that Mr. Lopez told him that he was approached by a man, while outside of his car, who told him to give him everything. H. 5-7; T. 775. According to Russo, Mr. Lopez said he then got into the front seat of his car and the man sat directly behind him in the backseat and pulled out a black gun. H. 7; *see also* T. 775. Police reports document this version of events and not the version of events that Mr. Lopez described at trial. *See* Ex. 4 (UF-61 Complaint Report), at A. 5 ("C/V states that *while he was opening the door on his car* an unknown male approached him with a black firearm") (emphasis added); Ex. 13 (DD5 #1), at A. 39 ("The c/v informed me he was *getting into his car* that was parked on the c/o E. 138 St. and Canal St. when male black approached his car and got into the back seat *as the c/v was getting into the drivers seat*.")

7

(emphasis added); Ex. 5 (NYPD Arrest Report), at A. 7 (noting that the perpetrator approached Mr. Lopez with a gun and "forced" him "into the car").

19.     The man, who purportedly threatened to kill Mr. Lopez with a gun—keeping it aimed at his head and face throughout the incident, T. 526, 538, 595-97—took Mr. Lopez's wallet, cash, phone, keys, and jewelry, T. 528-32, 536. The robber then pulled off Mr. Lopez's double-finger ring, causing his finger to bleed. T. 530-33, 658. According to Mr. Lopez, during the course of the robbery this man moved into the front passenger seat. T. 535-38. The only lights illuminating the robber were from the dashboard, the car radio, and the streetlights outside. T. 534.

20.     Although Mr. Lopez could only roughly estimate the amount of time in which the robbery occurred, he testified that "[i]t felt like forever." T. 594. He explained that during that time he was only able to observe the assailant's face a few times for two to three seconds at a time. T. 597.

21.     Mr. Lopez testified that he was terrified by the incident. T. 540 ("I was so nervous that I couldn't really think straight. My heart is beating, I'm shaking.") However, he did not seek any assistance. *Id.* He did not go back to Sin City to have them call the police. He also did not walk the short distance to the nearby and, according to a defense investigator, "extremely [well-]lit" twenty-four-hour taxi stand, T. 1073, located on 138th Street between Canal Street and Park Avenue.

22.     Mr. Lopez claimed that, instead, he decided to wait in his car for daylight because he did not know the area. T. 540. He locked the car doors, and

8

went to sleep. T. 571. His plan was to "wait until the sun rose." T. 541. Mr. Lopez

awoke from this "nap" more than eight hours later, at 9:30 or 10 a.m. T. 579-80.

23.     When Mr. Lopez got up, he cleaned up the papers and other items

strewn about his car and discovered two identification cards belonging to Mr. Little[3]

lying upright in the middle of the back seat. T. 543-545. One of the cards, an

Electronic Benefits Transfer (EBT) card, Ex. 14 (Photos of Mr. Little's ID Cards), at

A. 41, had a photograph of Mr. Little on it. T. 582. Mr. Lopez looked at this card for

"a quick couple of minutes." T. 580-81. He then decided to go to the nearest police

station to report the purported robbery. T. 547, 580-81.

B.  The Investigation

24.     Police Officer Anthony Russo was in charge of the investigation into

this incident. T. 674. He interviewed the complainant on the morning of September

18, 2011. T. 601, 674-75. Although Mr. Lopez had spent the night at a strip club,

celebrating his friend's birthday, Russo did not ask how much alcohol Mr. Lopez

drank.[4] T. 801-802.

---

[3]     The identifications show Mr. Little's first name as Clifton.

[4]     Mr. Lopez testified that despite spending about three hours in a strip club,
celebrating his friend's birthday, T. 519, he was not drunk when he walked back to his car.
T. 520. Mr. Lopez claimed he had only had two $20 shots of Hennessy during the entire
evening. T. 518. He insisted not only that he had ordered two single shots, not double shots,
but also that he did not even know what the term "double shot" meant until he was told by
defense counsel. T. 555, 664. However, Sin City's general manager testified that the only
$20 shots of Hennessy sold at the strip club in 2011 were double shots. T. 1133, 1137. The
prosecution did not call Otis Jones, or anyone else, to testify about how much Mr. Lopez
had to drink on the night of September 17, 2011.

*The Photo Array Identification*

25.     After Mr. Lopez walked into the 40th Precinct on September 18, 2011, around 10 or 10:30 a.m., and told Officer Russo that he had been robbed at around 1 a.m., he gave the police the ID cards he had retrieved from the back seat of his car. T. 544-45. He told police that the man who robbed him was depicted on the EBT card. T. 639. He did not give police a detailed description of the perpetrator—describing him as a black man—as he "didn't need to." T. 590-91.[5] Mr. Lopez testified, "I told [police] it was male Black, that's all I gave. I didn't give no height, no weight. I didn't give anything else because I seen him in the picture. That's what I showed [police]." T. 640.

26.     Mr. Lopez, at 5'4" tall, T. 589, did, however, explain that the man who robbed him was "[r]eal taller" than him, T. 661, *see also* T. 589, and "bigger" than

---

Mr. Lopez invoked his Fifth Amendment privilege when asked by defense counsel: (1) if he had ever entered a bar with a fake ID as a minor, T. 568; (2) when he started drinking alcohol, T. 568; and (3) about his arrest at 6:35 a.m. on January 28, 2012, for driving while intoxicated, with a blood alcohol content of .17, T. 566, more than double the legal limit. *See* N.Y. Veh. & Traf. Law § 1192 (2).

[5]     Despite Mr. Lopez's very clear trial testimony that he did not give a detailed description of the perpetrator to police, Officer Russo testified at the suppression hearing that Mr. Lopez described the perpetrator as "male black, medium build, 5'7, 5'8," and Russo's police report and notes from a handwritten memo book page describe the perpetrator as a black man with a medium complexion at 5'6" tall and weighing 160 pounds. Ex. 13 (DD5 #1 and Handwritten Memo Book Page), at A. 39-40. Officer Russo testified that after Mr. Lopez handed him Mr. Little's photo ID card, he pulled up Mr. Little's information in the NYPD computer system. H. 9.

Based on Mr. Lopez's adamant trial testimony that he did not describe the perpetrator's height, weight, or complexion, T. 640, 653, it is just as likely as not that the information on DD5 #1 was discovered by Officer Russo *after* he inputted Mr. Little's information into the computer.

him, even though he could not surmise the perpetrator's weight or body type. T. 589.

27.     Mr. Little was 5'5" tall and weighed about 160 pounds. T. 944; Ex. 5 (NYPD Arrest Report), at A. 7; Ex. 6 (Lineup Information Report), at A. 9.

28.     Officer Russo testified that he was able to determine who the "perpetrator" was as a direct result of the photo ID card that Mr. Lopez handed to him and that Mr. Lopez believed had been left behind by the robber. H. 7; *see* Ex. 14 (Photos of Mr. Little's ID Cards), at A. 41. Russo testified during the pre-trial suppression hearing that he used the photo ID card provided by Mr. Lopez to generate a photo array containing Mr. Little. H. 9; *see* Ex. 16 (Photo Array), at A. 47. Just 15-20 minutes after walking into the precinct with Mr. Little's photo ID card in hand, Mr. Lopez identified a photograph of Mr. Little as the robber. H. 13, 57-58; Ex. 16, at A. 47. At trial, Officer Russo agreed that Mr. Lopez described the robber as "real taller" than Mr. Lopez. T. 740.

29.     After this identification, Russo issued an "I-card" for Mr. Little's arrest, H. 13, and placed wanted posters[6] with Mr. Little's photo on them in neighboring commands and around the area of Sin City in the Bronx. H. 14-15, 83.

---

[6]     Officer Russo testified during the hearing that he did not preserve the wanted posters. H. 48-50.

*The Location of the Robbery*

30.     Although Mr. Lopez testified at trial that he did not know the name of the street where he parked, T. 560, police noted a specific crime location – the northwest corner of east 138th Street and Canal Street. *See* Ex. 4 (UF-61 Complaint Report), at A. 5 ("North West Corner East 138 Street & Canal Street"); Ex. 17 (DD5 #8), at A. 48 ("Canal St West and East 138 Street – North West Corner"); *see also* Ex. 12 (Felony Complaint), at A. 37; Ex. 13 (DD5 #1), at A. 39; Ex. 18 (DD5 #9), at A. 49; Ex. 19 (DD5 #26), at A. 50. At trial, Russo testified variously that the incident occurred on Canal Street near East 135th Street, T. 761, and that it occurred in the vicinity of Canal Street and East 138th Street, T. 737, 766.

31.     Furthermore, even though Mr. Lopez's car was parked a short walk from the police station, and he did not know the name of the street where he parked, no police officers ever went with him to determine the location where his car had been parked. T. 619-621. Officer Russo did not use a map or photographs to determine where Mr. Lopez had parked either; Officer Russo determined where he thought the car had been parked based on the complainant's verbal description. T. 677. There is no evidence that any police officer ever viewed Mr. Lopez's car, much less processed it for physical evidence, such as DNA or fingerprints.

32.     When Russo later attempted to obtain video surveillance footage, he viewed *but did not preserve* video surveillance of Canal Street from the cameras on the 24-hour taxi building, T. 770, located on the corner of Canal Street and 138th Street. T. 1076; *see also* Ex. 20 (Aerial Photo of Area Including Taxi Building on

12

138th and Canal), at A. 51. Even though these cameras were in the precise area—the corner of Canal Street and 138th Street—that the police forms noted as the spot where Mr. Lopez parked his car, Russo testified at trial that he had determined after talking to Mr. Lopez that the actual parking spot was in front of a Bonland Shipping building halfway down the block on Canal Street between 138th and 135th Streets. T. 803-05. Although Russo knew from prior investigations that the well-lit 24-hour taxi stand also had cameras which faced the exterior of Sin City on Park Avenue, he did not look at this footage. T. 771-73.

*The Arrest and the Alleged Statement*

33.     On January 3, 2012, Mr. Little, while shopping at a bodega, was stopped by Police Officer Mark Ward, who identified Mr. Little from having seen him on the wanted posters, and Mr. Little was placed under arrest. H. 14-15; T. 968.

34.     Officer Russo and Detective Clifford Parks[7] interrogated Mr. Little at around 2:30 p.m., and Mr. Little purportedly made a statement after receiving his

---

[7]     Both Clifford Parks and Anthony Russo have been accused of police misconduct in federal civil rights suits, pursuant to Civil Rights Act of 1871, 42 U.S.C. § 1983, which have settled in favor of the plaintiffs. *See* Exs. 21-22 (Complaints and Docket Reports on *Goodhope v. The City of New York, et al*, 15-cv-7320 and *Boglin, et al v. The City of New York, et al*, 15-cv-4416), at A. 52-97. In *Goodhope* and *Boglin, et al*, plaintiffs Mark Goodhope, Trey Boglin, Stuvon Gethers, and Darrell Strickland all alleged that they had been arrested on January 28, 2013 on a false criminal charge of criminal possession of a weapon in the second degree after police, including Parks and Russo, had illegally entered and searched the apartment without a search warrant. They further alleged that three out of the four of them had been strip-searched and that they had been wrongly imprisoned until January 30, 2013. *Id.* at A. 54-56, 70-71. Mr. Goodhope's case was settled on March

*Miranda* rights. H. 33, 36, 41; T. 704, 710-11. Russo testified that Mr. Little told him that he had been outside Sin City on the night of the incident, flashing money to try to get women to come home with him, and that he denied leaving his ID in the backseat of anyone's car.[8] T. 710-711; H. 36, 39. However, Russo did not record or take handwritten notes of these alleged statements. T. 730. Russo only documented the interview and the alleged statement on a police report, made two days later, on January 5, 2012, as follows:

> The perp did inform me he remembers the night of the incident. He stated he was there around 0100 trying to get in to the club Sin City because his friends were going to meet him inside. He could not get in so he started to show his money to girls that were waiting on line to get in, hoping to get one of them to leave with him. *The perp did refuse to speak to me anymore about the incident night.*

Ex. 23 (DD5 #34), at A. 98 (emphasis added); *see* T. 731-32. Russo's police report did not memorialize any statements by Mr. Little about his identification cards.[9] T. 732-33.

35.    Mr. Little denied making the statements attributed to him by Russo. T. 945, 947-48. He testified that he told the officer that he was with Crystal Sanchez, his girlfriend, on the night of the alleged robbery. T. 944.

---

23, 2016. *See* Ex. 21 at A. 68. The case involving Mr. Boglin, Mr. Gethers, and Mr. Strickland was settled on May 12, 2017. *See* Ex. 22 at A. 97.

[8]    There is no evidence that the police ever attempted to determine whether Mr. Little had been in possession of his EBT card on the night of September 17, 2011.

[9]    There is, however, a partially handwritten report that appears to be written by Det. Clifford Parks, who did not testify at trial, noting that Mr. Little said that he did not leave his cards in a car. Ex. 24 (Handwritten Report by Det. Parks), at A. 99.

36.     During this interrogation, Russo showed Mr. Little the two ID cards

the complainant found in his car. T. 945. When Russo showed him the cards, Mr.

Little realized that Tristan McCall may have been involved in this incident, but he

initially tried to protect him. T. 946-47. When Mr. Little had initially reported his

EBT card missing in October 2011, T. 966, he did not report that Mr. McCall had

taken it. T. 916-17. When Mr. Little testified before the grand jury, he also did not

mention that Mr. McCall took his EBT card. T. 928. The first time Mr. Little

reported that Mr. McCall had taken his ID cards—and thus may have been involved

in this incident—was at trial. T. 998a. He had been trying to protect his friend, but

by the time of trial no longer considered Mr. McCall to be a friend. T. 909, 912. Mr.

Little stopped considering Mr. McCall his friend after Mr. McCall visited him in jail,

right after he had testified at the grand jury, and asked him questions about his

grand jury testimony. T. 1005. Mr. McCall did not come to visit Mr. Little at any

other time while Mr. Little was in jail awaiting trial, and had since changed his

phone number. T. 928.

*The Lineup Identification*

37.     Later on the same day as the arrest, January 3, 2012, around 5 p.m.,

a lineup, which included Mr. Little and five fillers, who were all seated, was

conducted. H. 16-17, 19-20, 41, 63; T. 701, 714, 717; Ex. 6 (Lineup Information

Report), at A. 9; Ex. 25 (Photo of Lineup), at A. 100. The heights of the lineup

participants varied dramatically—from Mr. Little's height of 5'5" tall to the

participants in positions five and six at 6'1" tall. Ex. 6, at A. 9. Mr. Lopez identified

Mr. Little as the person who had robbed him. H. 27; T. 551-53.

C. Pre-trial Proceedings, Trial, Post-Verdict Motion, Sentencing, and Pro Se
   Post-Conviction Proceedings

*Pre-trial Proceedings*

38.     On January 10, 2012, Mr. Little testified at the grand jury proceeding,

where he was represented by Angel Frau of the Legal Aid Society. Ex. 26 (Charles

Little Grand Jury Minutes), at A. 102. Mr. Little testified that he spent the night of

September 17-18, 2011, at the apartment of his then-girlfriend, Crystal Sanchez,

watching the Floyd Mayweather boxing match with some of her family members.

*Id.* at A. 106. Mr. Little did not report to the grand jury that he had given his ID

cards to Tristan McCall sometime prior to the night that Mr. Lopez was robbed. *See*

*id.* at A. 112-13, 117-18.

39.     The grand jury indicted Mr. Little on nine counts, including robbery

in the first degree, robbery in the third degree, two counts of grand larceny in the

fourth degree, criminal possession of stolen property in the fourth degree and in the

fifth degree, petit larceny, criminal possession of a weapon in the fourth degree, and

menacing in the second degree. Ex. 15 (Indictment), at A. 42-46.

40.     A subsequent attorney, J. F. Alemany, Esq., filed an omnibus motion

seeking suppression of Mr. Little's alleged statement and of the identifications,

stating that there was not probable cause to arrest Mr. Little and that the

proceedings employed at the lineup were suggestive and violated Mr. Little's

16

constitutional rights. *See* Ex. 27 (Defense Omnibus Motion, filed April 9, 2012), at A. 122.

41.     Justice Miriam R. Best granted the defense motion for a *Huntley/Wade/Dunaway* hearing. *See* Ex. 28 (Decision on Omnibus, dated July 11, 2012), at A. 130-31.

42.     Mr. Little was eventually represented in his pre-trial hearing and at trial and sentencing by assigned attorney Maria Tobia.

43.     A *Huntley/Wade/Dunaway* hearing was held on May 20 and 21, 2013, before Justice Denis Boyle. H. 1-2, 77-78. The sole witness at the proceeding was Anthony Russo, a 40th Precinct police officer in the Detective Squad. H. 5-6; T. 672-74. Russo testified about identification procedures he conducted with the complainant Jonathan Lopez and about Mr. Little's alleged statement.

44.     After testimony, both sides made arguments to the court related to the identification procedures. Defense counsel argued that the complainant's possession of Mr. Little's photo ID card created a suggestive situation that influenced the complainant's subsequent identifications of Mr. Little. H. 96-98. Additionally, defense counsel pointed out that police did not question the complainant to determine whether he was intoxicated during the robbery, whether he had an adequate opportunity to observe the perpetrator, why he failed to call 911, or why he waited nine hours before reporting the incident. H. 96-98.

45.     Defense counsel further argued that Mr. Little's skin tone was much lighter than the skin tones of the fillers in both the photo array and the lineup, and

that Mr. Little was far shorter than the fillers—which was evident even though all of the participants were seated. H. 99-100.

46.     In response, the prosecution argued that the identification procedures performed by the police were not unnecessarily suggestive. H. 100. The prosecution specifically noted that the "incandescent lighting" could "account for some of the differences in complexion," and that having the participants seated during the lineup "alleviate[d] height issues." H. 102.

47.     Defense counsel and the prosecution rested on the record with regard to the *Huntley* issues. H. 104.

48.     The court rejected Mr. Little's suppression motion, H. 103-04, and issued a written decision. Ex. 29 (Decision on Suppression Motion, dated June 28, 2013), at A. 140, 152.

*Trial*

49.     Mr. Little's trial began with opening statements on May 30, 2013 and ended with the jury's verdict on June 13, 2013. Justice Denis Boyle presided over the trial. Mr. Little was sentenced on January 17, 2014.

50.     At the trial, the prosecution called three witnesses, including the complainant Jonathan Lopez, and the investigating officer Anthony Russo. The prosecution also called Parole Officer Duane Ancrun, who testified that Mr. Little, who was on parole and under his weekly supervision, T. 828-29, failed to report to parole beginning September 15, 2011, which resulted in the issuance of an absconder warrant on October 21, 2011. T. 864. On cross examination, Officer

18

Ancrun confirmed that Mr. Little had also failed to report to parole on occasions prior to September 15, 2011. T. 851, 856, 860, 865.

51.     Mr. Little testified on his own behalf and said that he spent the night of September 17, 2011 at the apartment of his then-girlfriend, Crystal Sanchez, watching the Floyd Mayweather boxing match on Pay-Per-View, along with Ms. Sanchez's family members, Mr. Little's sister and a mutual friend, Tricia McCall.[10] T. 973, 1028.

52.     Mr. Little also testified that sometime between September 8 and September 11 of that year, Mr. Little's childhood friend Tristan McCall took Mr. Little's EBT and health care cards out of his wallet, as collateral for having paid Mr. Little's phone bill. T. 908, 992. Mr. Little and Mr. McCall had been friends since Mr. Little was nine years old. T. 909. As far as Mr. Little knew, Mr. McCall still had his IDs at the time of this incident. T. 918-19.

53.     Mr. Little testified that he did not surrender to the police after discovering that he was a suspect in a robbery, T. 900, because, having been accused of a crime he did not commit, he was scared and did not have an attorney. T. 904-05.

---

[10]     Tricia McCall is not related to Tristan McCall. T. 877, 1033.

19

54. The defense also presented the testimony of three defense investigators, much of which was devoted to their futile attempts to locate Ms. Sanchez.[11]

55. Defense counsel presented a misidentification defense—that Mr. Little had been misidentified after the complainant found and studied Mr. Little's photo ID card in the backseat of his car. Further, in counsel's opening statement, she said that Mr. Little would testify that Mr. McCall took Mr. Little's ID cards as "insurance" since Mr. Little had borrowed money from Mr. McCall. T. 488-89, 492-93.

56. On June 10, 2013, defense counsel made an offer of proof in an attempt to present testimony from a witness who had overheard a conversation between Mr. McCall and his friends. Counsel explained that her investigators found Anne Walker, T. 1095, who worked in a community safety capacity for the building, where Mr. McCall and Mr. Little lived, and who knew them and the group of people to whom Mr. McCall was talking that day. T. 1095. Counsel said Ms. Walker was "extremely observant about what is going on within the buildings and within the community." T. 1095. Because the wanted posters were up in the building, people in the community were aware that Mr. Little was wanted for this robbery. T. 1096.

---

[11]     Two of the three investigators also testified about their investigations regarding the area around Sin City and the 24-hour taxi stand. T. 1069-77, 1082-84, Supp. 11-14, 20-23.

20

With regard to the conversation that Ms. Walker overheard, counsel stated the following:

> One of the participants in that conversation makes a comment to Tristan about it not being right and the benefit card and the robbery. The exact words were something – withdrawn. They are not exact words. The words had the import of you shouldn't have done him like that, you shouldn't have done that with the EBT card. I believe she referred to it as food stamps card when she spoke to me.
>
> And Tristan, he was kind of had a holding court position, looking at these other guys and started chuckling after, directly after the statement that you shouldn't have done him like that and the EBT card.

T. 1096.

57.     Counsel proffered this testimony to show Mr. Little's state of mind— that Mr. Little was aware that Mr. McCall "had done something," T. 1096, and he did not want to turn himself in for something he did not do before finding an attorney. T. 1098-99. Additionally, counsel argued that Mr. McCall's laughter after the conversation "in some way rises to the level of admission." T. 1099.

58.     The prosecution, in turn, argued that Mr. McCall's laugh did not rise to the level of an admission, because it was entirely speculative, and that the prejudicial effect of admitting Ms. Walker's testimony would far outweigh any probative value. T. 1099-1100. The prosecution further argued that the conversation could not bear on Mr. Little's consciousness of guilt or innocence as Mr. Little was not there and did not personally hear the conversation. T. 1100.

59.     The Court found that the proposed testimony was inadmissible, stating that:

Tristan's chuckle, neither an admission nor, I think, more properly anything resembling a declaration against penal interest and the conversation taken as a whole doesn't bear on the defendant's consciousness of guilt. And on balance, it's just entirely speculative as to any potential value whatsoever, so I would not allow that testimony.

T. 1101.

60.     Although the jury was charged on single eyewitness identifications, T. 1328-30, and defense counsel argued that Mr. Lopez was too drunk to make a reliable identification, *see* T. 1182-90, and that Mr. Lopez was unduly influenced by the photo of Mr. Little on the ID card that he found in his backseat when he subsequently identified Mr. Little as the robber, *see* T. 1195-96, 1202-03, 1205-09, defense counsel did not, at any point during trial, request to present expert testimony on factors that can adversely affect the reliability of eyewitness identifications.

61.     Defense counsel also failed to request a cross-racial identification charge, consult or present testimony on cross-racial identifications, or make any argument about the greater likelihood of misidentification when an identification is cross-racial.

62.     On June 13, 2013, the jury found Charles Little guilty of the single count of robbery in the first degree. T. 1349.

*Post-Verdict Motion and Sentencing*

63.     On July 10, 2013 during a post-verdict appearance, defense counsel requested an adjournment for sentencing after locating Ms. Sanchez in order to speak more with Ms. Sanchez, who confirmed that Mr. Little had been with her at

her home during the entire night when the robbery occurred, and who provided information about an admission that Mr. McCall had made to her about the robbery. Ex. 30 (July 10, 2013 Minutes), at A. 154-57. Counsel indicated that she may file a post-verdict motion. *Id.*

64. On October 11, 2013, without further explanation, defense counsel announced that she had adopted and filed Mr. Little's *pro se* post-verdict motion. Ex. 31 (Oct. 11, 2013 Minutes), at 162. Mr. Little's motion requested to set aside the verdict pursuant to C.P.L. § 330.30(1), arguing that Officer Russo's failure to preserve a wanted poster and obtain and preserve video surveillance from the 24-hour taxi building constituted a violation pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *People v. Rosario*, 9 N.Y.2d 286 (1961). *See* Ex. 32 (*Pro Se* CPL § 330.30(1) Motion, filed Sept. 20, 2013), at A. 164-82. The prosecution filed opposition papers on December 9, 2013. Mr. Little's motion was denied. *See* Ex. 33 (Decision, dated Jan. 13, 2014), at A. 183-85.

65. On January 17, 2014, at sentencing, the prosecution argued that Mr. Little should be sentenced to fifteen years imprisonment, with five years of post-release supervision, due to the violent nature of the crime and his lies under oath. S. 5-7.

66. Defense counsel asked for Mr. Little to be sentenced to eight years of imprisonment, the minimum sentence given his prior convictions for the sale of drugs. S. 8. Defense counsel noted that although Mr. Little had testified untruthfully before the grand jury, he had been in a position where he had to choose

23

"between saving [himself] by telling the truth and implicating a life-long friend." S. 11-12.

67.    The court sentenced Mr. Little, as a predicate felony offender, to twelve years imprisonment, with five years of post-release supervision. S. 16.

*Pro Se Post-Conviction Proceedings*

68.    Mr. Little has previously filed *pro se* C.P.L § 440.10 motions. In these motions, Mr. Little argued that his trial counsel was ineffective for failing to move to dismiss the indictment, pursuant to C.P.L § 30.30.

69.    The first *pro se* motion, filed in or around June 2014, was withdrawn without prejudice on September 2 or 10, 2014. *See* Ex. 34 (*Pro Se* CPL § 440.10 Motion with Handwritten Order Withdrawing Motion and Letter from OAD Attorney), at A. 186-203.

70.    The second *pro se* motion, filed on January 12, 2015, was denied after the prosecution filed opposition papers and Mr. Little filed a reply. *See* Ex. 35 (Order Denying CPL § 440.10 Motion, dated Sept. 3, 2015), at A. 204-13.[12] Although leave to appeal the denial of the motion was granted on November 29, 2016, Mr. Little ultimately withdrew his appeal on the advice of his former OAD attorney Matthew A. Wasserman. Ex. 36 (Withdrawal Stipulation and Order Withdrawing Appeal of CPL § 440.10), at A. 214-18.

---

[12]    Related to this C.P.L. § 440.10 denial, Mr. Little then filed motions to reargue and to renew, which were all ultimately denied.

D. <u>The Instant Motion</u>

71.     After filing the direct appeal brief on June 29, 2016, OAD discovered evidence of Mr. Little's innocence after OAD's investigator spoke to Anne Walker. Thus, in December 2016, after the prosecution filed its brief, OAD sent a letter to the CIU requesting a review of this case, and specifically, an interview by CIU with Ms. Walker. Ex. 37 (OAD Letter to CIU), at A. 219, 223. CIU agreed to review the case, and the parties agreed to adjourn the direct appeal proceedings. However, in a letter dated April 6, 2017, ADA Seth Steed wrote that after interviewing Ms. Walker and Crystal Sanchez, CIU declined to take any further action. Ex. 11 (CIU Letter to OAD), at A. 36. ADA Steed stated that his unit had not found credible evidence establishing Mr. Little's actual innocence or that he was wrongfully convicted. *Id.* Subsequently, Mr. Little's reply brief was filed on April 28, 2017, and his conviction was affirmed on June 13, 2017, with leave to appeal to the Court of Appeals denied on September 8, 2017.

*Evidence that Tristan McCall is the Actual Perpetrator*

72.     On July 9, 2016, Brandi Alexander, an investigator at OAD, spoke to Anne Walker at 1762 Story Avenue, Apartment 2B, which is located on the second floor of the Bronx NYCHA development where Mr. Little and Mr. McCall grew up. Ex. 10. (Affidavit of Brandi Alexander), at A. 33-34. Ms. Walker, a senior citizen, explained that she worked for the building's tenant patrol and that she worked closely with the local NYPD community affairs officers. *Id.* at A. 33. She stated that she knew Mr. Little from watching him grow up in the building and was fond of

25

him, but that she had no significant relationship with him. *Id.* She was aware that he was spending years in prison after being convicted for a robbery. *Id.* She also stated that she knew Tristan McCall from the building. *Id.* at A. 34.

73.    Ms. Walker said that in late September 2011, while standing near her open window, she overheard a conversation among Tristan McCall and some of his friends, who she also knew from the area. *Id.* Mr. McCall expressed his guilt for what was happening to Mr. Little, and Mr. McCall said that he thought he left Mr. Little's identification behind in a cab. *Id.*

74.    Ms. Walker told OAD's investigator that she relayed this information to an NYPD community affairs officer, who told her to protect herself and not to get involved. *Id.*

75.    On January 11, 2017, Ms. Walker was interviewed by the CIU, and she gave a consistent account of what she observed and overheard. Ex. 11 (CIU letter to OAD), at A. 35. She stated that possibly at the end of September 2011, in the early afternoon, while she was watering her plants at the windowsill of her open living room window overlooking the front entrance of the building, she observed Tristan McCall and others in front of the building. *Id.* According to the CIU, Ms. Walker stated that she "heard Mr. McCall tell the group that Charles Little had lent his EBT card to Mr. McCall and that Mr. McCall said that he had accidentally left the EBT card in a cab." *Id.* Ms. Walker also told the CIU that another individual was present for the conversation, that she told her caretaker about the

26

conversation, and that she told another person, who cautioned her not to get involved, about the conversation. *Id.*

76. On December 9, 2017, at about 4:40 p.m., OAD's investigator spoke to Joyce Adams, Ms. Walker's in-home caretaker. Ex. 10 (Affidavit of Brandi Alexander), at A. 34. Ms. Adams said that Anne Walker told her about a conversation that Ms. Walker overheard between Tristan and his friends that same day. *Id.* Ms. Walker told Ms. Adams that, through her open window, she heard "Tristan and some guys talking about how Tristan borrowed Mr. Little's benefits card and left it in a cab." *Id.*

77. Much of this information was available at trial but was deemed inadmissible, *see* T. 1101, and Ms. Walker did not testify. Ms. Walker has consistently maintained from 2011 until today that she overheard Tristan McCall's conversation about Mr. Little's benefits card. At the time of trial, defense investigator Bernard Johnson wrote up a summary of an interview with Anne Walker stating that Ms. Walker knew Mr. Little as Clifton, that he ran errands for her and sometimes sat at the community watch table, and that she "overheard individuals in the building talking about the situation and they were saying that that was not right what they did to him with his ebt card." Ex. 38 (Email from Johnson to Tobia, dated March 24, 2013), at A. 225. Ms. Walker determined that

27

the "boys" involved in the conversation were "Tristan, George,[13] Terrel, and a Nelson." *Id.*

78.     In an undated activity log submitted by another trial defense investigator, Alfred Smith, a re-interview of Anne Walker is noted. Ex. 39 (Activity Log #1 by Alfred Smith), at A. 226-27. Mr. Smith wrote that "Ann Walker Apt 2B [ ] states that when she heard the group of boys talking ... named Tristan, George, Terrell and a Nelson ... [t]hey were discussing what had happened to Clifton and it was wrong what they had done." *Id.* at A. 227.

79.     In another undated activity log submitted by Mr. Smith, notes of a conversation with Ms. Walker detailed that Ms. Walker "stated that she heard individuals talking about the incident and they stated that it wasn't right that they did that to him with his EBT card." Ex. 40 (Activity Log #2 by Alfred Smith), at A. 228.

80.     In an email from Mr. Smith to Mr. Johnson, dated June 4, 2013, Mr. Smith wrote that Ms. Walker told "the same story that she heard the boys talking outside her window and Tristan was among them." Ex. 41 (Email from Smith to Johnson, dated June 4, 2013), at A. 229.

---

[13]     Upon information and belief, Tristan McCall has a brother named George McCall, who also grew up in the NYCHA housing development known as the Monroe Houses. Ex. 42 (NYPD Arrest Report of George McCall, dated Sept. 3, 2008), at A. 230-32. George McCall was arrested on September 3, 2008 on robbery charges alleging that he "threaten[ed] the C/V with a loaded firearm while removing the C/V's personal property without permission or authority." *Id.* at A. 230.

28

81.     Additionally, former OAD staff attorney Mr. Wasserman and ADA Steed from the CIU spoke, on separate occasions, to Crystal Sanchez, and she consistently confirmed Mr. Little's alibi. Ex. 37 (OAD Letter to CIU), at A. 223; Ex. 11 (CIU Letter to OAD), at A. 36.

82.     Ms. Sanchez also told the CIU that when she dated Mr. Little, she observed that he kept his cash loose in his pocket but carried his benefit card as identification in his bi-fold wallet with other cards. Ex. 11, at A. 36. She specified that he never carried his cards loose. *Id.* Further, to Ms. Sanchez's knowledge, Mr. Little did not carry a gun. *Id.*

> *Eyewitness ID Expert Dr. Deryn Strange Concludes that the Circumstances Surrounding the Identification of Charles Little "Call into Question the Reliability of Jonathan Lopez's Identification"*

83.     On or about August 29, 2018, I spoke with Dr. Deryn Strange, Professor of Psychology at John Jay College of Criminal Justice and the Graduate Center of the City University of New York, Fellow of the Association for Psychological Science, and President of the Society for Applied Research in Memory and Cognition, about Mr. Little's case. *See* Ex. 43 (*Curriculum Vita* of Deryn Strange), at A. 233, 235, 248.

84.     Dr. Strange holds a Ph.D. in Psychology from Victoria University of Wellington (2005). *Id.* at A. 233. Her area of specialization is on memory distortion, particularly as it relates to traumatic memory. Ex. 8 (Affidavit of Dr. Deryn Strange), at A. 11. Dr. Strange has published 39 scientific papers in peer-reviewed psychology journals on the topic of human memory, and she routinely presents the

results of her research at national and international scientific conferences. *Id.*; *see also* Ex. 43. Dr. Strange has been qualified as an expert in memory errors in state, federal, and military courts approximately 40 times. Ex. 8, at A. 11.

85.     I asked Dr. Strange to review the portions of the transcript and record in this case concerning the eyewitness identification in order to identify any factors that may have affected the eyewitness's identification of Mr. Little after the eyewitness was robbed in his car on September 18, 2011. In order to make her assessment, I provided Dr. Strange with the Suppression Hearing transcript, Mr. Lopez's trial testimony, Officer Russo's trial testimony, a copy of Mr. Little's identification cards, approximately six pages of police reports, as well as photos and documents associated with the photo array and live lineup identification procedures.

86.     In a 14-page report, attached as Ex. 8, Dr. Strange concluded that, if called to testify at Mr. Little's trial, she would have testified that:

> [T]he factors discussed [in her affidavit] are evident in this case and call into question the reliability of Jonathan Lopez's identification of Charles Little. Where Mr. Lopez's viewing of Mr. Little's photo identification card in the backseat of his car likely functioned as a mugshot or show up identification, there is a risk of unconscious transference which could have influenced Mr. Lopez's subsequent identifications of Mr. Little. This unique post-event information was significant and may have inaccurately influenced Mr. Lopez's memory of the image of the assailant. Other factors that may have adversely affected the accuracy of Mr. Lopez's identification include, but are not limited to, cross-race impairment, weapon focus, stress, the limited time exposure, and the lighting. Importantly, the factors can and do have a cumulative effect on identification performance.

Ex. 8, at A. 24.

87.     Dr. Strange detailed the factors in her report, stating that the factors involved here could have contributed to an inaccurate identification by Mr. Lopez. The factors that Dr. Strange identifies include:

- **Cross-Race Identification**—Where, as here, there are differences between the racial backgrounds of an eyewitness and perpetrator, the risk of mistaken identifications is significantly increased, and the impairment is even greater with short exposure times. *Id.* at A. 16.

- **Post-Event Information**—Where, as here, an eyewitness learns information after an event has concluded, "[t]hat information can reinforce details of [one's] own memory of the event," but it can also "incorporate other details that [one] did not encode—that may or may not be correct—into [one's] own memory of the event." And, "[c]ritically, [the eyewitness does] not know that [his] memory has been altered." *Id.* at A. 17.

- **Weapon Focus**—Where, as here, an eyewitness observes a gun in the hand of the perpetrator, especially where that gun is pointed at his head, the weapon "reduce[s] [the eyewitness's] ability to later recognize the perpetrator." *Id.* at A. 14.

- **Stress**—Where, as here, an eyewitness reports experiencing fear, panic, or shock during the course of a crime committed against him, this extreme stress "debilitate[s] perceptual skills." *Id.* at A. 14-15.

- **Lighting**—Where, as here, an eyewitness observes an assailant under conditions of low lighting, the "ability to encode and thus remember a face will be poor." *Id.* at A. 13.

- **Short Exposure Duration**—Where, as here, an eyewitness has only limited opportunities to observe a perpetrator, the risk of a misidentification increases. *Id.* at A. 16-17.

- **Second Identification Attempts**—Where a "suspect appears in both a showup and a lineup, the chances the suspect will be identified increases substantially. Here, Mr. Little's photo identification card likely acted like a showup or mugshot, which increased Mr. Little's chances of being identified as the assailant in subsequent identification procedures." *Id.* at A. 18.

- **Non-Blind Presentation**—Where, as here, a non-blind lineup procedure is used with an eyewitness, the risk of a mistaken identification is significantly increased. *Id.* at A. 19-20.

- **Witness Confidence**—Where, as here, an eyewitness testifies confidently at trial, that "confidence at trial may be useless as an indicator of accuracy"; and yet, "jurors infer accuracy from confidence." In fact, confidence "is the most powerful single determinant of whether or not observers of that testimony will believe that the eyewitness made an accurate identification. *Id.* at A. 20-22.

- **Confidence Malleability**—An eyewitness's confidence is highly malleable and can be contaminated by "actors in the legal system" to the point where the eyewitness's in-court expression of confidence is "a meaningless indicator of the eyewitness's memory." *Id.* at A. 22.

88.    The viewing of Mr. Little's identification was overwhelmingly suggestive. Dr. Strange found that "[b]ecause the photo identification card that Mr. Lopez saw acted as post-event information, it may have influenced Mr. Lopez's memory of the assailant without Mr. Lopez's understanding that his memory had been altered." *Id.* at A. 17. She further explained that information retrieved after an event can be absorbed into memories of the actual event, "sometimes overwriting it, and we don't know the difference anymore." *Id.* at A. 18. Dr. Strange noted that, "Mr. Lopez had gathered information both during and post the event, which may help to explain how he identified Mr. Little in three separate identification procedures—a photo array, a lineup, and at trial—but also described the assailant at trial as "real taller" and "bigger" than him, where Mr. Lopez is 5'4" tall, and Mr. Little is only about an inch taller." *Id.* (citing T. 589, 661; Ex. 6 (Lineup Information Report)). Indeed, each further identification procedure likely made Mr. Lopez more prone to believe that Mr. Little was the robber. *See* Ex. 8, at A. 18-19.

89.     There are additional reasons to question the single-eyewitness cross-racial identification in this case. To begin, "[c]ross-race identifications are typically less accurate than own-race identifications" and the impairment increases with shorter exposure times. *Id.* at A. 16. Here, in the darkness of the night with only street lights and the dashboard to illuminate the assailant's face, T. 534, 540, 559, Mr. Lopez, who testified that he felt panicked and so nervous that he "couldn't really think straight," T. 540; *see also* T. 527, 537-38, 594, was likely in such a high state of stress that it worked to "debilitate [his] perceptual skills." Ex. 8, at A. 15. Additionally, where Mr. Lopez said that a gun was pointed just inches from his head throughout the robbery, weapon focus may have reduced Mr. Lopez's "ability to later recognize the perpetrator." *Id.* at A. 14.

90.     Finally, Dr. Strange pointed out that although Mr. Lopez testified confidently at trial that he "could never forget [Mr. Little's] face," T. 645, Mr. Lopez's confidence "may have been influenced by both the post event information of finding Mr. Little's photo identification card in his backseat, the photo array procedure conducted shortly thereafter, and the subsequent lineup a few months later," and thus, was not reliable. Ex. 8, at A. 21. Studies show that not only is confidence a poor predictor of identification accuracy, but also that jurors rely heavily on it. *Id.* "There is consistent evidence to indicate that the confidence that an eyewitness expresses in his or her identification during testimony is the most powerful single determinant of whether or not observers of that testimony will believe that the eyewitness made an accurate identification." *Id.* Further,

eyewitnesses are generally over-confident, with the most confident (reporting that they are 90-100% confident) having a 40% error rate in making identifications. *Id.* Worse still, the feedback that Mr. Lopez received when a police officer called him, asking him to come in to view a lineup, and explaining that "the person that robbed" him had been arrested and was in custody, T. 585-86, 656, may have contributed to Mr. Lopez's heightened confidence. Ex. 8, at A. 22 ("witnesses receiving feedback expressed significantly more . . . confidence in their decision compared with participants who received no feedback") (internal quotations omitted).

*Affirmation of Maria Sarah Tobia, Esq.*

91.   On November 5, 2018, Ms. Tobia signed an affirmation stating the following:

> During the course of my representation, I did not consult with an eyewitness identification expert about the complainant's eyewitness identifications of Mr. Little to determine how the complainant's memory and perception along with the police identification procedures could have affected the reliability of the identifications in this case.
>
> The issue of post-event information, where the complainant found Mr. Little's photo identification card in the backseat of his car and, shortly thereafter, identified Mr. Little as the assailant in a photo array, was a significant issue in this case.
>
> Furthermore, because post-event information is a technical issue that may adversely affect the accuracy of an identification and may not be commonly understood by jurors, it could have been helpful to call an expert at trial to educate the jury about the proper weight to give this evidence.

Ex. 44 (Affirmation of Maria Sarah Tobia, Esq.), at A. 251-52.

# EXHIBIT A

1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF BRONX: CRIMINAL TERM:   PART H-94
 2   -------------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3
 4              -against-              INDICTMENT NO.
                                      309/2012
 5
     CHARLES LITTLE,
 6
                                      Calendar call
 7
 8                                 Defendant.
     -------------------------------------------------X
 9                                 265 East 161st Street
                                   Bronx, New York 10451
10                                 July 10, 2013

11   B E F O R E:

12              HONORABLE DENIS J. BOYLE
                Justice of the Supreme Court
13

14   A P P E A R A N C E S:

15
                ROBERT T. JOHNSON, ESQ.
16              DISTRICT ATTORNEY OF BRONX COUNTY
                BY:  TODD DRANTCH, ESQ.
17              Assistant District Attorney

18

19
                MARIA TOBIA, ESQ.
20              Attorney for the Defendant
                888 Grand Concourse
21              Bronx, New York 10451

22

23

24
                           Valerie E. Monaco
25                         Senior Court Reporter
```

2

PROCEEDINGS

1          THE CLERK:  Coming out.  This is number 13 on the

2     calendar, Charles Little.

3          MS. TOBIA:  Maria Tobia for Mr. Little, 888 Grand

4     Concourse.

5          MR. DRANTCH:  Todd Drantch for the Office of the

6     District Attorney.  Good afternoon, Your Honor.

7          THE COURT:  Good afternoon Mr. Drantch.

8          Yes, Ms. Tobia?

9          MS. TOBIA:  Judge, first of all, let the record

10    reflect I did have an opportunity to speak to Mr. Little

11    earlier in the day and that was the first opportunity that

12    I had to convey to him that I had personally spoken to

13    Crystal Sanchez after the conviction at his trial.  I spoke

14    to her today.

15          Ms. Sanchez relayed to me that her cellphone had

16    been shut off for an extended period of time due to a

17    nonpayment of her bill and that it came back on some time

18    in late June or early July.  That's one factor why we

19    couldn't reach her that day.  Of course my client at some

20    point had a phone number for her but we couldn't find her

21    as Your Honor is aware.  Also the address we located her at

22    is not an address that's in the record here at all.  So it

23    was a phone situation we were able to find her, I believe,

24    after the trial.

25          Today I spoke to her on the telephone earlier in

3

PROCEEDINGS

1    the day and she relayed to me the following information and

2    it's basically this information that I'm asking for an

3    adjournment to file a motion to set aside the verdict based

4    on newly discovered evidence.

5         I also indicate that we did do our best efforts

6    to locate her and that I was not Mr. Little's first

7    attorney.  So I had no personal contact with Ms. Sanchez at

8    the time my client proffered her to the Grand Jury.  And I

9    only became my client's attorney almost two years after the

10   case had been pending.  And I just want that to be placed

11   on the record.  So it's not as if I lost track of her

12   during the pendency.  I've never met her before and had no

13   way of reaching her.

14        Ms. Sanchez related to me information that's

15   supporting my client's alibi which -- Judge, I have sit

16   down.  Is it okay?

17             THE COURT:  Oh, by all means.

18             MS. TOBIA:  Which I was not surprised about

19   because, of course, she had been proffered by my client for

20   Grand Jury and I assume that the prior counsel knew her.

21        I then proceeded to ask her some questions about

22   whether or not she had ever spoken to Tristan McCall about

23   this incident or anything at all.  And she did relay to me

24   then some very interesting information that was not in my

25   client's possession or my possession or anyone's possession

4

PROCEEDINGS

1    prior to the trial and she had no contact with anyone

2    associated with the trial during the trial just so the

3    record is clear, not my client's family, nor his current

4    wife, nor myself or Mr. -- nor mine client nor I could find

5    her.

6         What she said basically was that Tristan McCall

7    had asked how my client was holding up.  She relayed that

8    he wasn't holding up very well at all, that he was upset.

9    And Tristan started discussing the circumstances of the

10   alleged crime which, as Your Honor is aware, we believed

11   that -- and we still believe -- that Tristan McCall

12   committed this crime.

13        Specifically Tristan McCall spoke to her

14   regarding what she describes to me as a double ring which

15   is consistent with my client's testimony about a double

16   ring being taken, a ring that went on two fingers.  And

17   that the ring, according to Tristan McCall's conversation

18   with Crystal Sanchez, would not come off and that he had to

19   pull it and that he hurt the guy.

20        And in addition the person that we believe was

21   the actual perpetrator, Tristan McCall, discussed with

22   Crystal Sanchez that -- this I did tell the People earlier

23   today that he was at Sin City, that he did watch the fight

24   at Sin City because this fight was also going on in Sin

25   City and that it was the night of the fight that he did not

5

PROCEEDINGS

1    discuss it.  My client was not at Sin City as he said,

2    watched the fight with Crystal Sanchez and she supported

3    that testimony when I interviewed her.  And that the

4    person, Tristan McCall, relayed to Crystal Sanchez that he

5    tucked his braids under a hat, a baseball hat, during the

6    alleged -- during the robbery.  Oh, another fact is that he

7    also described the person, the victim, as a Spanish kid.  I

8    believe that was the language.

9              So that is the sum and substance of what she told

10   me.  I found this out today.  My client was unaware of this

11   information completely.  And I actually only asked her

12   these things in passing because I was under the impression

13   that mostly her testimony would have to do with the alley.

14   And I was not aware that Tristan had any contact with her

15   during any period that my client was incarcerated other

16   than that first day that they came together to visit my

17   client.  Had this information been available to me, I would

18   have called her as a witness.  I think it would have had

19   very strong potentiality to change the verdict.  I think

20   that information, given the specificity, is admissible and

21   in conjunction, of course, with my client's testimony about

22   the card and the visit that Tristan McCall made to him at

23   the boat.

24              So I'm asking Your Honor for an opportunity to

25   further speak to Ms. Sanchez because I have not had an

6

PROCEEDINGS

1    opportunity to speak to her completely.  I'd like to

2    interview her at length at my office.  Today was not a day

3    that I could do that because of the number of cases I had

4    on and that I'm not feeling particularly well today.  And

5    if the People want to interview her, I have no problem with

6    that.  I would like to be present.  I don't know what her

7    position is.  But, of course, that's up to Ms. Sanchez.

8    And I think that this is very significant information that

9    could have resulted in a different verdict and there's

10   nothing to tie my client to this crime but for the

11   identification and the benefit card and I think that --

12           THE COURT:  So you're asking for an adjournment

13   of sentence?

14           MS. TOBIA:  Yes.

15           THE COURT:  Do you want to be heard, Mr. Drantch?

16           MR. DRANTCH:  Your Honor, with regards to

17   whether -- as far as the substance of whether this is newly

18   discovered evidence or not and any response, I'm going to

19   reserve that for when a motion is filed so I can adequately

20   respond to it.

21           With regards to an adjournment my understanding

22   is that this kind of motion will be made in a 330 or 440

23   type motion.  Therefore, I will -- the People have no

24   position on the adjournment.  We'll leave it to whatever

25   Your Honor wants to do.  The People are prepared to go

PROCEEDINGS

1    forward with sentencing today.  We were prepared to go

2    forward with sentencing two weeks ago.  We have only been

3    told about this information with Your Honor today.  This

4    afternoon we did have a conversation off calendar prior to

5    the call but it was today that we first learned of this

6    information.

7              So if Your Honor wishes to go forward with

8    sentencing, the People have no objection to that.  If Your

9    Honor wishes to adjourn the case, the People have no

10   objection to that either.

11             THE COURT:  Okay.  I'll reserve on sentence and

12   adjourn these proceedings insofar as your ability to

13   interview this individual and consider whether you intend

14   to file a 440 motion I'll call it.  How long will this all

15   take?

16             MS. TOBIA:  A little bit of time, Judge.  But

17   not -- is there a time this summer that you will not be

18   available?

19             THE COURT:  Well, I'll be back and available as

20   of around August 19th.  But if there's going to be a

21   motion submitted in the meantime, the People will need an

22   opportunity to respond.  I'm just trying to get a ballpark

23   sense as to when to calendar this case.

24             MS. TOBIA:  I would say that I need at least two

25   weeks really to interview her, to do the research and write

8

PROCEEDINGS

1   something.

2           THE COURT:  Mr. Drantch, are you available?

3           MR. DRANTCH:  My availability, as I know it right

4   now, is I don't believe I will be available the last two

5   weeks in August.  And then we have the holidays the first

6   week in September.  So any time after the 9th would be --

7           THE COURT:  How's September 20th in this part

8   for both sides?

9           MR. DRANTCH:  That's fine.

10          MS. TOBIA:  That's fine.  And I'll do my utmost

11  to get the papers in within two weeks.  If we are going to

12  go all the way to September I ask for three.

13          THE COURT:  As a practical matter, you don't have

14  to get your papers in within two weeks but I will have this

15  on my calendar for September 20th for further

16  proceedings.

17          MS. TOBIA:  I understand, Judge, thank you.

18          MR. DRANTCH:  Oh, People are requesting an

19  extension of the order of protection.

20          THE COURT:  I will extend the order of

21  protection.

22          Certified to be a true and accurate transcript of

23  the stenographic minutes taken within.

24                          Valerie E. Monaco
                            Senior Court Reporter
25

# EXHIBIT B



**OAD** OFFICE OF THE APPELLATE DEFENDER

11 Park Place, Suite 1601, New York, NY 10007 | Tel. 212 402 4100 | Fax 212 402 4199

www.appellatedefender.org

December 1, 2016

Gina Mignola, Esq.
Bureau Chief, Conviction Integrity Unit
Office of the District Attorney, Bronx County
198 East 161st Street
Bronx, New York   10451

Re:          *People v. Charles Little*
Ind. 309-2012

Dear ADA Mignola:

ADA Stanley Kaplan suggested that I contact you about this case. I had spoken to him about putting the direct appeal on hold so that the Conviction Integrity Unit could review evidence we've unearthed of Mr. Little's actual innocence.

This case is in a somewhat unusual procedural posture: we discovered evidence of Mr. Little's innocence *after* I had already filed the direct appeal brief. ADA Kaplan has responded to this brief, and it is currently scheduled to be heard in the January 2017 term. If we are to submit an adjournment request—which I would be happy to do—it is due on December 8, and my reply brief is due December 16. For this reason, all parties would need to know as soon as possible whether CIU intends to review this case now, or whether we should come back, if need be, after the direct appeal is concluded.

Below I will summarize the relevant facts of this case, our reinvestigation, and why we think this case deserves a hard look from CIU. In short, we have discovered credible evidence that an alternate perpetrator, Tristan McCall, committed the robbery in this case. (Mr. McCall is currently on probation for committing a 2014 robbery in Manhattan.) The most damaging evidence against Mr. Little at trial was two ID cards belonging to him that were found in the back seat of the complainant's car. Although Mr. Little testified that Mr. McCall had borrowed these cards, the evidence we have found of Mr. McCall's involvement was not before the jury.

<u>The events of September 17, 2011, and the subsequent police investigation</u>

Mr. Little was convicted of a gunpoint robbery that occurred at about 1:00 a.m. on September 17, 2011 in a car on a dark street in the South Bronx. The complainant, Jonathan

Lopez, had spent several hours in a strip club (Sin City) prior to the robbery. Although he denied being drunk, after being robbed he went to sleep in his car, only waking up at 9:30 or 10:00 a.m. the next day.

Upon waking up, Mr. Lopez found two ID cards belonging to Mr. Little lying loose in the backseat of his car. One of these cards (a benefits card) had Mr. Little's photo on it. After looking at these cards, Mr. Lopez went to the 40th Precinct. Detective Anthony Russo conducted a photo array, using a mug shot of Mr. Little that closely resembled the photo on his ID card. (Mr. Little was under supervision for a drug sales conviction at the time of this incident, but he had never previously been convicted of a violent crime.) Predictably, the complainant picked out the photo that looked just like the ID card he had found in the backseat of his car:









The complainant subsequently identified Mr. Little as the robber in a later lineup and at trial.

There are several reasons to question the single-eyewitness cross-racial identifcation in this case. (The complainant is Hispanic.) In addition to the complainant likely being drunk, the identification was made under conditions of duress, with poor lighting and weapons focus; these are all factors that eyewitness ID studies have found contribute to faulty eyewitness identifications.[1] And, most importantly, the viewing of Mr. Little's identification was overwhelmingly suggestive; after seeing a single photo of Mr. Little under conditions suggesting that he was the perpetrator, it is little wonder that the complainant identified him to the police in a photo array and at a lineup, then at trial.[2] Indeed, each further identification procedure likely made him more prone to believe that Mr. Little was the robber. However, while the jury was charged on single eyewitness identifications and defense counsel argued that Mr. Lopez was too drunk to make a reliable identification, the jury did not hear any expert eyewitness identification testimony or argument about the factors present in this case that produce false identifications.

After Mr. Lopez made a confirmatory ID of Mr. Little in the photo array, the police essentially conducted no further investigation. Not only did they not process the complainant's car for physical evidence, they didn't even bother to go find out where it was, despite the fact that it was nearby and the complainant could not name the street where he parked because he was unfamiliar with the area. And, although he canvassed for video, Detective Russo only looked for video covering the specific location where he surmised the complainant had parked, and nowhere else. The bulk of the police efforts went toward finding Mr. Little, which took until January 2012.

Charles Little's testimony at trial

Mr. Little testified at trial that he had an alibi for the night in question—he was watching a pay-per-view fight with his then girlfriend, Crystal Sanchez-Moore, and her family.[3] He also testified that his friend Tristan McCall had taken his EBT card and health care card as collateral for an unpaid debt several days prior to this incident. He had not said that Mr. McCall had these cards when he testified before the grand jury; instead, he stated that he had lost them. He had also not mentioned that Mr. McCall had his EBT card when he reported it lost. He testified at trial that, initially, he didn't want to point the finger at Mr. McCall because they had been friends since they were nine years old. But he decided to testify against Mr. McCall by the time of trial

---

[1] Nat'l Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* 1, 72 (2014), *available at* http://www.nap.edu/catalog/18891/identifying-the-culprit-assessing-eyewitness-identification.

[2] *See id.* at 66–67; *see also* C.A. Morgan III, et al., *Misinformation Can Influence Memory for Recently Experienced, Highly Stressful Events*, 36 Int'l J. L. & Psychiatry 11, 16 (2013).

[3] No alibi witnesses came forward at trial to support Mr. Little's defense. Defense investigators testified about their failed attempts to locate these witnesses in order to avoid a missing witness charge.

because he no longer considered Mr. McCall his friend, and he didn't want to take the fall for something someone else did.[4]

Mr. Little also explained that he did not report to probation for several months after this incident because he was aware that the police were looking for him for a crime he did not commit. He could not afford to retain counsel, and was thus afraid to turn himself in.

OAD's re-investigation of this case

This summer, after I had filed a brief, OAD's investigator spoke to a woman, Ann Walker, who heard Tristan McCall confessing to this crime. Mr. McCall was overheard expressing his guilt to some friends for what was happening to Mr. Little and saying that he thought he had left Mr. Little's identification behind. Ms. Walker heard this conversation from her apartment, which is located on the 2nd floor of the Bronx NYCHA development where Mr. Little and Mr. McCall grew up, directly over the building's breezeway.

Ms. Walker, a senior citizen, is on good terms with the local NYPD community affairs officers and works for her building's tenant patrol. She has no evident motive to lie. She expressed fondness toward Mr. Little, and is upset that he is doing a lengthy prison bid for a crime he may not have committed, but has no significant relationship with him.

Ms. Walker told our investigator that she had relayed this information to a NYPD community affairs officer, who told her to protect herself and not to get involved. Ms. Walker also said that she had spoken to a defense investigator at the time of trial, but then had subsequently deliberately absented herself on the day that he was supposed to meet her because she was worried about being involved. I spoke to defense investigator Bernard Johnson, who told me that one of his employees had spoken to Ms. Walker but that when Mr. Johnson went to meet with her she wasn't there. He did not recall if he had ever spoken to her himself. Ms. Walker has let us know that she does not want to get involved with court proceedings, but indicated that she may be willing to speak to the police.

There are several other interesting things our investigation turned up. I spoke to Mr. Little's sister, Darshini Little, on the phone, who confirmed that Mr. Little was in the habit of

---

[4] In addition to being confronted with his inconsistent statement to the grand jury, Mr. Little was also confronted with the fact that Detective Russo testified that Mr. Little had stated that he had been outside of the Sin City strip club on the night in question. Mr. Little denied making this statement. And there was no paper trail showing that Mr. Little made this statement: the only document memorializing Detective Russo's attempt to interview Mr. Little was a DD5 that did not mention this alleged statement.

lending Mr. McCall his benefits card to use his food stamps. I also spoke to Crystal Sanchez-Moore over the phone, who confirmed Mr. Little's alibi.

Following trial, defense counsel Maria Tobia also spoke to Crystal Sanchez-Moore, who told Ms. Tobia that Mr. McCall confessed to her some details of the robbery that only the perpetrator would have known. (It is my understanding that Ms. Sanchez-Moore was not present during the trial.) Defense counsel put this information on the record on July 10, 2013. *See* Exhibit A (Minutes of July 10, 2013 appearance). The court advised Ms. Tobia to file a 440, but she never did so. When I spoke to Ms. Tobia on the phone, she said that whatever she said on the record was what had been told to her. However, she had no independent recollection of what Crystal Sanchez-Moore told her, nor did she recall why she ultimately didn't file a 440.

*     *     *     *

While perhaps not a case of prosecutorial misconduct or police malfeasance, this appears to be a case of tunnel blindness. The police were literally handed a suspect and never did any further investigation. And when you look closely at the evidence, it crumbles. Mr. Little explained his inconsistent testimony—he wanted to protect his friend. The suggestiveness of seeing Mr. Little's ID cards in the backseat, especially when coupled with the poor conditions to observe the robber's face, make the single-eyewitness identification in this case wholly unreliable. Far from independently corroborating the ID cards in the backseat, it cannot be separated from their discovery. Finally, there is evidence that Mr. McCall, not Mr. Little, had Mr. Little's benefit card at the time of this crime.

However, the main reason we are bringing this case to CIU's attention is because there is credible evidence of innocence, not presented at trial, which points to an alternate suspect. Ann Walker, who overheard Tristan McCall confess to this crime, has no ax to grind. She is a member of her building's tenant patrol, with a friendly relationship with the NYPD. Further, although this is Mr. Little's only conviction for a violent felony, Mr. McCall pled guilty to a robbery in Manhattan that bears marked similarities to this one. *See* Exhibit B (Criminal Complaint for New York County Indictment No. 1243-2014).While it involved a knife, not a gun, and took place on the Lower East Side rather than the South Bronx, both robberies occurred very late at night and were of unaccompanied men coming from night life areas.

Our request for CIU is simple: we ask that someone from the Bronx District Attorney's office go out to interview Ms. Walker. (We can provide you with her contact information.) If your team finds her information to be credible, we would then ask you to discuss next steps with us.

Thank you for your time and attention. Please do not hesitate to contact me if you have any questions, or if I can provide any additional information. I can be reached at (212) 402-4146 or mwasserman@appellatedefender.org.

Sincerely,

Matthew Wasserman
Staff Attorney

Encls.

CC:    Joe Nursey, Supervising Attorney
       Anastasia Heeger, Senior Staff Attorney

6



**DARCEL D. CLARK**
DISTRICT ATTORNEY

---

Seth Steed
Conviction Integrity Unit

198 East 161ˢᵗ Street
Bronx, NY 10451

Direct Dial (718) 838-7565
Fax (718) 590-6523

April 6, 2017

**VIA EMAIL: mwasserman@appellatedefender.org**
Mr. Matthew Wasserman
Office of the Appellate Defender
11 Park Place, Suite 1601
New York, NY 10007

Re:   <u>People v. Charles Little, Ind. 309-12</u>

Dear Mr. Wasserman:

A jury convicted Mr. Little of first-degree robbery. You perfected Mr. Little's appeal and Bronx Assistant District Attorney Stanley Kaplan filed a response on behalf of the People. Then, at your request, the appeal was stayed so that the Conviction Integrity Unit could review the case. In particular, by letter dated December 1, 2016, you requested that the Conviction Integrity Unit interview Mrs. Ann Walker.

On January 11, 2017, the Conviction Integrity Unit interviewed Mrs. Walker. Although we believe that you are already aware of any evidence that Mrs. Walker may have to offer, please be advised that we are disclosing to you the following information in accordance with our obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and the United States and New York State Constitutions.[1]

Mrs. Walker told the Conviction Integrity Unit that, on an unknown date, possibly at the end of September 2011 (prior to Mr. Little's arrest), during an early afternoon, Mrs. Walker was watering her plants at the windowsill of her living room window, which overlooks the front entrance of the building. Her window was open. She observed Tristan McCall and others in front of the building. Mrs. Walker heard Mr. McCall tell the group that Charles Little had lent his EBT card to Mr. McCall and that Mr. McCall said that he had accidentally left the EBT card in a cab. Mrs. Walker identified another individual who was present for that conversation. Mrs. Walker told her caretaker about the conversation. Mrs. Walker also told another individual about the conversation, and that individual cautioned her not to get involved.

---

[1]   (*See* trial transcript at pg. 1095, wherein defense counsel states "I have personally spoken to Ms. Walker on a couple of occasions ....").

Additionally, on January 31, 2017, the Conviction Integrity Unit interviewed Crystal Sanchez. Once again, we believe that you are already aware of the evidence that Ms. Sanchez may have to offer.[2] Nevertheless, please be advised that we are disclosing to you the following information in accordance with our obligations under *Brady*, and the United States and New York State Constitutions. Ms. Sanchez stated that she formerly dated Mr. Little and that Mr. Little kept his cash loose in his pocket, but carried his benefit card as identification in a wallet (a bi-fold wallet) with other cards. He never carried his cards loose. Mr. Little did not carry a gun to her knowledge.

Ms. Sanchez also recounted that, on September 17, 2011, Mr. Little was with Ms. Sanchez at her mother's home. They had a small party for the Mayweather fight. Also present in the apartment were her sisters and Tristian McCall. They all remained in the residence for the entirety of the fight. Mr. Little remained with Ms. Sanchez for the remainder of the evening, except for walking outside one time for approximately 15 minutes. Mr. Little and Ms. Sanchez were physically intimate, and they went to sleep after 2:00 a.m. She woke up early, around 9:00 to 10:00 a.m. on September 18, 2011, and Mr. Little was heading out of the residence. In Ms. Sanchez's opinion, she did not believe that Mr. Little was capable of committing a gun point robbery.

At this point, the Conviction Integrity Unit has have reviewed files, transcripts, briefs, and court decisions. We have interviewed witnesses, and considered potential new avenues of investigation. We have given this case a great deal of consideration, but we did not find *credible* evidence establishing that Mr. Little is actually innocent, or that he was wrongfully convicted. As such, the Conviction Integrity Unit will not take any further action in this matter at this time.

We did want to bring one other thing to your attention. Attached, please find a six page document containing prison visitor information related to your client. The records appear to show that Jonathan Lopez attempted to visit your client on or about January 19, 2017. I checked with NYS Department of Corrections and Community Supervision, and Clinton Correctional Facility, and both confirm that no such visit, or refusal of a visit, ever took place. The notation referencing Mr. Lopez is a clerical notation of the date that the order of protection against your client, in Mr. Lopez's favor, was entered into the prison information system.

Thank you for bringing this case to our attention. We welcome the opportunity to review evidence that suggests that someone is actually innocent or was wrongfully convicted. Please direct any questions regarding the continued litigation of this case to ADA Stanley Kaplan. Of course, once the litigation is complete, you can always ask the Conviction Integrity Unit to review the case again, particularly if there is new evidence for us to consider.

Sincerely,

Seth Steed
Assistant District Attorney

---

[2]      (*See People v. Little*, 36 Misc.3d 1237(A) at *2 (Sup. Ct. Bronx Co. 2012) ("Defendant testified that on September 17, 2011, he was present in Debra E.'s home with … Crystal S. watching a boxing match ….").

2

SUPREME COURT OF THE STATE OF NEW YORK
BRONX COUNTY: CRIMINAL TERM

THE PEOPLE OF THE STATE OF NEW YORK,

     Respondent,

        – against –

CHARLES LITTLE,

       Defendant-Appellant.

Ind. No. 309/2012

MARIA SARAH TOBIA, ESQ., an attorney duly admitted to practice in the State of New York, hereby affirms the following under penalties of perjury:

1. I am making this affirmation in connection with Charles Little's motion, pursuant to Criminal Procedure Law § 440.10, to vacate his conviction.  This affirmation is made on information and belief, the sources of which are my review of my file in connection with this case and my memory of my representation of Mr. Little at the trial level.

2. I was assigned to represent Charles Little for trial under Bronx County Indictment Number 309/2012.

3. During the course of my representation, I did not consult with an eyewitness identification expert about the complainant's eyewitness identifications of Mr. Little to determine how the complainant's memory and perception along

1

with the police identification procedures could have affected the reliability of the identifications in this case.

4. The issue of post-event information, where the complainant found Mr. Little's photo identification card in the backseat of his car and, shortly thereafter, identified Mr. Little as the assailant in a photo array, was a significant issue in this case.

5. Furthermore, because post-event information is a technical issue that may adversely affect the accuracy of an identification and may not be commonly understood by jurors, it could have been helpful to call an expert at trial to educate the jury about the proper weight to give this evidence.

Dated:      New York, NY
            October ⸺ 2018
            _November_

                                        _MARIA SARAH TOBIA, ESQ._

2

SUPREME COURT OF THE STATE OF NEW YORK
BRONX COUNTY

------------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,   :

                              :        **AFFIDAVIT**

                              :

        -against-           :        Ind. No.  309-2012

                              :

CHARLES LITTLE,               :

                 Defendant.     :

------------------------------------------------------------------------x

STATE OF NEW YORK   )
COUNTY OF NEW YORK )

      BRANDI ALEXANDER, being duly sworn, under penalty of perjury hereby deposes and says:

    1.     I am a private investigator, and I was hired by the Office of the Appellate Defender in connection with the above-referenced case.

    2.     On July 9, 2016, around 7:30 p.m., I interviewed Anne Walker, a 79 year old woman, at her home at 1762 Story Avenue, Apartment 2B, located on the second floor of an apartment building that is part of the Monroe Houses, a Bronx NYCHA development. I identified myself to Ms. Walker as an investigator working for the Office of the Appellate Defender on Mr. Little's behalf. Ms. Walker's in-home caretaker Joyce Adams was present when I first entered the apartment, but she went to another room during the interview.

    3.     Ms. Walker said that she was employed as the Community Director for the Monroe Houses, which involves tenant patrol and community affairs, and that she works closely with on-site NYPD community affairs officers. Ms. Walker stated that she had been doing this work for about 20 years and was in this same position in 2011.

    4.     Ms. Walker said that she knew Mr. Little and watched him grow up. She expressed that she was fond of him and his sister but that she did not have a significant relationship with Mr. Little. Ms. Walker knew that Mr. Little was serving a lengthy prison sentence after being convicted of a robbery.

5.     Ms. Walker also told me that she knew Tristan McCall from the building.

6.     Ms. Walker recalled that in late September 2011, as she was standing near her open window in the living room, she heard a commotion and looked out the window. She then observed and heard a conversation among Tristan McCall and some of his friends. She explained that she knew all of the men involved in the conversation. She heard Tristan say that he felt bad about what was happening to Mr. Little and that he thought he left Mr. Little's identification behind in a cab.

7.     Ms. Walker said that she relayed this information to an NYPD community affairs officer, who told her to protect herself and to not get involved.

8.     On December 9, 2017, at about 4:40 p.m., I interviewed Joyce Adams, Ms. Walker's in-home caretaker, at 1762 Story Avenue, Apartment 2B, in the Bronx.

9.     Ms. Adams said that although she did not personally overhear a conversation among Tristan McCall and his friends, Ms. Walker told her about the conversation on the same day that Ms. Walker had heard it. Ms. Walker told Ms. Adams that she heard through her open window Tristan and some guys talking about how Tristan borrowed Mr. Little's benefits card and left it in a cab.


_B. Alexander_
BRANDI ALEXANDER

Sworn before me this 25th
day of October, 2018

_Nina Butler_
NOTARY PUBLIC

DIANA BUTLER
Notary Public - State of New Jersey
Commission # 2164678
My Comm. Expires Apr. 20, 2019

34

**AFFIDAVIT OF EXPERT DERYN STRANGE, PH.D.**
**PEOPLE V. CHARLES LITTLE, 309-2012**

### I. Expertise of Witness

My name is Deryn Strange, PhD. I have been asked by counsel to examine portions of the Charles AKA Clifton Little case file in order to identify factors that could have contributed to a misidentification by the witness in this case and about which I would be prepared to testify at the trial of Mr. Little.

My qualifications are as follows:

I am a Professor of Psychology at John Jay College of Criminal Justice and the Graduate Center of the City University of New York, where I teach courses at the undergraduate and graduate levels and conduct research in the field of memory and psychology and the law. My particular research focus is on memory distortion, particularly as it relates to traumatic memory. Prior to my academic appointments, I received extensive training (in both teaching and research) in the study of human memory at Victoria University of Wellington (New Zealand), where I completed both my PhD and undergraduate degrees, and at the University of Otago (New Zealand) where I completed my postdoctoral training. Specifically, I received my PhD in 2005, my BSc (Hons) in Psychology in 2001, and BA in Psychology and Education in 2000. I have published 39 scientific papers concerning the topic of human memory in peer-reviewed psychology journals. I have received grants to fund my research. I have also served as an ad hoc reviewer for prestigious psychology journals. In addition, I am a Fellow of the *Association for Psychological Science,* and I am the President of the *Society for Applied Research in Memory and Cognition;* both are international societies. I routinely present the results of my research at scientific conferences both nationally and internationally, and I am a member of several professional scientific organizations including the *Association for Psychological Science,* the *Society for Applied Research in Memory and Cognition, Psychonomic Society, American Psychology-Law Society* and *Women in Cognitive Science.* Thus, I have access to the latest research in my field. My curriculum vita is attached to this report. Finally, I have been admitted as an expert in memory errors in state, federal and military courts approximately 40 times.

I was provided with a copy of the following documents:
- Jonathan Lopez Trial Testimony
- Lineup and Related Documents
- Officer Russo Trial Testimony
- Photo Array and Related Documents
- Photo ID Card
- Police Documents related to the Identifications
- Suppression Hearing Transcript

In the sections below I discuss how memory works, the general problem of mistaken identifications, and highlight research findings relating to the factors that come into play in this case. In doing so, I am not commenting on the credibility of any witness nor expressing an opinion about the reliability of any identification in this case. Rather, the research findings provide background information that would be useful to a jury when it makes its assessments of eyewitness evidence and witness credibility.

### II. General Overview of Eyewitness Memory Research

Despite its intuitive appeal as a metaphor, memory does not function like a digital video recorder. We do not remember everything that ever happened to us; we are unable to pinpoint a particular point in

1

time and play that moment back unedited. Instead, retrieving a memory is a *reconstructive* process of putting together traces, which can involve components of the original experience, but also assumptions and new information we learned after the event that fill the gaps in our memory (see for reviews, Lindsay & Read, 1994; Loftus & Bernstein, 2005; Schacter, 2001).

The simplest model of how memory works describes a three-stage process: encoding, storage, and retrieval. There are factors at each stage that can affect the reported memory. First, is encoding: for something to be remembered later, it must be entered into our memory system. That means that we have to pay attention to it (Chabris & Simons, 2010). Unfortunately, we have limited attentional capacity and thus cannot focus on all environmental stimuli at once. Therefore, we make choices about where to focus our attention. Those choices are governed by the situational demands. Because the demands of an experience are different for each person—ranging, for example, from a person's viewing perspective to their goals and prior experience—people's accounts of an event can differ in both small and large ways (Echterhoff, Hirst, & Hussy, 2005; Gabbert, Memon & Allan, 2003; Gabbert, Memon, & Wright, 2006).

Second, is storage: which is the act of retaining information in memory for a period of time. During this phase, every time the memory is activated in some way—such as, reading an article about the event or talking to other people—it will be slightly altered. That is, we can begin to incorporate other details into our memory that we did not see but that other people reported to fill in the gaps in our knowledge of the event (Loftus, 1996). Critically, because we do not store each detail of a memory with a tag or a label specifying its origins (e.g., 'event,' 'person A'), we cannot easily determine the details we actually experienced versus those that we did not (Johnson, Hashtroudi & Lindsay, 1993; Lindsay, 2008).

Third, is retrieval: which is the simple act of reporting on the event. Retrieval will be affected by the kinds of questions we are asked. Thus some details will be reinforced on each retelling of the event and will, therefore, be better remembered over time, while other details will be forgotten. Indeed, for over a century, we have known that memory weakens over time (Ebbinghaus, 1913; Schacter, 2001), even for significant events (Loftus, 1996). Put differently, memory is more accurate immediately after an event than a day, a week, or years after the event. Importantly, this is true for all events, even those we swear we will "never forget," such as 9/11 (Talarico & Rubin, 2003). To summarize then, normal human memory is a reconstructive process prone to error.

### III. The Problem of Eyewitness Identification Errors

**Archival Studies Show that Mistaken Identification is the Primary Cause of Erroneous Convictions.**
Several legal scholars, beginning with Borchard (1932), have studied the causes of mistaken identification in over 1,000 criminal cases (see also Brandon & Davies, 1973; Frank & Frank, 1957; Huff, 1987; Huff, Rattner & Sagarin, 1986).  Huff (1987) concludes, on the basis of studying 500 cases of erroneous conviction, that the single leading cause of mistaken conviction was erroneous eyewitness identification of the defendants.  He states that eyewitness error was involved in nearly 60% of the cases he studied. Rattner's (1988) analysis of 205 cases of wrongful conviction demonstrated that over 50% were attributable to mistaken identifications (also see Borchard, 1932). This rate is all the more remarkable given that some commentators estimate that eyewitness identifications are prominent in only 5% of trials (Loh, 1981).

**The Predominant Form of Defective Evidence in DNA Exonerations Is Eyewitness Identification.** More recently, the prominence of mistaken identifications as a source of erroneous convictions has been reaffirmed by the results of exonerations based on DNA evidence.  By 1998 post-conviction DNA testing had freed 62 persons in the United States convicted by juries of crimes that they did not commit—8 of whom were sentenced to death. In Scheck et al.'s (2000) analysis of the first 62 cases, 52

2

were mistaken eyewitness identification cases with a total of 77 mistaken eyewitnesses *(that is, many defendants were misidentified by more than one witness)*. University of Virginia Law Professor Brandon L. Garrett has systematically examined the first-200 DNA exculpation cases in which the innocent people served an average of 12 years in prison. Garrett (2008) reports that the leading cause of the wrongful convictions was erroneous eyewitness identification—which occurred in 79 percent of the cases. In a quarter of the cases, eyewitness testimony was the *only* direct evidence against the defendant. The Innocence Project website indicates, as of September 2018, 253 of the 362 DNA exonerations were based on misidentification evidence (70%), and more than a third of the misidentification cases had 2 or more witnesses who made misidentifications.

## IV. Factors that Influence the Accuracy of Identifications

In the following sections, I describe the relevant scientific foundation on which I base my opinions. The science I rely upon has been generally accepted in the scientific community for many decades (see, e.g., Kassin, Ellsworth, & Smith, 1989; Kassin, Tubb, Hosch, & Memon, 2001; Schmechel, O'Toole, Easterly & Loftus, 2006). Indeed, the data supporting my opinions has been gathered over the past century primarily using controlled laboratory research as a means of identifying basic scientific principles. Much of this research has been funded by research grants from national agencies, including the National Science Foundation, the National Institutes of Health, along with military research arms such as the Air Force and the Naval Offices of Scientific Research and the Defense Advanced Research Projects Agency. The results of such research studies have been published in peer-reviewed journals in the fields of Biology, Computer Science, Neuroscience, and Psychology, as well as in the premier cross-discipline journals: *Nature* and *Science*. Moreover wherever possible I will report the results of meta-analytic studies. Meta-analysis is where researchers statistically combine the results from a large body of literature. It is an attempt to quantify an approximate effect of a particular variable. The benefit of meta-analysis is that it can capitalize on larger numbers of participants than are often found in individual studies so we end up with a more reliable statistical inference about what the real effect is. It also allows us to neatly summarize a large body of literature.

### Lighting

Here, the crime occurred at nighttime. We know from the record (Trial, p. 534) that there were some lights in the car emanating from the dashboard and radio and that there were streetlights outside (e.g., p. 559 "it was dark but there were streetlights"). Under conditions of low lighting, vision is accomplished using the *scotopic visual system*, which is unable to detect either the color or the detail that is necessary to encode a person's fine-grained features (e.g., facial features). Put differently, reliance on the scotopic visual system will quite obviously mean that ability to encode and thus remember a face will be poor (Wandell, 1995). Moreover, encoding the details of a face using only streetlights as a source of light is unlikely to help for several reasons: (a) streetlights are quite dim by design, (b) streetlights are, in general, relatively sparsely placed along the street, and (c) streetlights provide only partial illumination of a person, and that too is dependent on the distance of the witness (Wandell, 1995).

Wagenaar and colleagues have studied the ability of witnesses to recognize faces at varying distances and levels of illumination. For example, Wagenaar and Van der Schier (1996) simulated situations in which witnesses viewed an individual at one of nine different illuminations varying from 0.3 – 3000 lux: 0.3 lux is equivalent to the light we have on a night with a full moon, and 3000 lux is the amount of illumination on a day with a few clouds. After viewing the people, they saw lineups and were asked to select the person they had seen. They found that as lighting conditions improved so did the odds that they would correctly select the correct face. At .03 lux, people were rarely accurate.

3

## Weapon Focus

Weapon focus refers to the attention witnesses give to a perpetrator's weapon during a crime. Simply put, the attention the witness focuses on a weapon will reduce their ability to later recognize the perpetrator. In this case, Mr. Lopez reported that the assailant not only threatened to kill him with a gun, but that the assailant pointed the gun towards his head and face throughout the incident, and, at times, held the gun just inches from his head. (Trial, p. 526, 538, 595-97). Thus, weapon focus was a factor here that may have influenced the accuracy of Mr. Lopez's identification.

A meta-analysis by Steblay (1992) included 19 studies with a total sample of 2,082 participants. The weapon-focus effect on identifications was statistically significant and reflected a modest impairment overall—however, the effect was larger in target-absent lineups (e.g., when the real perpetrator was not present in the array) and when memory was impaired by other factors.

DeCarlo (2010)—an active duty Connecticut police chief—used a videotaped robbery and found that in a no weapon condition, witnesses were able to correctly identify the target 78% of the time. When a weapon was implied by the perpetrator waving his hands around in his pocket, accuracy dropped to 55% and when a weapon was actually shown, accuracy dropped to 33%. When the perpetrator was absent from the lineup the correct rejection was 89% for the no weapon condition, but when a weapon was implied, accuracy dropped to 76% and when a weapon was actually shown, correct rejections dropped to 65%.

A number of studies have demonstrated that a variety of surprising objects (including a whole, raw chicken) can draw attention away from the perpetrator and that novelty, rather than threat, may be the critical ingredient in the effect. Additionally, a meta-analysis by Fawcett, et al., (2013) confirms the weapon focus effect using data from 47 comparisons and further notes that the size of the effects was "unaffected by whether the event occurred in a laboratory, simulation, or real-world environment."

*In Desmarais & Read's (2010) meta-analysis of 23 surveys assessing 4,669 lay respondents' knowledge of eyewitness issues, they reported that just 47% of American respondents understood that weapon focus would impair identification performance (though as detailed above that does not mean that this understanding would be reflected in their assessments of trial evidence). Clearly, there is substantial disagreement among laypersons about the impact that the presence of a weapon can have on identification performance and this is not the kind of disagreement that can really be resolved through logic or argument—as with all the factors discussed below, the nature of the relationship between weapon presence and identification accuracy is an empirical, scientific question—eyewitness expert testimony would provide jurors with scientifically-grounded guidance on this issue and, as detailed above, increase juror sensitivity to weapon focus.*

## Stress

Stress is another factor that can influence the accuracy of an identification. Here, Mr. Lopez reported that he "froze up," not knowing what to do. He further detailed that he was panicked, scared, shaking, and so nervous that he couldn't think straight. (Trial, p. 527, 537, 540, 594).

Despite the importance of knowledge in this area, one cannot simulate violent crimes or pose a threat to the well-being of naive experimental subjects. Researchers have therefore resorted to a variety of manipulations including the use of violent versus nonviolent videotaped crimes. Increased violence in videotaped reenactments of crimes has been shown to lead to decrements in both identification accuracy and eyewitness recall (Clifford & Hollin, 1981; Clifford & Scott, 1978; Johnson & Scott, 1976; Sanders & Warnick, 1980).

4

Deffenbacher (1983, 1991) pointed to the "Yerkes-Dodson Law" when explaining the effects of arousal on identification. Stress or arousal demonstrates an inverted U-shaped relationship with identification accuracy. Low levels of arousal, such as when waking up, produce low attentiveness; moderate levels of arousal, such as that felt by an athlete preparing to compete, serve to heighten perceptual and attentiveness skills; and, higher levels, such as that felt by an individual under extreme danger or duress, debilitate perceptual skills. Deffenbacher, et al. (2004) published a meta-analysis of stress effect studies. The meta-analysis was conducted on 27 tests of the effects of heightened stress on identification accuracy. This sample included work published between 1974 and 1997, with a total of 1727 participants involved in relevant tests of the stress—the mean proportions correct for target-present lineups under high and low stress conditions were .39 and .59, respectively (with false alarm rates, errors, of 34% and 19% respectively). The effect of stress was larger for target-present than for target-absent lineups—that is, *stress particularly reduced correct identification rates.* The effect was twice as large for eyewitness-identification studies that simulated eyewitness conditions (e.g., staged crimes) than for studies that induced stress in other ways.

Some particularly critical studies on stress have been completed since the meta-analysis was conducted. They demonstrate that even people who are highly trained are not immune to the deleterious effects of stress on memory (Morgan et al., 2000a; 2000b; 2001a; 2001b; 2002; 2003; 2006). For example, Morgan and his colleagues have conducted a series of studies with people undergoing U.S. Navy Survival School training. Simply put, this training is highly stressful; participants experience what it is like to be a prisoner of war, from evading the enemy to capture and interrogation. The stress experienced by subjects during the confinement phase produces neurobiological alterations on par with those documented in individuals exposed to real-world, threat-to-life experiences (Morgan et al., 2000b). Indeed, at the end of the interrogation phase, the interaction of hormones participants experience renders them temporarily infertile (high cortisol, low testosterone). Morgan and colleagues have also observed significant deficits in working memory abilities and declines in visuo-constructive abilities (2006). In addition, in one study Morgan et al. (2014) exposed participants to a type of misinformation about the event: 1) a 'no misinformation' control; 2) 'leading questions,' where participants were asked leading questions via a questionnaire (e.g. "was the uniform worn by your interrogator green with red boards or blue with orange boards?" when neither option was correct); 3) 'misleading photographs,' where participants were asked a series of questions about "their interrogator" while being shown a photograph of a different interrogator; 4) and finally, 'doctored video,' where participants were shown doctored video footage of one of their trainers wearing weapons during an earlier exercise.

Morgan et al. (2013) showed that all types of misinformation distorted memory. For example, 85% of participants reported their interrogator wore the wrong color uniform, 84% of participants falsely identified their interrogator in the misinformation photo condition compared to 15% in the control condition, and 51% of participants who saw a familiar trainer in the doctored video reported their instructors were carrying weapons compared to 5% of control participants. Taken together, Morgan et al.'s study shows that even highly trained military personal are susceptible to significant memory distortion for a realistic stressful experience. Thus we can presume that memory is universally diminished during stressful experiences.

*Desmarais & Read's (2010) meta-analysis of lay respondents' knowledge of eyewitness issues did not include stress as a factor, but Benton et al. (2006) reported that 68% of American respondents believed that stress could impair identification performance.*

5

## Cross-Race Identification

In this case, the victim, Jonathan Lopez, is a white Hispanic man (DD5 #1). Charles Little is black (as indicated on the Lineup and photo array forms). Cross-race identifications are typically less accurate than own-race identifications.

Meissner & Brigham (2001) have written what I consider to be the best review of research on the problems of what have sometimes been called other-race or cross-race identifications or own-race bias (ORB). Meissner and Brigham analyzed data from 39 research articles, with 91 independent samples involving nearly 5,000 witness participants. Measures of correct identifications and false alarm rates, and aggregate measures of discrimination accuracy and response criterion were examined. Overall, they reported that when the perpetrator is present the ratio of correct to incorrect identifications was 40% higher for same-race identifications. The ratio of mistaken identifications to correct rejections in target-absent arrays was 56% greater for other-race identifications. Overall, the ratio of correct to incorrect identifications was more than 2.2 greater for own-race faces as compared with performance on other-race faces.

Meissner and Brigham reported that cross-race impairment was greater with short exposure times (especially with respect to false identifications), longer periods of time between viewing and identification were associated with larger ORB (especially with respect to false identifications), Whites showed more ORB than other groups (especially with respect to false identifications of Blacks).

Meissner and Brigham also explored the question of whether cross-race contact might reduce these effects and found that overall, contact played a small role in the ORB, accounting for just 2% of the variability across participants. They also found that the amount of viewing time available to witnesses significantly influenced accuracy in the ORB--particularly through an increase in false alarms to other-race faces when study time is limited. That is to say, there is little reason to think other-race contact would play an important role in reducing own-race bias and some reason to think the brief exposure to the perpetrator would aggravate the problem.

*Desmarais & Read's (2010) meta-analysis of lay respondents' knowledge of eyewitness issues reported that 51% of their respondents understood that cross-race identifications are less reliable than same-race identifications. As with the other factors discussed above, this means there is significant disagreement among laypersons about the impact that these factors have on witness confidence—eyewitness expert testimony would provide jurors with scientifically-grounded guidance on this issue.*

## Time Estimation and Exposure Duration

It should be a matter of common sense that the time available for viewing a perpetrator is positively associated with the witness's ability to subsequently identify him/her. Indeed, Shapiro and Penrod's (1986) study of more than 100 experiments showed that exposure time was a reliable predictor of accuracy. In this case, Mr. Lopez could not estimate the amount of time in which the incident occurred, but he did explain that during each of the several times that he looked back at the assailant, who was pointing a gun at his head, Mr. Lopez only looked at the assailant's face for 2-3 seconds at a time. (Trial, p. 533-34, 539, 594, 597). Mr. Lopez also said that the robbery felt like it lasted "forever" because he was scared. (Trial, p. 594).

Here, the time available for viewing the perpetrator appeared to be short and could have influenced the accuracy of Mr. Lopez's identification. However, it should be noted that even a long exposure is no guarantee of accuracy—in the Morgan, et al. (2004) study, the interrogations of soldiers whose memory was later tested lasted 40 minutes. Yet the rate of correct identifications among high-stress soldiers ranged from only 27 to 49% when targets were present, and foil identification rates approached 50% using standard lineups and photospreads. Bornstein, Deffenbacher, McGorty &

6

Penrod (2011) conducted a meta-analyses of studies of the effects of exposure time using 33 independent estimates of effect size drawn from 25 articles. This meta-analysis confirms the significant effect of exposure time on identification accuracy—a mean effect size of $r = .32$, which is a large effect.

Less a matter of common sense is the concept of *functional duration*. Simply put, of the total duration comprising some event, only a fraction of that duration is available to the witness for memorizing what will later be relevant—usually the offender's appearance. This is the time during which a multitude of circumstances have to simultaneously obtain: the offender is physically in the witness's field of view, there is enough light for the witness to be able to discern the offender's appearance, the witness is close enough to the offender to be able to discern his appearance, the offender is paying attention to the offender's appearance, and so on (e.g., Wandell, 1995; Loftus, 1972).

Finally, people have difficulty estimating the length of any event. Yarmey and his colleagues have conducted the most extensive research on the accuracy of estimates of duration accuracy. In his 2000 study, Yarmey found that witnesses to what he termed "variant events"—non-routinized events which do not occur over and over (again such as withdrawing money from an ATM) machine—were, on average, overestimated by between 25% (for an event lasting 13 minutes) and more than 100% (events lasting 24 seconds or less). An event lasting 46 seconds was overestimated by 67%, and events lasting 1 minute 20 seconds and 2 minutes 58 seconds were over-estimated by 40%. Thus people routinely overestimate the length of an event.

*Desmarais & Read's (2010) meta-analysis of lay respondents' knowledge of eyewitness issues indicates 51% of respondents understood the effects of exposure time on identification accuracy. Their analyses did not include time estimation as a factor, nor did Benton et al. (2006). Some indication of the likely levels of agreement can be adduced from the fact that the mean percentage of jurors agreeing with expert conclusions across 16 different factors was 52% in Desmarais & Read with the lowest rate of agreement = 40% for confidence and accuracy. This means there is widespread general disagreement among laypersons about the impact that these factors have on identification performance—eyewitness expert testimony would provide jurors with scientifically-grounded guidance on this issue and, as detailed above, increase juror sensitivity to the impact of short exposure.*

### Post-Event Information

Post-event information is the information we learn after an event has concluded. That information can reinforce details of our own memory of the event (i.e., be consistent with our memory). However, we can also incorporate other details that we did not encode—that may or may not be correct—into our own memory of the event. Critically, we do not know that our memory has been altered.

This case includes an unusual and significant occurrence of post-event information. Mr. Lopez found a photo identification card belonging to Mr. Little in the backseat of his car just hours after the robbery occurred. He then spent "a quick couple of minutes" looking at the card. (Trial, p. 543, 581). Shortly thereafter, at the police precinct, Mr. Lopez picked Mr. Little's photo out of a photo array. (Suppression, p. 9-11). Because the photo identification card that Mr. Lopez saw acted as post-event information, it may have influenced Mr. Lopez's memory of the assailant without Mr. Lopez's understanding that his memory had been altered. At trial, Mr. Lopez testified that he did not give police a detailed description of the person who robbed him because he "didn't need to." Instead, he described the perpetrator—a "male Black"—as "real taller" and "bigger" than him, a poor match for Mr. Little, who was around the same height as Mr. Lopez. (Trial, p. 589, 591, 640, 661, 740; Lineup Information Report).

Indeed, a substantial body of literature illustrates that information a witness acquires after an event— via conversations with others, media reports, or other sources of information—can influence what

7

he/she later recalls about the original event (Loftus, 1996; Schacter, 2001). For example, researchers have used a particular methodology, called "the misinformation effect" (ME), for over thirty years to demonstrate the kinds of things that can be absorbed into our memories (Loftus, 1996). The ME is a three-stage procedure: first participants watch an event—such as a film depicting the theft of several items from a house. After the film, we let 12 minutes go by before we give participants a written description, a narrative, describing that film. The critical issue is that we alter some of the details. For example, if the thief stole a can of Coke out of the fridge at one point, in one condition we would simply say that he had stolen a soda out of the fridge. In the other condition, we'd instead say he stole a can of Pepsi. We then let another 5 minutes go by before we give participants a forced-choice memory test, where they have to tell us what they remember from the film. What we are interested in is participants' accuracy for what they actually saw in the film when we tried to mislead them in the narrative. What we find—across hundreds of experiments—is that people's accuracy is reliably diminished: they are less accurate on misled items than generic items in the memory test.

Importantly, the effect occurs for small details, such as facial features, and larger details, like buildings being present that were not. And nobody is immune (Morgan et al., 2013; Paithis et al., 2013). It happens because of a failure in source-monitoring (Johnson et al., 1993; Lindsay, 2008). Put simply, we do not store memories with tags or labels specifying where the knowledge of each individual piece of that memory came from. As a result, information from the narrative gets absorbed into information from the film, sometimes overwriting it, and we don't know the difference anymore.

Similarly, in this case, Mr. Lopez had gathered information both during and post the event, which may help to explain how he identified Mr. Little in three separate identification procedures—a photo array, a lineup, and at trial—but also described the assailant at trial as "real taller" and "bigger" than him, where Mr. Lopez is 5'4" tall, and Mr. Little is only about an inch taller. (Trial, p. 589, 661, Lineup Information Report).

*A large survey of laypeople and experts by Simons and Chabris (2011) found that 23.9% of the public "strongly agreed" and 39.1% of the public "mostly agreed" (total = 63%) with the idea that memory works like a video camera, accurately recording the events we see and hear so that we can review and inspect them later. As my general overview of memory states, that simply is not true. Moreover, almost half the public sample endorsed the idea that memory is permanent (Total = 47.6%).*

## V. Aspects of Identification Procedures that Affect Identification Accuracy

### Second Identification Attempts

In a study of the suggestibility of showups, Dickinson (2006) found—in line with the mugshot exposure effects —that when an innocent suspect appears in both a showup and a lineup, the chances the suspect will be identified increases substantially.  Here, Mr. Little's photo identification card likely acted like a showup or mugshot, which increased Mr. Little's chances of being identified as the assailant in subsequent identification procedures.

Indeed, merely telling a witness that he/she will have a chance for a second viewing may be sufficient to affect the accuracy of the identification (Duckworth & Kreiner, 2009).  In that study the researchers manipulated whether participants were informed that they would have a second chance to view a sequential lineup via a randomly-ordered lineup (administered on a computer) versus a control condition in which participants viewed the lineup only once. Participants who were *not told* they would have a second viewing made more correct identifications of the perpetrator and made fewer incorrect rejections of the lineup.

8

In a related study, Godfrey & Clark (2010) conducted two experiments measuring the effects of multiple identification procedures when the time between the first and second attempted identification varied (Experiment 1: one week delay; Experiment 2: 30 minute delay). Following the viewing of a robbery video, witnesses were asked to write down anything they could remember about the crime and the perpetrator together with their confidence in their ability to identify the perpetrator. Witnesses were then shown either a photo showup or participated in a filler task. In the first experiment, witnesses returned to the laboratory the following week and were shown either a guilty-suspect or innocent-suspect lineup. In the second experiment, participants saw the showup, were given a second filler task and then were presented with the lineup only thirty minutes after the showup. When the interval was 30 minutes few participants changed from a showup nonidentification to a suspect-identification in the lineup, whereas nearly half of the participants made this change when the interval was one week. When the interval was 30 minutes, there was an increase in foil (non-suspect) identifications from showup to lineup, but no change in correct or false identifications. When the interval was long, there was an increase in both correct and false identifications from showup to lineup, but no change in foil identifications. Suspects (both guilty and innocent) were more likely to be identified in multiple identification procedures but the identifications had little probative value. Witness confidence was not a reliable indicator of eyewitness accuracy.

In a more recent study (Steblay, Tix, & Benson, 2013) participants watched a crime video and were asked to identify the perpetrator from perpetrator-present and –absent lineups of the same format (sequential or simultaneous), with a two-week time period between the two lineups.  Participants who made choosing errors in the first lineup continued with, rather than corrected, their identification error at the second lineup. There was no difference in confidence between those who made correct and false identification—though choosers were significantly more confident than non-choosers.

*Desmarais & Read's (2010) meta-analysis of lay respondents' knowledge of eyewitness issues indicates that 68% of laypersons thought unconscious transference impacted identification performance, but Benton et al. (2006) reported that 30% of American respondents held that belief.  In either event these results mean there is still substantial disagreement among laypersons about the impact that unconscious transference can have on identification performance—eyewitness expert testimony would provide jurors with scientifically-grounded guidance on this issue and, as detailed above, increase juror sensitivity to the effects of unconscious transference.*

## Non-Blind Presentation

Concern has been expressed about the fact that identification procedures are conducted "non-blind"—that is, the administering officers know who the suspect is. Here, the officer administering the identification procedures knew who the suspect was. That is not a blind procedure.

Psychological and medial researchers have completely abandoned non-blind research out of fear that research participants will be unwittingly influenced by researchers who unwittingly communicate their expectations (e.g., about the effectiveness of a new test medicine). Can witnesses be influenced by administrators who know the identity of the suspect?   The first study to examine the influence of administrator knowledge paired mock line-up administrators with mock witnesses who had previously viewed a live, staged crime involving two perpetrators (Phillips et al., 1999). Phillips and colleagues manipulated whether the administrator knew the identity of the suspect, the type of lineup presented (simultaneous vs. sequential), as well as the presence of an observer during the line-up task. When the line-up was presented sequentially and an observer was present, administrator knowledge influenced witnesses to choose an innocent suspect.

9

Additional support for the effects of line-up administrator knowledge was obtained in research manipulating the level of contact between administrators and witnesses (Haw & Fisher, 2004). For some witnesses, administrators had direct contact with them while administering the line-up. For others, administrators sat behind the witnesses out of their direct view, limiting their ability to communicate cues to the suspect's identity to the witnesses. When the administrator was permitted high contact with the witness and presented a target-absent simultaneous line-up, witnesses were more likely to identify the innocent suspect. In contrast, other studies have failed to find any influence of administrator knowledge on witnesses' identification decisions (Haw et al., 2003; Russano et al., 2006).

Greathouse & Kovera (2009) manipulated whether an administrator had knowledge of the suspect's identity, the type of line-up (simultaneous vs. sequential), the presence of the actual perpetrator in the line-up, and the type of line-up instructions (biased vs. unbiased). When the witnesses received biased instructions and simultaneous line-ups, they were more likely to make suspect identifications in non-blind than in blind lineups. The data suggest that the increase in mistaken identifications was the result of non-blind administrators influencing those who would have, under blind conditions, made filler identifications to make suspect identifications instead. Line-up rejections did not significantly increase or decrease as a function of line-up administrator knowledge. Put differently, when a suspect was identified with a blind administrator, it was twice as likely that he was actually the perpetrator compared to a non-blind administrator.

In a more pronounced demonstration of the effects that a non-blind administrator can have, Alberts, Duncan, Wallace and Penrod (2008) trained administrators to "steer" witnesses to make positive identifications of suspects (both guilty and innocent suspects) and avoid identifications of non-suspects (foils) and to accomplish this steering without arousing the suspicion of witnesses.  Steering was highly successful: selection rates for "steered" witnesses were: 57% guilty suspects, 32% innocent suspects and 19% filler identifications versus 18% guilty suspects, 10% innocent suspects and 39% filler identifications.  Witnesses were essentially unaware that they had been influenced.  Clark, et al. (2013) used similar procedures and obtained similar results.

*Desmarais & Read's (2010) meta-analysis of lay respondents' knowledge of eyewitness issues did not include blind presentation as a factor, nor did Benton et al. (2006).  As noted above, research on other factors certainly suggests there will be disagreement among laypersons about the impact that non-blind presentation have on identification performance—eyewitness expert testimony would provide jurors with scientifically-grounded guidance on this issue.*

## VI. Witness Confidence and Witness Accuracy

The problems with respect to witnesses' confidence about the accuracy of their identifications and the actual accuracy of those identifications are manifold.  Some of these problems relate to juror use of witness confidence and some relate to the weakness of the association between confidence and accuracy (CA). Witness confidence can be influenced by post-identification factors such as repeated questioning, briefings in anticipation of cross examination, and feedback about the behavior of other witnesses.  Jurors over-believe eyewitnesses, have difficulty reliably differentiating accurate from inaccurate eyewitnesses, and (as detailed below) are not adequately sensitive to aspects of witnessing and identification conditions. A major source of juror unreliability is reliance on witness confidence. Juror reliance on witness confidence appears to be unaffected by traditional safeguards such as cross-examination and judges' instructions in eyewitness cases.

In this case, after being subjected to two separate identification procedures—a photo array shortly after finding Mr. Little's photo identification card in his car, and a lineup a few months later—Mr. Lopez

10

testified confidently at trial that he "could never forget a face" because of the "tragic" thing that had happened to him. (Trial, p. 645). When he was questioned about how long he looked at the lineup before selecting Mr. Little, Mr. Lopez said that although he looked for "a fair amount of time," he didn't feel that he needed to because, again, he "could never forget that face." (Trial, p. 647). Mr. Lopez's confidence at trial may have been influenced by both the post event information of finding Mr. Little's photo identification card in his backseat, the photo array procedure conducted shortly thereafter, and the subsequent lineup a few months later.

Although there is a presumption among many actors in the legal system that there is a positive confidence—accuracy relation, serious questions about whether that is true at the trial stage have been raised by researchers within the law-psychology community. These issues were discussed in some detail in a 1998 Whitepaper (Wells, et al, 1998) and I have excerpted portions of that paper here:

**Surveys Show that Most People Believe Confidence is Diagnostic of Accuracy.** Based on survey techniques, it is clear that people believe that there is a strong relation between eyewitness identification confidence and eyewitness identification accuracy (Brigham & Bothwell, 1983; Brigham & Wolfskiel, 1983; Deffenbacher & Loftus, 1982; Rahaim & Brodsky, 1982).

**Jurors Infer Accuracy from Confidence.** There is consistent evidence to indicate that the confidence that an eyewitness expresses in his or her identification during testimony is the most powerful single determinant of whether or not observers of that testimony will believe that the eyewitness made an accurate identification (e.g., see Cutler, Penrod & Dexter, 1990; Leippe & Romanczyk, 1987, 1989; Leippe, Manion, & Romanczyk, 1991; Lindsay, Wells, & O'Connor, 1989; Lindsay, Wells, & Rumpel, 1981; Turtle & Wells, 1988; Wells, Ferguson, & Lindsay, 1981; Wells, Lindsay, & Ferguson, 1979; Wells & Murray, 1984).

To what extent does witness confidence predict identification accuracy? Should jurors (and attorneys and judges) rely so heavily on witness confidence as a guide to witness accuracy? The research is clear that unless conditions were perfect, confidence is not a meaningful variable (Wixted & Wells, 2017).

**Pre-identification Confidence Reveals Little about Identification Accuracy.** Cutler & Penrod (1989a) examined nine studies testing the relation between pre-identification confidence and identification accuracy. Across nine studies the pre-identification confidence-accuracy correlation ranged from .00 to .20—which indicates that pre-identification confidence is a *poor* predictor of identification performance.

**But, Witnesses are Over-Confident.** Though confidence-accuracy correlations are sometimes relatively high, most research yields relatively low correlations. Sauer, Brewer & Wells (2008) report some of the most informative results: a 40% error rate among witnesses who make identifications and are 90%-100% confident (only 18% of their witnesses expressed this high level of confidence), a 51% error rate among those who are 70-80% confident, and a 59% error rate among those who were 50-60% confident.  In short, although there is some evidence of greater accuracy among those who are more confident, error rates can be high among even the small percentage of most-confident witnesses.

**Confidence at Trial may be Useless as an Indicator of Accuracy.** Imagine that prosecutors are skimming only the most confident witnesses; there is no artificial confidence-boosting among the witnesses; and we have reliable measures of confidence, not the vague verbal reports currently obtained by police. Among these highly confident witnesses, the results above indicate that 20 to 30% could be in error. But even if the error rate is only 10% for these highly selected and most confident witnesses, they will all appear highly confident to jurors—so confidence cannot help the jurors figure out which witnesses have made errors. Indeed, the simple correlation between confidence and accuracy for these witnesses

11

will be much worse than among all witnesses, because there is very little variability in confidence and maybe no useful variance. Though it is tempting to conclude that jurors might be entitled to assume a fairly high base rate of accuracy among these highly confident witnesses (even if confidence cannot aid them in differentiating accurate and inaccurate witnesses), if guilty (and accurately identified) defendants are pleading guilty at higher rates than innocent defendants it would not be safe to conclude that the accuracy rate is fairly high; indeed, the accuracy rate could be fairly low, because the guilty defendants facing confident witnesses have already pleaded guilty.

In short, the research results and logic call into question the notion that witness confidence can be of significant assistance to jurors.

*Desmarais & Read's (2010) meta-analysis of lay respondents' knowledge of eyewitness issues include confidence-accuracy, and they reported that just 40% of their respondents understood that confidence and accuracy are modestly related—the lowest rate of expert-lay agreement across all the factors included in their analyses.*

### Confidence Malleability & Witness Feedback

Even if the research showed that eyewitness-identification confidence and accuracy are related at a level that could have practical utility, this conclusion would come with another huge caveat. Confidence malleability refers to the tendency for an eyewitness to become more (or less) confident in his or her identification as a function of events that occur after the identification. The confidence malleability problem is particularly important because actors in the legal system can contaminate the confidence of an eyewitness in ways that can make an eyewitness's in-court expression of confidence a meaningless indicator of the eyewitness's memory. Unfortunately, an eyewitness's belief that the identified person is the culprit can also arise for reasons other than the eyewitness's memory (Leippe, 1980; Wells, Ferguson, & Lindsay, 1981; Luus & Wells, 1994; Wells & Bradfield, 1998). For example Hastie, Landsman, & Loftus (1978) found that witnesses who were questioned repeatedly grew more confident about the accuracy of details in their reports (see also Shaw, 1996; Shaw & McClure, 1996; Turtle & Yuille, 1994).

In this case, Mr. Lopez testified that during a conversation with a police officer where he was asked to come in to view a lineup, he was told that "the person that robbed" him had been arrested and was in custody. (Trial, p. 585-86, 656). This kind of feedback could have increased Mr. Lopez's confidence in selecting the person from the lineup whose face matched the photo from the identification that he found in his backseat soon after the robbery and the photo that he previously selected from the photo array.

A 2006 meta-analysis by Douglass and Steblay of 20 studies with 2,400 identifications found that witnesses receiving feedback "expressed significantly more . . . confidence in their decision compared with participants who received no feedback. This meta-analysis demonstrated that the effect of confirming feedback was consistent and reliable, with large effect sizes obtained for dependent measures including retrospective certainty, opportunity to view, and attention paid. The broad impact of confirming feedback is well illustrated in the following table from Douglas and Steblay—where $d$ indexes the size of the effect ($d$ is roughly twice as large as $r$)

12

| Dependent measure | Tests | d |
|---|---|---|
| Certainty at time of ID | 11 | 0.79 |
| How good a view? | 9 | 0.50 |
| Opportunity to view face | 9 | 0.55 |
| Attention paid | 9 | 0.46 |
| Good basis to make an ID | 9 | 0.77 |
| Ease of making an ID | 9 | 0.80 |
| Speed of ID | 9 | 0.45 |
| Willing to testify | 9 | 0.82 |
| My memory for strangers | 8 | 0.45 |
| Clarity of image in my mind | 7 | 0.68 |
| Trust in eyewitness with similar experience | 3 | 0.52 |
| How far away? | 2 | 0.12 |
| How long in view? | 4 | 0.29 |
| Confidence 'right now' | 2 | 0.53 |

Smalarz and Wells (2014a) investigated other ways in which confirming feedback can affect identification performance. After participants received either no feedback or confirming feedback the researcher/administrator pretended to have given the witness the "wrong" lineup, and then gave the witness the "correct" lineup. Results indicated that feedback impaired witnesses' ability to identify the culprit in a final memory test (Smalarz & Wells, 2014a). In a second study, Smalarz and Wells (2014b) found that evaluators/jurors could distinguish the accuracy and credibility of witnesses' videotaped testimony when witnesses were not given feedback, but when witnesses received feedback, there were no differences in evaluators' ratings of accuracy/credibility (Smalarz & Wells, 2014b).

*Desmarais & Read's (2010) meta-analysis of lay respondents' knowledge of eyewitness issues reported that 59% of their respondents understood that witness confidence can be influenced by factors unrelated to witness accuracy. As with the other factors discussed above, this means there is significant disagreement among laypersons about the impact that these factors have on witness confidence—eyewitness expert testimony would provide jurors with scientifically-grounded guidance on this issue.*

### VII. Cumulative Impact of Threats to Reliability

I have enumerated a large number of factors linked to eyewitness reliability in research that are involved in this case. A strong case can be made that these factors can cumulatively increase identification errors. There is also evidence that the studies reported here typically underestimate the effects of these factors on performance.

**Generalizability of Effects.** Shapiro & Penrod (1986) noted that in the studies in their meta-analysis, overall performance levels were worse in more realistic eyewitness studies and higher in the laboratory studies and that those differences were readily accounted for by systematic differences between more and less realistic studies. Lindsay and Harvie (1988) reported a similar pattern: less-realistic studies appear to systematically over-state levels of witness performance. Steblay's (1992) meta-analysis of the weapon focus effect, for example, similarly showed that relatively artificial simulations *underestimated* the magnitude of the effect. Deffenbacher, Bornstein, Penrod, and McGorty's (2004) found that the effect of stress was twice as large for staged-crime studies than for studies manipulating stress by other means.

**Cumulation of Effects.** In studies where several factors are manipulated at one time it is regularly observed that they simultaneously influence witness performance. For example, Cutler, Penrod, O'Rourke and Martens (1986) found, across two studies, that disguise, biased instructions, weapon

13

visibility, retention interval, and lineup size all influenced identification accuracy. Cutler, Penrod & Marten (1987a) found simultaneous effects of disguise, retention interval and mugshot viewing. Cutler, Penrod & Marten (1987b) found simultaneous effects for disguise, weapon focus, retention interval and instructions to witnesses. Although these specific factors are not all present in this case, there are several significant factors, including weapon focus and stress, that, combined with other factors, including cross-racial identification, post-event information, mugshot exposure effect, and non-blind presentation, likely created a cumulation of effects affecting the accuracy of the identification.

Shapiro and Penrod (1986) analyzed performance across the hundreds of experimental conditions and found that even when statistically controlling for the effects of other variables most variables still explained significant portions of variability in performance. With regard to correct identification rates, attention variables and the duration of exposure per face were positively related to hit-rate performance. The number of targets studied and retention interval accounted for significant variance. With respect to identification errors, greater attention led to fewer false alarms, the number of targets studied was positively associated with false-alarm rates, there were many more false identifications when participants were confronted with live targets as opposed to still photographs, and there was a negative correlation between the false-alarm rate and number of foils.

If called to testify at Mr. Little's trial, I would have testified that the factors discussed above are evident in this case and call into question the reliability of Jonathan Lopez's identification of Charles Little. Where Mr. Lopez's viewing of Mr. Little's photo identification card in the backseat of his car likely functioned as a mugshot or show up identification, there is a risk of unconscious transference which could have influenced Mr. Lopez's subsequent identifications of Mr. Little. This unique post-event information was significant and may have inaccurately influenced Mr. Lopez's memory of the image of the assailant. Other factors that may have adversely affected the accuracy of Mr. Lopez's identification include, but are not limited to, cross-race impairment, weapon focus, stress, the limited time exposure, and the lighting. Importantly, the factors can and do have a cumulative effect on identification performance.

Submitted,

Deryn Strange, Ph.D.
Associate Professor of Psychology
John Jay College of Criminal Justice

Date: October 23, 2018

STATE OF NEW YORK
COUNTY OF NEW YORK

Sworn to me and subscribed in my presence this __23__ day of _____October_____, 2018 by Deryn Strange.

WILLIAM L. KENDALL
Notary Public, State of New York
No. 02KE6363359
Qualified in Kings County
Commission Expires August 21, 2021

Notary Public
Commission Expires:

14

# References

In preparing the above report, I relied on the following empirical publications:

Behrman, Bruce W. & Davey , Sherrie L. Eyewitness Identification in Actual Criminal Cases: An Archival Analysis, *Law and Human Behavior 2001* 25, 475-491.

Bothwell, R. K., Deffenbacher, K. A., & Brigham, J. C. (1987). Correlation of eyewitness accuracy and confidence: Optimality hypothesis revisited. *Journal of Applied Psychology, 72,* 691-695.. Journal of Applied Psychology, 1987 Nov Vol 72(4) 691-695.

Brewer, N., Keast, A. & Rishworth, A. (2002). The confidence-accuracy relationship in eyewitness identification: The effects of reflection and disconfirmation on correlation and calibration. *Journal of Experimental Psychology: Applied, 8, 44-*56.

Brigham JC. 1990. Target person distinctiveness and attractiveness as moderator variables in the confidence–accuracy relationship in eyewitness identification. *Basic and Applied Social Psychology* 11: 101–115.

Brigham, J. C., & Bothwell, R. K. (1983). The ability of prospective jurors to estimate the accuracy of eyewitness identifications. *Law and Human Behavior, 7,* 19-30.

Brigham, J. C., Maas, A., Snyder, L. D., & Spaulding, K. (1982). Accuracy of eyewitness identifications in a field setting. *Journal of Personality and Social Psychology, 42,* 673-681.

Brigham, J. C., & Wolfskeil, M. P. (1983). Opinions of attorneys and law enforcement personnel on the accuracy of eyewitness identification. *Law and Human Behavior, 7,* 337-349.

Brown, E., Deffenbacher, K., & Sturgill, W. (1977). Memory for faces and the circumstances of encounter. Journal

Buckhout, R., Alper, A., Chern, S., Silverberg, G., & Slomovits, M. (1974). Determinants of eyewitness performance on a line-up. *Bulletin of the Psychonomic Society,* 4, 191-192.

Charman, S.D., & Wells, G.L. (2006). Applied lineup theory. In R.C.L. Lindsay, D.F. Ross, J.D. Read & M.P. Toglia (Eds.), Handbook of eyewitness psychology (Vol. 2, pp. 219–254). Mahwah, NJ: Erlbaum.

Clifford, B. R., & Hollin, C. (1981). Effects of the type of incident and the number of perpetrators on eyewitness memory. *Journal of Applied Psychology, 66,* 364-370.

Clifford, B. R., & Scott, J. (1978). Individual and situational findings in eyewitness testimony. *Journal of Applied Psychology, 63,* 352-359.

Cutler, B. L., & Penrod, S. D. (1989). Forensically relevant moderators of the relation between eyewitness identification accuracy and confidence. *Journal of Applied Psychology, 74,* 650-652.

Cutler, B.L., & Penrod, S.D. (1989a). Moderators of the confidence-accuracy correlation in eyewitness identifications: The role of information processing and base-rates. *Applied Cognitive Psychology, 3,* 95-107.

Cutler, B. L., Penrod, S. D., & Dexter, H. R. (1989). The eyewitness, the expert psychologist, and the jury. *Law and Human Behavior, 13,* 311-332.

Cutler, B. L., Penrod, S. D., & Martens, T. K. (1987a). Improving the reliability of eyewitness identifications: Putting context into context. *Journal of Applied Psychology, 72,* 629-637.

Cutler, B. L., Penrod, S., O'Rourke, T. E., & Martens, T. K. (1986). Unconfounding the effects of contextual cues on eyewitness identification accuracy. *Social Behaviour, 1,* 113-134.

15

Dahl, M., Allwood, C. M., Scimone, B. & Rennemark, M. (2015) Old and very old adults as witnesses: event memory and metamemory, *Psychology, Crime & Law, 21:8,* 764-775, DOI: 10.1080/1068316X.2015.1038266

DeCarlo, J. (2010). A Study Comparing the Eyewitness Accuracy of Police Officers and Citizens. Dissertation completed at City University of New York.

Deffenbacher, K. (1980). Eyewitness accuracy and confidence: Can we infer anything about their relationship? *Law and Human Behavior, 4,* 243-260.

Deffenbacher, K. A. (1991). A maturing of research on the behaviour of eyewitnesses. *Applied Cognitive Psychology, 5(5),* 377-402.

Deffenbacher, K. A.; Bornstein, B. H.; & Penrod, S. D. (2006).  Mugshot exposure effects: retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307. http://dx.doi.org/10.1007/s10979-006-9008-1

Deffenbacher, K. A.; Bornstein, B. H.; Penrod, S. D. & McGorty, K. (2004). A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory. *Law and Human Behavior, 28,* 687-706.

Deffenbacher, K. A., Carr, T. H., & Leu, J. R. (1981). Memory for words, pictures, and faces: Retroactive interference, forgetting and reminiscence. *Journal of Experimental Psychology: Human Learning & Memory, 7,* 299-305.

Deffenbacher, K. A. & Loftus, E. F. (1982). Do jurors share a common understanding concerning eyewitness behavior? *Law and Human Behavior, 6,* 15-30.

Douglass, A. B., Neuschatz, J. S., Imrich, J. F., & Wilkinson, M. (2010). Does post-identification feedback affect evaluations of eyewitness testimony and identification procedures? *Law and Human Behavior, 34*(4), 282–294. doi:10.1007/s10979-009-9189-5

Douglass, Amy Bradfield & Steblay, Nancy.  (2006). *Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect,* 20 Applied Cognitive Psychol. 859.

Egan, D. Pittner, M. Goldstein, A.G. (1977) Eyewitness identification: Photographs vs. live models. *Law and Human Behavior, 1,* 199-206.

Fahsing, I.A., Ask, K. & Granhag, P.A. (2004). The Man Behind the Mask: Accuracy and Predictors of Eyewitness Offender Descriptions, *Journal of Applied Psychology, 89,* 722–729

Fawcett, Jonathan M.; Russell, Emily J.; Peace, Kristine A.; Christie, John (2013). "Of guns and geese: A meta-analytic review of the 'weapon focus' literature". *Psychology, Crime & Law* 19 (1): 35–66.

Fisher, G. H., & Cox, R. L. (1975). Recognizing human faces. Applied Ergonomics, 6, 104-109.

Fleet, M. L., Brigham, J. C., & Bothwell, R. K. (1987). The confidence-accuracy relationship: The effects of confidence assessment and choosing. *Journal of Applied Social Psychology, 17,* 171-187.

Garrett, B. L. (2008). Judging Innocence. *Columbia Law Review, 108.* 55-142.

Gorenstein, G. W., & Ellsworth, P. C. (1980). Effect of choosing an incorrect photograph on a later identification by an eyewitness. Journal of Applied Psychology, 65, 616–622.

Gurney, D. J., Vekaria, K., & Howlett, N. (2013).A nod in the wrong direction: Does nonverbal feedback affect eyewitness confidence?*Psychiatry, Psychology & Law.*

Haber, R.N. & Haber. L. A Meta-Analysis of Research on Eyewitness Lineup Identification Accuracy. Paper presented at the Annual convention of the Psychonomics Society, Orlando, Florida, November 16, 2001.

16

Hastie, R., Landsman, R. & Loftus, E. F. (1978). Eyewitness testimony: The dangers of guessing. *Jurimetrics Journal, 19,* 1-8.

Horry, R., Memon, A., Milne, B. & Wright, D. (June, 2010). System and estimator variables in real eyewitness identifications: a field study of video lineups in England. 20th conference of the European Association of Psychology and Law, Gothenburg.

Hosch, H. M., & Platz, S. J. (1984). Self-monitoring and eyewitness accuracy. *Personality and Social Psychology Bulletin, 10,* 289- 292.

Jenkins R, White D, Montfort X, Burton AM. (2011). Variability in photos of the same face. *Cognition* 121:313-323.

Johnson, C., & Scott, B. (1976). *Eyewitness testimony and subject identification as a function of arousal, sex of witness, and scheduling of interrogation.* Paper presented at American Psychological Association Convention, Washington, DC.

Juslin, P., Olsson, N., & Winman, A. (1996). Calibration and diagnosticity of confidence in eyewitness identification: Comments on what can be inferred from the low confidence-accuracy correlation. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 22,* 1304–1316.

Kellstrand, E. B. (2006). Eyewitness identification accuracy in cases accepted and rejected for prosecution: An archival analysis of criminal case files, Unpublished Manuscript. San Diego: University of California.

Key, K. N., Cash, D. K., Neuschatz, J., Price,J., Wetmore, S. A. & Gronlund, S. D. (2015): Age differences (or lack thereof) in discriminability for lineups and showups, *Psychology, Crime & Law,* DOI: 10.1080/1068316X.2015.1054387

Krafka, C., & Penrod, S. (1985). Reinstatement of context in a field experiment on eyewitness identification. *Journal of Personality and Social Psychology, 49(1),* 58

Leippe, M.R. (1980). Effect of integrative memorial and cognitive processes on the correspondence of eyewitness accuracy and confidence. *Law and Human Behavior, 4,* 261-274.

Leippe, M. R., Manion, A. P., & Romanczyk, A. (1992). Eyewitness persuasion: How and how well do factfinders judge the accuracy of adults' and children's memory reports? *Journal of Personality and Social Psychology, 63,* 181–197.

Leippe, M. R., & Romanczyk, A. (1987). Children on the witness stand: A communicationpersuasion analysis of jurors' reactions to child witnesses. In S. J. Ceci, M. P. Toglia, & D. F. Ross (Eds.), *Children's eyewitness memory* (pp. 155–177). New York: Springer-Verlag.

Lindsay, R. C., & Harvie, V. L. (1988). Hits, false alarms, correct and mistaken identifications: The effect of methods of data collection on facial memory. *Gruneberg, M. M.(Ed), Morris, P. E.(Ed), & et al. Practical aspects of memory: Current research and issues, Vol. 1: Memory in everyday life. (pp. 47-52). Oxford, England: John Wiley & Sons*

Lindsay, R. C. L., Wells, G. L., & O'Connor, F. J. (1989). Mock juror belief of accurate and inaccurate eyewitnesses: A replication and extension. *Law and Human Behavior, 13,* 333-339.

Lindsay, R. C. L., Wells, G. L., & Rumpel, C. M. (1981). Can people detect eyewitness identification accuracy within and across situations? *Journal of Applied Psychology, 66,* 79-89.

Liptak, A. (October 30, 2011). Supreme Court to Weigh Effects of Bad Plea Advice. *The New York Times.*

Loftus, E. F. (1976). Unconscious transference. *Law and Psychology Review, 2,* 93-98.

17

Loftus, E. F., Schooler, J. W., Boone, S. M., & Kline, D. (1987). Time went by so slowly: Overestimation of event duration by males and females. *Applied Cognitive Psychology,* 1, 3-13.

Luus, C.A.E., & Wells, G.L. (1994). The malleability of eyewitness confidence: Co-witness and perseverance effects. *Journal of Applied Psychology, 79,* 714-723.

Maas, A. & Kohnken, G. (1989). Eyewitness identification: Simulating the "weapon effect." *Law and Behavior, 13,* 397-408.

Mansour, J. K., Beaudry, J. L., Bertrand, M. I., Kalmet, N., Melsom, E., & Lindsay, R. C. L. (2012). Impact of disguise on identification decision and confidence with simultaneous and sequential lineups. *Law and Human Behavior, 36,* 513-526. doi: 10.1037/h0093937

Megreya, A. M., & Burton, A. M. (2006). Recognising faces seen alone or with others: When two heads are worse than one. *Applied Cognitive Psychology, 20,* 957–972.

Megreya, A. M., & Burton, A. M. (2008). Matching faces to photographs: Poor performance in eyewitness memory (without the memory). *Journal of Experimental Psychology: Applied,* 14, 364-372.

Megreya A M, Bindemann M (2012) ``Identification accuracy for single- and doubleperpetrator crimes: Does accomplice gender matter?'' *British Journal of Psychology, 103,* 439-453.

Memon, A., Havard, C., Clifford, B., Gabbert, F., & Watt, M. (2011). A field evaluation of the VIPER system: A new technique for eliciting eyewitness identification evidence. *Psychology, Crime, & Law.17,* 711-729.

Mitchell, K., Livosky, M., & Mather, M. (1998). The weapon focus effect revisited: The role of novelty. *Legal and Criminological Psychology, 3,* 287–303.

Morgan III, C.A., Hazlett, G. A., Doran, A., Garrett, S., Hoyt, G., Thomas, P., et al. (2004). Accuracy of eyewitness memory for persons encountered during exposure to highly intense stress. International Journal of Law and Psychiatry, 27, 265– 279.

Olsson, N. (2000). A comparison of correlation, calibration, and diagnosti-city as measures of the confidence–accuracy relationship in witness identification. *.Journal of Applied Psychology, 85,* 504–511.

Orchard, T. L., & Yarmey, A. D. (1995). The effects of whispers, voice-sample duration, and voice sample distinctiveness on criminal speaker identification. Applied Cognitive Psychology, 9, 249–260.

O'Rourke, T., Penrod, S.D., Cutler, B.L., & Stuve, T.E. (1989). The external validity of eyewitness identification research: Generalizing across age groups. *Law and Human Behavior, 13,* 385-396.

Palermo, R., & Rhodes, G. (2002). The influence of divided attention on holistic face perception. Cognition, 82(3), 225–257.

Penrod, S. D. & Bornstein, B. H. (2007). Generalizing Eyewitness Reliability Research. In R.C.L. Lindsay, D. Ross, D Read & M. Toglia, (Eds.), *Handbook of eyewitness psychology* (Vol. II): *Memory for people.* Mahwah, NJ: Erlbaum.

Pezdek, K., & Stolzenberg, S. (2014). Are individuals' familiarity judgments diagnostic of prior contact? *Psychology, Crime, & Law. 20*(4), 302-314.

Pickel, K. (1998). Unusual and threat as possible causes of "weapon focus." *Memory, 6,* 277–296.

Pickel, K. L. (1999). The influence of context on the "weapon focus" effect. *Law and Human Behavior, 23*(3), 299-311.

18

Pickel, K. (2007). Remembering and identifying menacing perpetrators: Exposure to violence and the weapon focus effect. L. In Lindsay, Rod C. L. (Ed); Ross, David F. (Ed); Read, J. Don (Ed); Toglia, Michael P. (Ed). *The handbook of eyewitness psychology, Vol II: Memory for people.* (pp. 339-360). Mahwah, NJ, US: Lawrence Erlbaum Associates.

Pigott, M. A., Brigham, J. C., & Bothwell, R. K. (1990). A field study of the relationship between quality of eyewitnesses' descriptions and identification accuracy. *Journal of Police Science and Administration, 17,* 84-88.

Pike, G., Brace, N., & Kynan, S. (2002). The visual identification of suspects: Procedures and practice (Briefing Note 202). London: Home Office.

Pryke, S., Lindsay, R. C. L., Dysart, J. E., & Dupuis, P. (2004). Multiple independent identification decisions: A method of calibrating eyewitness identifications. *Journal of Applied Psychology, 89,* 73-84. doi:10.1037/0021-9010.89.1.73

Rahaim, G. L., & Brodsky, S. L. (1982). Empirical evidence versus common sense: Juror and lawyer knowledge of eyewitness accuracy. *Law and Psychology Review, 7,* 1-15.

Read, J. D. (1995).  The availability heuristic in person identification - the sometimes misleading consequences of enhanced contextual information.  *Applied Cognitive Psychology, 9,* 91-121.

Read, J. D., Tollestrup, P., Hammersley, R., McFadzen, E., & Christensen, A. (1990). The unconscious transference effect: Are innocent bystanders ever misidentified? *Applied Cognitive Psychology, 4,* 3-31.

Sauer, J. D., Brewer, N., & Wells, G. L. (2008). Is there a magical time boundary for diagnosing eyewitness identification accuracy in sequential line-ups?. *Legal and Criminological Psychology,* 13(1), 123-135.

Shapiro, P. N., & Penrod, S. D. (1986). Meta-analysis of facial identification studies. *Psychological Bulletin, 100,* 139-156.

Shaw, J. S. (1996). Increases in eyewitness confidence resulting from postevent questioning. *Journal of* Experimental *Psychology: Applied,* 2.126-146.

Shaw, J. S., & McClure, K. A. (1996). Repeated postevent questioning can lead to elevated levels of eyewitness confidence. *Law and Human Behavior,* 20.629-654.

Shaw, J. I., & Skolnick, P. (1999). Weapon focus and gender differences in eyewitness accuracy: Arousal versus salience. *Journal of Applied Social Psychology, 29*(11), 2328-2341.

Shepherd, J. W. (1983). Identification after long delays. In S. M. A. Lloyd-Bostock & B. R. Clifford (Eds.), *Evaluating witness evidence* (pp. 173–187). Chichester: Wiley.

Slater, A. (1994). Identification Parades: A Scientific Evaluation. (Police Research Award Scheme, Police Research Group, Home Office (reported in Tim Valentine & Pamela Heaton. (1999) An Evaluation of the Fairness of Police Line-Ups and Video Identifications, *Applied Cognitive Psychology,* 13, S59-72).

Sporer, S., Penrod, S.D., Read, D. & Cutler, B.L. (1995). Gaining confidence in confidence: A new meta-analysis on the confidence- accuracy relationship in eyewitness identification studies. *Psychological Bulletin, 118,* 315-327

Steblay, N. M. (1992). A meta-analytic review of the weapon focus effect. *Law & Human Behavior, 16*(4).

Steblay, N., Dysart, J., Fulero, S. & Lindsay, R.C.L. (2003). Eyewitness accuracy rates in police showup and lineup presentations: a meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

19

Steblay, N. K., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2001). Eyewitness accuracy rates in sequential and simultaneous lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 25*, 459-473. doi:10.1023/A:1012888715007

Sučić, I., Tokić, D. & Ivešić, M. (2015) Field study of response accuracy and decision confidence with regard to lineup composition and lineup presentation, *Psychology, Crime & Law, 21:8*, 798-819, DOI: 10.1080/1068316X.2015.1054383

Tollestrup, P., Turtle, J., & Yuille, J. (1994). Actual victims and witnesses to robbery and fraud: An archival analysis. In D. F. Ross, J. D. Read, & M. P. Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (pp. 144–160). New York, NY: Cambridge University Press.

Turtle, J. W., & Wells, G. L. (1988). Children versus adults as eyewitnesses: Whose testimony holds up under cross examination? In M. W. Gruneberg et al. Eds.), *Practical aspects of memory* (pp. 27-33). New York: Wiley.

Turtle, J. W., & Yuille, J, C. (1994). Lost but not forgotten details: Repeated eyewitness recall leads to reminiscence but not hypermnesia. *Journal of Applied Psychology, 79*, 260-271.

Valentine, T. (2008).  Indentifying perpetrators.  In *Forensic Psychology,* edited by Graham Davies, Clive Hollin, Ray Bull, Chichester, England ; Hoboken, NJ : John Wiley & Sons.

Valentine, T., & Mesout, J. (2009). Eyewitness identification under stress in the London Dungeon.*Applied Cognitive Psychology*, 23(2), 151-161.

Valentine, T., Pickering, A, & Darling, S. (2003). Characteristics of eyewitness identification that predict the outcome of real lineups Applied *Cognitive Psychology, 17*, 4969-994.

Vierordt, K. von (1868). Der Zeitsinn nach Versuchen [The sense of time according to research]. Tübingen: H. Laupp.

Vokey, J. R., & Read, J. D. (1992). Familiarity, .memorability, and the effect of typicality on the recognition of faces. Memory *& Cognition*, 20, 291-302

Warnick, Dell H.; Sanders, Glenn S. (1980). The effects of group discussion on eyewitness accuracy. Journal of *Applied Social Psychology. 10(3).* 249-259.

Wells, G. L., & Bradfield, A. L. (1998). "Good. You identified the suspect": Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83*, 360–376.

Wells, G. L., Ferguson, T. J., & Lindsay, R. C. L. (1981).The tractability of eyewitness confidence and its implications for triers of fact. *Journal of Applied Psychology, 66*, 688–696.

Wells, G. L., & Lindsay, R. C. L. (1980). On estimating the diagnosticity of eyewitness nonidentifications. *Psychological Bulletin, 88*, 776–784.

Wells, G. L., & Murray, D. M. (1984). Eyewitness confidence. In G. L. Wells, & E. F. Loftus, (Eds.), *Eyewitness testimony: Psychological perspectives*. New York: Cambridge University Press.

Wells, G. L., Lindsay, R. C. L., & Ferguson, T. J. (1979). Accuracy, confidence, and juror perceptions in eyewitness identification. *Journal of Applied Psychology, 64,* 440-448.

Wells, G. L., Memon, A. & Penrod, S. D. (2006). Eyewitness Evidence: Improving its Probative Value. *Psychological Science in the Public Interest, 7,* 45-75.

Wells, G. L., Small, M., Penrod, S. D., Malpass, R. S., Fulero, S. M., & Brimacombe, C. A. E. (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 23,* 603–648.

Wells, G.L., Steblay, N.K. & Dysart, J.E. (2011). An Initial Report of the AJS National Eyewitness Identification Field Studies. American Judicature Society. http://www.ajs.org/wc/pdfs/EWID_PrintFriendly.pdf

20

Wetmore, S.A. , J.S. Neuschatz, S.D. Gronlund, A. Wooten, C.A. Goodsell, and C.A. Carlson (2014). Effect of Retention Interval on Showup and Lineup Performance. *Journal of Applied Research in Memory and Cognition.4, 8-14.*

Williams, G. (1963). *The proof of guilt.* Springfield, IL.: Charles C. Thomas.

Wright, D. B., & McDaid, A. T. (1996). Comparing system and estimator variables using data from real line-ups. *Applied Cognitive Psychology*, 10(1), 75-84.

Wright, D. B., & Skagerberg, E. M. (2007). Postidentification Feedback Affects Real Eyewitnesses.*Psychological Science*, 18(2), 172-178.

Yarmey, A. D. (1990). Accuracy and confidence of duration estimates following questions containing marked and unmarked modifiers. *Journal of Applied Social Psychology, 20,* 1139–1149.

Yarmey, A. D. (1993). Stereotypes and recognition memory for faces and voices of good guys and bad guys. *Applied Cognitive Psychology, 7,* 419–431.

Yarmey, A. D. (2000). Retrospective duration estimations for variant and invariant events in field situations. *Applied Cognitive Psychology, 14,* 45-57.

Yarmey, A. D., & Jones, H. P.T. (1983). Accuracy of memory of male and female eyewitnesses to criminal assault and rape. *Bulletin of the Psychonomic Society, 2,* 89-92.

Yarmey, A. D. and Yarmey, M. J. (1997). Eyewitness recall and duration estimates in field settings. J*ournal of Applied Social Psychology, 27,* 330-344.

Yarmey, A. D., Yarmey, A. L., & Yarmey, M. J. (1994). Face and voice identifications in showups and lineups. *Applied Cognitive Psychology, 8,* 453–464.

21

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX: CRIMINAL TERM: PART 32
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE PEOPLE OF THE STATE OF NEW YORK

          - against -                                Indictment Number: 0309/12

CHARLES LITTLE,

                          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Denis J. Boyle, J.:

        Before me is a motion pursuant to Criminal Procedure Law section 440.10 to vacate the judgment of conviction for the crime of Robbery in the First Degree (Penal Law section 160.15(4)), pursuant to a jury verdict on June 13, 2013, after a trial before me. The defendant was thereafter sentenced, on January 17, 2014, upon that conviction, to a determinate state prison sentence of twelve years to be followed by five years post-release supervision.[1] In support of defendant's motion to vacate judgment, and as argued in detail in Defendant's Post-Judgment Motion and Reply Memorandum, defendant contends in the first instance that judgment must be vacated on the ground that he was denied his right to the effective assistance of counsel at trial under both the Federal Constitution and that of the State of New York. The defendant further argues, for reasons expanded upon in the defendant's motion and reply memorandum, that a hearing must be ordered to fully explore defendant's claim of actual innocence. As detailed in the People's Affirmation in Opposition, the People oppose both branches of the defendant's

---

[1] The record of further proceedings reflects that the judgment of conviction was unanimously affirmed at 151 AD3d 531 [1st Department 2017], lv denied 30 NY3d 951.

1

motion to vacate judgment.

The defendant grounds his argument that he was denied his constitutional right to the effective assistance of counsel at trial on the contention that his trial attorney failed to consult with an eyewitness identification expert and to present eyewitness expert testimony at trial (Defense Memorandum of Law in Support of Charles Little's Motion to Vacate Judgment Pursuant to C.P.L. section 440.10, Point B, pgs. 7-25; Defendant's Reply Memorandum of Law, Point I, pgs. 11-18). In sum and substance, as argued by the defendant, at the heart of the trial was the issue of the accuracy of identification testimony by the complainant. Among other factors that bore on the jury's evaluation of the accuracy of the identification in issue was evidence at trial which implicated cross-racial identification, post-event information, weapon focus, stress, lighting conditions, short exposure duration, witness confidence and confidence malleability as well as the increased risk for a flawed identification which attends a non-blind lineup procedure and the potential significance of "second identification" attempts, where, as here, a photo identification card featuring the defendant's photograph was recovered from inside the cab which was the scene of the robbery and which was viewed by the complainant in the aftermath of the robbery and prior to the identification of the defendant by the complainant at subsequent photo array and lineup procedures. The defendant maintains that it follows from defense counsel's failure to consult with and to call at trial an eyewitness expert, that trial counsel's actions "fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different" (Strickland v Washington, 466 US 668; see People v Oliveras, 21 NY3d 339).[2]

As held in People v Clark (28 NY3d 556), "[T]he standards for assessing a defendant's ineffective assistance of counsel claim are well settled.  Under our State Constitution, a defendant must establish that counsel failed to provide meaningful representation and thus deprived defendant of a fair trial (People v Hobot, 84 NY2d 1021, 1022 [1995]).  'In making that assessment, the court must view counsel's performance in its totality' (People v Wragg, 26 NY3d 403, 409 [2015], citing People v Baldi, 54 NY2d 137, 147 [1981]).  'Counsel's performance should be objectively evaluated to determine whether it was consistent with strategic decisions of a reasonably competent attorney' (People v Benevento, 91 NY2d 708, 712 [1998]] [internal quotation marks and citation omitted]).  Defendant bears the ultimate burden of showing 'counsel's performance is constitutionally deficient' (Wragg, 26 NY3d at 409), as well as 'the absence of strategic or other legitimate explanations' for counsel's challenged actions (People v Rivera, 71 NY2d 705, 709 [1988]).

To satisfy the two-part federal test for ineffectiveness set forth in Strickland v Washington, a defendant must show 'counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms' (466 US 668, 688 [1984]), and also 'that the deficiency in performance prejudiced defendant' (Benevento, 91 NY2d at 713, citing People v Ford, 86 NY2d 397, 405 [1995]).  'Strickland's prejudice prong is what chiefly separates it from' our state standard (People v Stulz, 2 NY3d 277, 283 [2004]).  As this Court has ofttimes

---

[2] See, e.g., Affidavit of Expert Deryn Strange, Phd., Defense Exhibit 8, Curriculum Vita for Deryn Strange, Defense Exhibit 43, and Affidavit from defendant's trial counsel, Defense Exhibit 44, attached to Appendix of Affirmation in Support of Motion to Vacate Judgment Pursuant to C.P.L. section 440.10.

3

explained, 'defendant need not fully satisfy the prejudice test of Strickland' as '[o]ur focus is on the fairness of the proceedings as a whole' (id at 284)" (People v Clark, supra at pgs, 562-563; see People v Honghirun, 29 NY3d 284; People v Delgado, 101 AD3d 1144 [2nd Department 2012], lv denied 20 NY3d 1097). As noted in People v Honghirun, supra, "'[U]nder both standards, 'the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy' (Strickland v Washington, 466 US 668, 689 [1984] [internal quotation marks and citation omitted]" (id at pg. 289). That is, "the defendant must overcome the strong presumption that defense counsel rendered effective assistance (see People v Barboni, 21 NY3d 393, 406 [2013])" (People v Ambers, 26 NY3d 313 at pg. 317; see People v McCray, 140 AD3d 794 at 796 [2nd Department 2016]). As recognized in People v Campbell (30 NY3d 941), "[U]nder both federal and state constitutional standards, defendant 'bears the burden of establishing his claim[s] that counsel's performance is constitutionally deficient' (People v Nicholson, 26 NY3d 813, 831 [2016])" (id at pg.942; see People v Gross, 26 NY3d 689 at pg. 693). It bears adding, upon consideration of the instant motion, "[O]ne error ... in the context of an otherwise credible performance by counsel generally will not suffice in support of the conclusion that the representation was not 'meaningful' (see Baldi, 54 NY2d at 147) or fell below the objective standard of reasonableness required by the Federal Constitution (Strickland, 466 US at 688)" (People v Blake, 24 NY3d 78 at pg. 81). The court in People v Blake further noted that "[T]here are, of course, exceptional cases in which an error is so clear-cut, egregious and decisive that it will overshadow and taint the whole of the representation (see People v Turner, 5 NY3d at 480-481; and see People v Caban, 5 NY3d 143, 152 [2005])" (id at pg. 81).

4

With specific reference to defendant's argument in this matter, I note preliminarily, "that it is exceedingly rare that a defense attorney's strategic decision not to present expert testimony amounts to ineffective assistance of counsel (see Harrington v Richter, 562 US 86, 106 [2011]; People v Ross, 119 AD3d 964, 965 [2nd Department 2014]; cf. Hinton v Alabama, 571 US __ , 134 S Ct 1081, 1089 [2014])" (People v Caldavado, 26 NY3d 1034 at pg. 1036). Here, among other considerations, the evidence at trial revealed that the defendant's benefits card, which included as indicated supra, his photograph, was recovered from inside the cab which had been the scene of the subject robbery. The timing of this recovery strongly supported, obviously, a conclusion, on the issue of identification, that it was the defendant who had left it there. Yet the trial record reflects that defense counsel argued adroitly on summation the suggestive impact of viewing the single photo of the defendant on the benefits card and that the viewing by the identifying witness-complainant of the defendant's photographic image on the benefit card, in effect, suggested to the complainant that it was the defendant who had robbed him which led to a misidentification of defendant (see Record of Trial Proceedings on June 12, 2013; People's Affirmation in Opposition, pgs. 10-11, paragraph 21). The record at trial, including summation, reflects, in addition, that trial counsel cogently put in issue other factors in the record bearing on the jury's evaluation of the accuracy of the complainant's identification of the defendant, including the lighting conditions, the complainant's emotional state and alleged intoxication, and the brief duration of the incident. Of significance, as well, upon a consideration of defendant's argument that the failure of trial counsel to consult with and to call an expert on the issue of identification, is the fact that defendant testified at his trial and in doing so informed the jury that a former friend, Tristan McCall, had taken the subject benefits card from his wallet prior to the

5

robbery, thereby offering an explanation for how his benefit card could have been left behind in the cab in the immediate aftermath of the robbery by someone other than himself. The defendant's testimony in this regard also included an acknowledgment on cross-examination that he had not been truthful in his prior testimony before the grand jury regarding the circumstances under which Mr. McCall allegedly obtained defendant's benefit card. At trial, defendant maintained that he had lied in his testimony before the grand jury to protect his friend. In the course of his testimony, the defendant also forwarded, in effect, an alibi defense and maintained that he had been with a woman whom he named on the night of and at the time of, the robbery.[3] The defendant further testified, in pertinent part, that he had not made a statement to a detective subsequent to his arrest to which the detective had previously testified on the People's case-in-chief. The statement to which the detective had testified was to the effect that the defendant had admitted being in the area of a commercial establishment named Sin City on the night of the robbery.[4]

I find it apparent from the record that defense counsel's representation of the defendant at trial revealed a thorough appreciation for the various factors which combine to influence the accuracy of identification evidence. It can also be readily discerned from review of the record that the thrust of the defense was premised on the defendant's testimony which included his version of how his benefits card came to be left behind in the cab after the robber had fled the scene. In my view, the defense counsel's decision not to consult with or call an eye witness

---

[3]The woman whom defendant named was not called at trial; however, the defendant introduced two witnesses to testify to their efforts to locate her (see Record of Trial Proceedings, June 10, 2013; People's Affirmation in Opposition, pg.10, paragraph 20).

[4] The Sin City establishment is located near to where the robbery in issue was committed.

6

expert was entirely reasonable given the particular circumstances presented and the defendant's role at trial as the central defense witness. In any event, such alleged failure on trial counsel's part surely does not rise, in the context of this case, to a deprivation of defendant's right to effective representation under either the Federal or New York State Constitutions (see People v Medlin, 144 AD3d 426 [1st Department 2016], lv denied 29 NY3d 999; see also, People v Gross, supra). To be distinguished, for example, are the underlying facts in People v Carter (167 AD3d 513 [1st Department 2018]). In that case, where the defendant was charged with Assault in the Second Degree and Operating a Motor Vehicle While Under the Influence of Alcohol, the "case turned on whether defendant was intoxicated at the time of the vehicular accident at issue, and there was a serious issue about the accuracy of the final intoxilyzer reading, which conflicted with an earlier reading showing no intoxication. Defense counsel failed to take steps to consult with and produce an appropriate expert on breath and blood alcohol analysis to rebut the People's proof (citation omitted)" (id at pgs.513-514). At a hearing on defendant's motion to vacate judgment, trial counsel "conceded that his only reason for not calling an expert was the inability of his client, who was also unable to pay counsel's fee, to pay for an expert. He also conceded that he took no steps to obtain a court-appointed expert, and was unaware that this remedy might be available" (id at pg.514 ). Given that record, the First Department Appellate Division concluded, "[T]his constituted constitutionally deficient performance (citation omitted). As for the prejudice prong of an ineffective assistance claim," the Court added, " there is a reasonable probability that calling an expert would have affected the outcome of the trial, and that the absence of expert testimony rendered the proceeding unfair under the facts of the case" (id at pg.514). By way of further example, in People v Hull (71 AD3d 1336 [3rd Department 2010], at

a trial in which the defendant was charged with Murder in the Second Degree, the defendant did

not dispute that he had fired the fatal shot but contended that "he did not intend to shoot the

victim, did not cock the hammer ... before or during the confrontation, and did not pull the

trigger" (id at pg. 1337). The defendant's CPL 440.10 motion, "included the affidavit of a

licensed professional gunsmith who opined that the revolver could have discharged accidently in

the manner defendant reported" (id at pg. 1338). The affidavit of the expert continued to detail

"several ways in which the model of revolver that defendant was using could have discharged"

unintentionally (id at pg. 1338). In ruling on defendant's motion, the Court held, "this testimony

would have been directly pertinent to defendant's primary defense and would not have been

duplicative" (id at pg. 1339). Upon further consideration of the defendant's motion to vacate

judgment, the Court cited additional error on defense counsel's part in failing to object to aspects

of the prosecutions cross-examination of defendant. The Court concluded, "[C]onsidering the

seriousness of the errors in the totality of the circumstances, ... defendant was 'deprived of a fair

trial by less than meaningful representation' (citations omitted)" (id at pg. 1339).

The decision and reasoning in People v Caldavago, supra, bears further discussion as well.

In that case, the defendant was charged with Assault in the First Degree, premised on the theory

that he had assaulted a seven month old infant and thereby caused the child to suffer from shaken

baby syndrome. To prove their case at trial, the prosecution called thirteen medical witnesses,

nine of whom testified as experts. Defense counsel did not "present any expert testimony at trial

to contradict the SBS diagnosis proffered by the People's witnesses" (id at pg. 1036). As

discussed in the Caldavado decision, "defendant's CPL 440.10 proffer included statements from

two experts, who described additional lines of inquiry that would likely have been advantageous

8

to the defense but were not pursued at trial. In addition, "defendant submitted an affidavit from her sister, wherein she indicated that counsel asserted that he would not call an expert at trial because it would be 'pointless' to do so in light of the number of experts being called by the People" (People v Caldavado, supra at pg. 1036). Upon consideration of the record before it, the New York Court of Appeals held, "in a case such as this, where casting doubt on the prosecution's medical proof is the crux of the defense, a decision that it would be futile to call an expert based solely on the volume of expert testimony presented by the People is not a legitimate or reasonable tactical choice" (id at pg. 1036). The court continued, "although a hearing is not invariably required on a CPL 440.10 motion, under the circumstances presented here, ... a hearing is necessary to resolve defendant's claim of ineffective assistance of counsel (citations omitted)" (id at pgs. 1036-1037). Similarly, in People v Richard R. (31 Misc3d 1212(A) [County Court Westchester County 2011]), in a case where the defendant was charged with Course of Sexual Conduct Against a Child in the First Degree, alleged to have been committed against his five year old daughter, defense counsel did not call any expert witnesses at trial despite the fact that "the People's evidence at trial consisted primarily of the testimony of the child victim, her mother and medical experts and their review of their examination of the victim. No direct physical evidence linking [defendant] to the acts alleged, such as DNA results, or third party eyewitness testimony was adduced." In support of defendant's motion to vacate judgment, defendant submitted his own affidavit and the affidavits of two doctors. As detailed in the two affidavits from the doctors, they related opinions based upon their review of the medical evidence at trial that the evidence was actually exculpatory and that "the victim had not been sexually abused in the manner described" by the People's doctor. In ruling on defendant's

9

motion to vacate judgment, the Court in People v Richard R., noted, "[I]n sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of the ineffectiveness of counsel." The Court in People v Richard R., reasoned further, "in view of the 'centrality of expert testimony' in cases such as this - where expert testimony may well have a significant, if not determinative impact on whether a jury concludes that the alleged criminal acts occurred or not - the rationale underlying defense counsel's purported failure to consult with and admitted failure to call outside medical experts at trial must be examined. Accordingly," the Court in People v Richard R, ordered a hearing.

By way of comparison, it can be seen that although not irrelevant, the proposed expert testimony in the case at hand would have been substantially less central and more peripheral to the jury's consideration of the issues before it than the medical or otherwise technical evidence at issue in the Carter, Hull, Caldavago and Richard R., decisions discussed supra.[5] I am satisfied, based upon the record before me, including the submissions by the defendant and the People, that the defendant has not carried his burden to establish that trial counsel was constitutionally ineffective. Therefore, that branch of defendant's motion to vacate judgment which is premised

---

[5] In this regard, I have considered the case law cited by defendant, including Oregon v Lawson (352 Or. 724 [2012]), wherein upon considering two consolidated cases for decision the Court held in pertinent part, "[a]s a result of the substantial degree of acceptance within the scientific community concerning data on the reliability of eyewitness identifications, federal and state courts around the country have recognized that traditional methods of informing factfinders of the pitfalls of eyewitness identification - cross-examination, closing arguments and generalized jury instructions - frequently are not adequate to inform factfinders of the factors affecting the reliability of such identification" (citing State v Guilbert (306 Conn 218, 49 A3d 705 [2012])(id at pg. 761). In that decision, the Court issued a revised test governing the admissibility of eyewitness testimony when a defendant in a criminal case files a pretrial motion to exclude eyewitness identification. However, the Court did not discuss under what circumstances a failure to call an eyewitness expert might constitute ineffective assistance of counsel.

10

on defense counsel's failure to consult with or call at trial an expert on eye witness identification is denied without a hearing (People v Manchester, 123 AD3d 1285 [3rd Department 2014], lv denied 26 NY3d 931; People v Koonce, 68 AD3d 424 [1st Department 2009], lv denied 14 NY3d 802; People v Waymon, 65 AD3d 708 [2nd Department 2009], lv denied 13 NY3d 863).

As indicated supra, the defendant has also moved for a hearing to explore defendant's claim of actual innocence (Defendant's Memorandum of Law, Point II, pgs. 26-32; Defendant's Reply Memorandum of Law, Point II, pgs. 19-28). The defendant's claim that he is actually innocent is based on his contention, as he testified at trial, that sometime between September 8 and September 11, 2011, a childhood friend, Tristan McCall, had taken defendant's EBT and health care cards out of defendant's wallet as collateral for having paid defendant's phone bill (Defense Memorandum of Law, pg.30). This, defendant maintains, explains how his identification card came to be in the taxi cab in the aftermath of the robbery inside the cab on September 28, 2011. In this context, defendant asserts, in support of the instant motion to vacate judgment, that two witnesses, Ms. Ann Walker and her caretaker, Ms. Joyce Adams, "have relayed information about an exculpatory conversation that Ms. Walker overheard in September 2011 in which Tristan McCall stated unequivocally that he left Mr. Little's photo identification card in a car and that he felt bad about the situation he had created for Mr. Little" (Defense Memorandum of Law, pg. 26; Defendant's Reply Memorandum of Law, Point II, pgs. 19-23). In opposition to this branch of the defendant's motion to vacate judgment, the prosecution takes issue with defendant's contention as to the weight and significance to be accorded this overheard conversation. As amplified upon in the People's Affirmation in Opposition, the People argue that the version and even the time frame of the overheard conversation on which the defendant

11

now relies has evolved over time and has been inconsistent in certain key respects (People's Affirmation in Opposition, pgs. 15-18; see, Defense Exhibits 10; 11 and 37-41, attached to Appendix to Affirmation in Support of Motion to Vacate Judgment Pursuant to C.P.L. section 440.10).

In People v Jimenez (142 AD3d 149 [1st Department 2016]), the First Department Appellate Division agreed with the Second Department holding in People v Hamilton, 115 AD3d 12 [2nd Department 2014]), wherein that Court held "that CPL 440.10(1)(h) embraces a claim of actual innocence" (People v Jimenez, supra at pg. 155). As stated in the Hamilton opinion, "[A] claim of actual innocence may be asserted, either as a 'gateway' to review of another claim which is otherwise procedurally barred, or as a 'freestanding' claim justifying relief in and of itself (citations omitted). A freestanding claim of actual innocence is rooted in several different concepts, including the constitutional rights to substantive and procedural due process and the constitutional right not to be subjected to cruel and unusual punishment (citations omitted)" (id at pg. 21).[6] The Court in People v Hamilton continued, in pertinent part, "the law is well settled that 'actual innocence' means factual innocence, not mere legal insufficiency of evidence of guilt (citation omitted) and must be based upon reliable evidence which was not presented at the trial (see Schlup v Delo, 513 US at 324). The standard of proof generally applied is proof of actual innocence by clear and convincing evidence (citations omitted)" (id at pg. 23). As stated further in People v Hamilton, "with respect to a claim of actual innocence, as distinguished from a

---

[6] The court in People v Hamilton, supra, further noted its recognition "that '[i]t is abhorrent to our sense of justice and fair play to countenance the possibility that someone innocent of a crime may be incarcerated or otherwise punished for a crime which he or she did not commit' (People v Tankleff, 49 AD3d at 177)(id at pg. 25).

specific constitutional violation, a constitutional violation occurs only if there is clear and

convincing evidence that the defendant is innocent (citations omitted).[7]   The constitutional

violation on a claim of actual innocence is that the defendant is subject to a criminal conviction

while he or she is in fact innocent.   Mere doubt as to the defendant's guilt, or a preponderance of

conflicting evidence as to the defendant's guilt, is insufficient, since a convicted defendant no

longer enjoys the presumption of innocence, and, in fact, is presumed to be guilty (citations

omitted).

A prima facie showing of 'actual innocence is made out when there is 'a sufficient

showing of possible merit to warrant a fuller exploration' by the court (Goldblum v Klem, 510

F3d 204, 219 [2007], cert denied 555 US 850 [2008], quoting Bennett v United States, 119 F3d

468, 469 [7th Cir. 1997])" (id at pg. 27).   Upon an application of the holdings in People v

Hamilton and People v Jimenez to the instant matter, I note that the Court in People v Hamilton

held that the evidence in support of a claim of actual innocence must be reliable (People v

Hamilton, supra at pg. 23).   In its analysis of the holding in People v Hamilton, the First

Department Appellate Division in People v Jimenez ruled, "actual innocence claims should be

considered in light of, and alongside, the more general standard applicable on any motion to

vacate a conviction brought under CPL 440.10.   Thus, statements of fact supporting the motion

must be sworn (People v Simpson, 120 AD3d 412, 412 [1st Dept 2014] 'Where a CPL 440.10

motion is based upon the existence or occurrence of facts, the motion papers must contain sworn

allegations of such facts (CPL 440.30 [1][a])], lv denied 24 NY3d 1046 [2014]).   Further,

---

[7] As stated in People v Velazquez (143 AD3d 126 [1st Department 2016], lv denied 28 NY3d 1189), "[T]o be sufficient, clear and convincing evidence must establish that the claim asserted is 'highly probable" (id at pg. 136).

13

hearsay statements in support of such motions are not probative evidence (see People v DeVito, 287 AD2d 265, 265 [1st Dept 2001], lv denied 97 NY2d 753 [2002], cert denied 537 US 821 [2002] [holding that the defendant was not entitled to vacatur of conviction based on newly discovered evidence that was comprised in part of an affidavit based on hearsay])" (People v Jimenez, supra at pg. 156).[8]

In this case, the statements in support of defendant's motion which are attributed to Ms. Walker are themselves hearsay statements, unsupported by either an affidavit from Ms. Walker or from her caretaker, Ms. Adams. Moreover, the content of the statements attributed to Ms. Walker includes additional hearsay, that being what she reported having overheard someone or others saying. It bears noting, as well, that Mr. McCall has not submitted an affidavit. As in People v Mallett (168 AD3d 542 [1st Department 2019], lv denied __ NY3d __ ), the instant defense motion is not supported "by any sworn, nonhearsay allegations by the source" of the information (id at pg.543). I would add to the foregoing that the remarks attributed to Mr. McCall do not include an admission that it was he who committed the subject robbery and they do not directly serve to exculpate the defendant.[9]

─────────────────────

[8] I note, that, as held in People v Hamilton, supra, at a hearing on defendant's claim of actual innocence, "all reliable evidence, including evidence not admissible at trial because of a procedural bar - such as the failure to name certain alibi witnesses in the alibi notice - should be admitted (see People v Cole, I Misc3d at 543; Schlup v Delo, 513 US at 328) (People v Hamilton, supra at pg. 27). However, the Hamilton decision does not stand for the proposition that the hearsay evidence proffered in this case is sufficient to warrant a hearing and I find nothing inconsistent in the Hamilton opinion with the decision in People v Jimenez, supra (see also, House v Bell, 547 US 518 [2006]; Hubbard v Pinchak, 378 F3d 333 [3rd Cir. 2004], cert denied 543 US 1070 [2005]; US v Goldblum, 510 F3d 204 [3rd Cir. 2007], cert denied 555 US 850).

[9] The submissions by defendant and the People on this motion to vacate judgment indicate that an investigation has been conducted by both counsel on behalf of the defendant and

In sum, the allegations proffered in support of that branch of defendant's motion to vacate judgment which is premised on the contention that he is actually innocent are insufficient to support the relief he seeks.  Nor do they warrant a hearing (People v Jimenez, supra; see People v Velazquez, supra at footnote 4; People v Lobban, 43 Misc3d 1202(A) [Supreme Court Kings County 2014]). [10]

Accordingly, the defendant's motion to vacate judgment is, in all respects, denied. [11]

This opinion constitutes the decision and order of the Court.

Date:  June 6, 2019

_Denis J. Boyle, A.J.S.C._

---

the Office of the Bronx District Attorney into the concerns raised by the statements and remarks alleged to have been overheard by Ms. Walker (see Defense Exhibits 10,11 and 37-41, attached to Defendant's Appendix to Affirmation in Support of Motion to Vacate Judgment Pursuant to C.P.L. section 440.10).

[10] To be distinguished, for example, from the case at hand, is People v Pottinger (156 AD3d 1379 [4th Department 2017]).  In that case, the defendant made a prima facie showing of actual innocence on his motion to vacate judgment where, "in support of his claim of actual innocence, he submitted competent evidence establishing an alibi through, inter alia, witnesses who, although identified before trial in a police report ... did not testify at trial" (id at pgs. 1380-1381; see also, People v Jones, 115 AD3d 984 [2nd Department 2014]).

[11] In view of the fact that the defendant's prior post-judgment motions were pro-se, and in the interest of reaching the merits of defendant's respective arguments, bearing as they do on defendant's constitutional right to effective assistance of counsel and actual innocence, I have not addressed the People's contention that defendant's claims are procedurally barred.

15

Charles Little DIN#14A0447
Washington Correctional Facility
72 Lock 11 Lane, P.O. BOX 180
Comstock, NY 12821-0180



Clerk of the Court
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007



RECEIVED
MAY 27 2021
CLERK'S OFFICE
S.D.N.Y.

RECEIVED
SDNY PRO SE OFFICE
2021 MAY 28  AM 11:01



Pro Se   JCR

" URGENT "

URGENT
LEGAL
MAIL

Charles Little 14A0447

Urgent Legal Mail