UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
CHARLES LITTLE,

                                        Petitioner,

                                                        DECLARATION IN
                                                        OPPOSITION
                        -against-                        21 CIV. 4792 (JPC)(KNF)
TYNON,
                                        Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
STATE OF NEW YORK )
                                )ss:
COUNTY OF BRONX    )

     NANCY D. KILLIAN, an attorney admitted to practice in the State of New York, and before this Court, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true, except those made upon information and belief, which she believes to be true:

     1.    I am an Assistant District Attorney in the Office of DARCEL D. CLARK, District Attorney, Bronx County, and submit this declaration in opposition to petitioner's application for a writ of habeas corpus.

     2.    Pursuant to an agreement with the Office of the Attorney General of the State of New York, this Office represents respondent in the action.

     3.    This declaration is based upon the records in this matter maintained by this Office, which I believe to be true and accurate. Although the full facts will be set

forth in the accompanying memorandum of law, in brief, petitioner was convicted of robbing the victim, with his guilt being established by the victim's testimony and the fact that petitioner's benefit card, bearing petitioner's photograph, and his credit or debit card were found in the victim's car in the robbery's aftermath. When petitioner was arrested and questioned by police and shown the cards left at the crime scene, petitioner volunteered that he did not leave them in the back of anyone's car, although the police had not mentioned anything about a car at that point. Petitioner testified and put forth an alibi defense, which the jury rejected. He also testified that the last time he had seen his identification cards at issue was over a week before the robbery, when his friend, Tristan McCall, took the cards from petitioner to secure a debt that petitioner owed him. Petitioner admitted that he had lied to the Grand Jury and that he had not told the Grand Jury about McCall's alleged possession of the cards a week before the crime. During his testimony, defense counsel sought permission to elicit testimony regarding a conversation overheard by Anne Walker, a neighbor of petitioner. According to counsel, Ms. Walker told counsel that at some point in time after the crime, she saw "Tristan McCall" with other young men, one of whom said to McCall "You shouldn't have done like that . . With the EBT card", to which McCall responded by "chuckling." The court denied the application, stating that the chuckle was neither an admission nor a declaration against penal interest. Petitioner

was convicted of Robbery in the First Degree (Penal Law § 160.15[4]) and on January 17, 2014, the Court adjudicated petitioner a second felony offender and sentenced him to 12 years incarceration followed by 5 years postrelease supervision (S.4, 16).[1]

4. In June 2016, petitioner, represented by Matthew A. Wasserman, Esq., of the Office of the Appellate Defender (OAD), filed a 48-page appellate brief in the Appellate Division, First Department, arguing that:

> (1) Petitioner's constitutional right to represent himself was violated by the trial court's failure to resolve his repeated requests to represent himself; (2) Petitioner was deprived of his right to a fair trial by the prosecution's improper summation, including unsupported speculation about petitioner's "opportunity" to commit this crime, personal denigration of defense witnesses, and distortion of the evidence; (3) Petitioner's conviction was against the weight of the evidence because the testimony of a single inebriated stranger of a different race, unsupported by any forensic evidence, was insufficient to identify him; and (4) Petitioner's sentence is excessive.

(Ex. 1, Def. Brief; *see also* Ex. 2, Respondent's Brief).[2]

---

[1] The minutes of trial are being submitted separately, as is the Appendix submitted by petitioner as part of the CPL 440 motion relevant to this proceeding. References preceded by "H." are to the pre-trial suppression hearing; "T." are to the trial minutes, those preceded by "S." are to the sentencing minutes, and those preceded by "A." are to the Appendix filed by petitioner in support of his pertinent collateral attack in state court.

[2] The appeal was held in abeyance for several months while the Bronx District Attorney's Conviction Integrity Unit (CIU) reviewed petitioner's case. Following "a great deal of consideration" CIU "did not find *credible* evidence establishing that Mr. Little is actually innocent or that he was wrongfully convicted" (A.36 [emphasis in original]).

On June 13, 2017, the First Department unanimously affirmed the judgment of conviction (People v Little, 151 AD3d 531 [1st Dept 2017], lv denied, 30 NY3d 951 [2017]). Pertinently, it held:

> There was no violation of defendant's right to represent himself … The minutes of the ensuing court appearance, as well as the next appearance, clearly establish that defendant was satisfied with the new attorney and no longer wished to represent himself.
>
> …
>
> The verdict was not against the weight of the evidence (*see People v Danielson*, 9 NY3d 342, 348–49 [2007]). There is no basis for disturbing the jury's determinations concerning identification and credibility. During the robbery, two benefit cards belonging to defendant were left in the victim's car, and defendant's explanation for the presence of his cards was highly implausible.
>
> We perceive no basis for reducing the sentence.

(Little, 151 AD3d at 531-32) (Exhibit 3). Leave to appeal to the New York Court of Appeals was then denied. People v Little, 30 NY3d 951 (2017).

5.     Petitioner, through appellate counsel, then filed a motion to vacate his conviction pursuant to NYCPL (hereinafter "CPL") 440.10(1)(h), alleging ineffective assistance of trial counsel, for failure to consult or call an identification expert, and claiming actual innocence. In support of his motion, petitioner submitted an appendix of exhibits, including an affirmation from his

trial counsel (A.251-52), but did not provide affidavits from himself, Ms. Walker, Tristan McCall, or any alibi witness (Exhibit 4: 440 Motion; Exhibit 5: Petitioner's Memorandum of Law; Exhibit 6: People's Response; Exhibit 7: Reply).

6.     In a decision and order dated June 6, 2019, the motion court denied petitioner's motion.   The court noted that petitioner had filed a prior 440 motion, the court exercised its discretion to decide the motion on the merits (Exhibit 8, 15 n 11).[3] The court first analyzed petitioner's claim of ineffective assistance of counsel for failure to consult or call at trial an eyewitness expert under both the applicable state and federal standards (id. at 2-10). The motion court observed that the defense strategy was dictated by petitioner's testimony at trial, wherein he told the jury that a former friend, Tristan McCall, took the benefits card from his wallet prior to the robbery. Petitioner had also admitted to lying before the Grand Jury (id. at 5-6).  Petitioner put forth an alibi defense without any supporting witnesses, though a defense investigator offered testimony concerning attempts to locate alibi witnesses (id. at 6). And petitioner denied telling Det. Russo that he was in the area of Sin City the night of the

---

[3]The Court chose not to invoke the discretionary procedural bar contained in NYCPL 440.10 (3)( c), which allows a court to deny a motion based on a finding that, upon a previous CPL 440.10 motion, the defendant was in a position to adequately raise the ground or issue presented in the second motion, but did not do so.

robbery (id.). Yet, the court noted, "defense counsel argued adroitly on summation [that] the suggestive impact of viewing the single photo of the defendant on the benefits card … led to a misidentification of defendant" (id. at 5). Furthermore, "trial counsel cogently put in issue other factors in the record bearing on the jury's evaluation of the accuracy of the complainant's identification of the defendant, including the lighting conditions, the complainant's emotional state and alleged intoxication, and the brief duration of the incident" (id.). Given "the defendant's role at trial as the central defense witness," it was "entirely reasonable" for counsel not to call or consult an eye witness expert, and the failure to do so did not rise "to a deprivation of defendant's right to effective representation" (id. at 7).

7.     The court then analyzed petitioner's claim of actual innocence pursuant to People v Jimenez, 142 AD3d 149 (1st Dept 2016) and People v Hamilton, 115 AD3d 12 (2d Dept 2014). The court noted that evidence in support of a claim of actual innocence "must be reliable" and "considered in light of, and alongside, the more general standard applicable on any" CPL 440 motion (id., at 13). Here, petitioner's motion was not supported "by any sworn, nonhearsay allegations by the source," in that the statements attributed to Ms. Walker and Ms. Adams were presented as hearsay, and further, the statements

themselves contain hearsay (id., at 14). Indeed, the hearsay remarks attributed to Tristian McCall—who likewise did not submit an affidavit—did not constitute an admission that he committed the robbery and did not directly exculpate the petitioner (id. at 14). Thus, petitioner's motion failed to make a prima facie showing of actual innocence to warrant a hearing (id., at 15). On October 1, 2019, the Honorable Barbara R. Kapnick of the Appellate Division granted petitioner leave to appeal the denial of his postjudgment motion.

8. On appeal to the Appellate Division, petitioner argued again that counsel was ineffective for failing to consult or call an expert on eyewitness identification and that the hearing court erred in denying his actual innocence claim without a hearing (Exhibit 9: Petitioner's Appellant's Brief [440 Appeal]; Exhibit 10: People's Response [440 Appeal]; Exhibit 11: Petitioner's Reply [440 Appeal]). On March 2, 2021, the Appellate Division rejected the claims, finding that counsel provided effective assistance, and that petitioner's claim of actual innocence was not supported by substantiated facts and was based on multiple levels of hearsay.

In pertinent part, the Court found that:

Defendant's guilt was established by compelling circumstantial evidence that was separate from the victim's identification testimony. After the robbery, the victim found defendant's benefits cards, one which contained defendant's picture, in the

7

back seat of the victim's car; given the circumstances, these cards could only have been left by the person who robbed the victim. A detective testified that defendant made a statement placing himself near the scene of the crime, and that when shown his benefit cards, defendant became visibly upset and volunteered that he had not left them in the back seat of a car (despite not having been told that the robbery took place in a car). At trial, defendant gave testimony, which this Court found "highly implausible" on direct appeal (151 AD3d 531, 532 [1st Dept 2017]), about how his friend had allegedly acquired the cards. Defendant also admitted at trial that he had lied in his grand jury testimony about his cards having been missing.

The court then concluded that, given this evidence, any argument that expert testimony on eyewitness identification should have been permitted or that an expert would have changed the outcome of trial, would be speculative, and it was not unreasonable for counsel to proceed without an identification expert. The Court also noted the "vigorous" nature of counsel's attack upon the victim's identification testimony.

Turning to the claim of actual innocence, and particularly the hearing court's decision to reject the claim without a hearing, the Appellate Division held:

> The court providently exercised its discretion in declining to hold a hearing on the branch of defendant's motion that sought to vacate his conviction based on actual innocence, because the motion was not supported by "sworn allegations substantiating or tending to substantiate all the essential facts" (CPL 440.30 [4] [b]). On the motion, defendant offered evidence, similar to

evidence he unsuccessfully sought to present at trial, that allegedly corroborated his story about his friend's acquisition of the cards found in the victim's car. However, this evidence consisted of multiple layers of hearsay, as well as lacking exculpatory value, and it did not require a hearing (see People v Jimenez, 142 AD3d 149, 155-158 [1st Dept 2016]; see also People v Velazquez, 143 AD3d 126, 136-137 [1st Dept 2016], lv denied 28 NY3d 1189 [2017]).

People v Little, 192 AD3d 408 (2001) (Exhibit 12). Petitioner then sought leave to appeal to the New York Court of Appeals, which was denied on May 10, 2021. People v Little, 37 NY3d 958 (2021).

9.    In the current petition, timely filed by petitioner pro se on May 27, 2021, petitioner raises the following Grounds:

    1.  Petitioner was denied is right to self-representation by the trial court's failure to hold an inquiry on petitioner's request to proceed pro se;
    2.  He was denied effective assistance of counsel due to counsel's failure to consult with or hire an expert on eyewitness identifications or seek to introduce expert testimony about the purported unreliability of eyewitness identifications;
    3.  He was improperly denied a hearing on his motion alleging actual innocence; and
    4.  He is actually innocent.

10.   It is respondent's position that the Appellate Division's resolutions of Grounds One and Two were neither contrary to nor unreasonable applications of clearly established Supreme Court precedent, nor were they based on unreasonable determinations of the facts, and that Grounds Three and

Four are not cognizable claims for substantive habeas relief.

WHEREFORE, the People of the State of New York respectfully request that defendant's application be denied.

**WHEREFORE**, respondent respectfully requests that the petition be dismissed or denied in its entirety.

_____/s_____
NANCY    D.    KILLIAN
(NK0771)
Assistant District Attorney

Bronx, New York
November 23, 2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
CHARLES LITTLE,

                           Petitioner,

                                       <u>DECLARATION   IN</u>
                                       <u>OPPOSITION</u>
                -against-                21 CIV. 4792(JPC)(KNF)
TYNON,

                          Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


**<u>MEMORANDUM OF LAW</u>**

**<u>STATEMENT</u>**

        This Memorandum of Law is submitted in opposition to the above-captioned habeas corpus petition.

# THE FACTS

The facts relied upon are contained in the declaration of Nancy D. Killian and in the accompanying exhibits.

As reflected in the testimony at trial, on September 17, 2011, Jonathan Lopez celebrated the birthday of a friend at Sin City strip club (Lopez: T.500-01). Mr. Lopez parked his car near the club, arriving between 10 p.m. and 11 p.m. (Lopez: T.501-02). In the area where he parked his car, Mr. Lopez noticed functioning lights on the street and on the surrounding buildings (Lopez: T.516). Once at the club, Mr. Lopez limited himself to two drinks because they were very expensive (Lopez: T.518). Mr. Lopez and his friend left the club around 1:00 a.m. on September 18, 2011, and once they parted ways, Mr. Lopez walked to his parked car alone (Lopez: T.519).

Mr. Lopez unlocked his car, turned on the ignition, and called his girlfriend to talk about his experience (Lopez: T.521). With his car on, the lights from the gauges, accessories, and large touch screen radio all illuminated the vehicle's interior (Lopez: T.521). Sitting in his car, Mr. Lopez felt something was wrong and told his girlfriend he would call her back (Lopez: T.525). Petitioner entered the vehicle's back seat and pointed a black gun to Mr. Lopez's head (Lopez: T.526-27). Petitioner demanded Mr. Lopez give him

everything in his pockets, his gold chain, and earrings or he would kill Mr. Lopez (Lopez: T.528, 531). Mr. Lopez turned over his wallet, ID and health insurance cards, $100 cash, and his iPhone 4 (Lopez: T.529). During this time, Mr. Lopez stared at petitioner's unobstructed face, to the extent that petitioner told him to stop looking, but Mr. Lopez continued looking at petitioner's face through the rearview mirror (Lopez: T.529, 533-34, 538). Mr. Lopez gave petitioner his chain and earrings, but expressed reluctance in handing over a double-finger ring that his mother had bought him. Petitioner stated, "you better give it to me before I kill you," then grabbed the ring, and pulled it off Mr. Lopez's fingers, causing Mr. Lopez's finger to bleed (Lopez: T.531-32).

Petitioner exited the rear of the vehicle, and sat in the front passenger seat, close enough that Mr. Lopez could "kiss him" (Lopez: T.536-37). Petitioner once again admonished Mr. Lopez to stop looking at him, but Mr. Lopez continued to stare while petitioner removed items from the glove compartment (Lopez: T.536). Petitioner reached towards Mr. Lopez, grabbing the car key from the ignition, and then fled (Lopez: T.536).

The incident "felt like it was never going to end," leaving Mr. Lopez in a state of shock (Lopez: T.539). Without his phone and unable to move his car, he was afraid to leave the area with petitioner potentially around the corner, so

he stayed in his vehicle until daylight (Lopez: T.540). The next morning, when Mr. Lopez felt safe to leave his car, he surveyed the vehicle and observed on the rear passenger seat that petitioner had left behind his benefit card with petitioner's photo and a credit or debit card (Lopez: T.543).

Mr. Lopez found the nearest police precinct and reported being robbed (Lopez: T.547-48). Mr. Lopez met with Detective Anthony Russo, of the 40th Precinct, explained the robbery, and provided the two cards with petitioner's identification (Det. Russo: T.675, 688-89, 702). Mr. Lopez described petitioner as a black male, medium complexion, approximately 5'6'', 160 pounds, with short hair, wearing a black hoody, blue jeans, and black sneakers (A.39 [DD5 #1]). Using a different photograph of petitioner than on the benefit card, Det. Russo created a photo array of six similarly looking individuals, and Mr. Lopez picked the petitioner out as the person who robbed him (H.9, 11).

Multiple efforts to apprehend petitioner were unsuccessful. Officers went to several Bronx addresses to no avail and coordinated with petitioner's parole officer, but petitioner absconded from his parole obligations and a parole warrant was issued (Det. Russo: T.694-702; PO Ancrum: T.837-42).

On or after November 4, 2011, Det. Russo placed about a dozen wanted posters with petitioner's picture and information in the lobby of 1742 Story

Avenue and nearby police precincts (Det. Russo: T.784-86).

On January 3, 2012, Det. Russo was notified that petitioner had been arrested by a different precinct, and Det. Russo took custody of the petitioner and brought him to the 40th Precinct (Det. Russo: T.701). After being informed of and waiving his *Miranda* rights, petitioner told Det. Russo that he was near Sin City at the time of the robbery, but he could not get in, so he was talking to females on the line to get them to go with him instead of into the club (Det. Russo: T.710). Det. Russo then showed petitioner the two cards left in Mr. Lopez's car. Petitioner volunteered that he didn't leave them in the back of anybody's car, though Det. Russo had not mentioned anything about a car in his interview with petitioner (Det. Russo: T.711; H.40). Petitioner became nervous, visibly shaken, and stopped talking (Det. Russo: T.712). That same day, Det. Russo conducted a lineup, during which Mr. Lopez identified petitioner as the person who robbed him (Lopez: T.549-551; Russo: T.715).

Petitioner was arraigned on January 4, 2012, in Criminal Court, Bronx County (Franco, J.). On January 10, 2012, petitioner testified before the Bronx County Grand Jury (A.101-21). Petitioner claimed that he first realized that his benefit card was missing in October 2011, several weeks after the robbery (A.112-13; Little: T.985). He told the Grand Jury that at the time of the

robbery, he was at an apartment with several other individuals watching a boxing match (A.106).[4] Petitioner proffered one witness to the Grand Jury, his then-girlfriend, Crystal Sanchez-Moore,[5] to support his purported alibi (A.107). The prosecutor informed the Grand Jury of the defense proffer, but the Grand Jury elected not to hear from Ms. Sanchez-Moore (A..134-36).

By indictment number 740/2006, filed on January 13, 2012, the Bronx County Grand Jury charged petitioner with Robbery in the First Degree (Penal Law § 160.15[4]) and related charges)(A.42).

On May 20 and May 21, 2013, a combined *Huntley/Wade/Dunaway* hearing was held before the Honorable Denis Boyle. The court denied petitioner's application to suppress his proffered statement and lineup identification. The Court filed a written decision on June 28, 2013 (A.140-52).

On May 30, 2013, the jury trial against petitioner commenced with

---

[4] In the Grand Jury, petitioner stated, "On September 17th, sport even happened [sic], which I was watching with my girlfriend, which is Crystal Sanchez. Her mother, Debra Estrada. Her sister, Jocelyn Estrada, and Katherine Estrada, Darshina Little and Tricia McCall (ph), one of my friends" (A.106 [phonetics marking in original]). At trial, petitioner claimed that Tricia McCall was Crystal's friend, whom he had not seen since the night of September 17, 2011, and that she is not related to Tristan McCall (Little: T.1033-34). In arguing against a potential missing witness charge, defense counsel stated, "My client testified that as to the McCall girl, he has no – he's not friends with her. He didn't really know her. He didn't have her phone number and she was friends with his ex-girlfriend" (T.1122-23).

[5] Crystal Sanchez and Crystal Moore are the same person; the latter being her name after marriage, and the former being her maiden name (T.1286).

opening statements (T.478 [People]; T.486 [Defense]). The People's case, in pertinent part, was presented as described above. Petitioner was represented at trial by Maria S. Tobia, Esq.

During the trial, Ms. Tobia attacked the identification of petitioner, and the petitioner testified in his own defense, putting forth an alibi defense. Petitioner told the trial jury that his former friend Tristan McCall took the EBT and Care Credit card out of petitioner's wallet prior to the robbery (Little: T.908, 911). He acknowledged that despite his oath to tell the truth, he lied in the Grand Jury when he testified that he first realized his EBT card was missing in October 2011 (Little: T.1001). He was aware he was wanted by police, and even called a detective to surrender, but he did not want to turn himself in without a lawyer (Little: T.900). Petitioner testified that a friend named Tanisha, last name unknown, told him that Tristan committed the crime that petitioner was wanted for (Little: T.971). Petitioner denied making Mirandized statements to Det. Russo about being near Sin City at the time of the crime. Rather, he said he stated to Det. Russo "without too much details" that he was with Crystal Sanchez-Moore on September 18, 2011, and then he asked for a lawyer and refused to answer any questions about the EBT and Care Credit card (Little: T.944-45). The first time he saw the wanted poster was after his was

arrested on January 3, 2012 (Little: T.934)

During petitioner's testimony, on June 10, 2013, defense counsel sought permission from the Court to elicit testimony regarding a conversation overheard by Anne Walker, a neighbor of the petitioner. Defense investigators initially located Ms. Walker months earlier (T.1095, A.225-29). In an email dated March 24, 2013, defense investigator Bernard Johnson described an interview with Ms. Walker, wherein she stated that she overheard unnamed individuals "talking about the situation and they were saying that that was not right what they did to him with his ebt [sic] card," and that Ms. Walker would get the names of the people in the conversation (A.225). In a follow up interview, Ms. Walker learned that the boys talking were "Tristan, George, Terrell, and a Nelson" (A.225).[6] Additionally, on June 4, 2013, there is an email from investigator Smith to Johnson stating that Ms. Walker "is willing to testify in court" that she heard Tristan and other boys talking outside her window, and that she did not see the wanted poster (A.229).

In counsel's application to the Court, Ms. Tobia relayed that she personally spoke with Ms. Walker "on a couple of occasions … via telephone"

---

[6] The email to counsel appears to be based on interviews of Ms. Walker conducted by defense investigator Alfred Smith on prior unknown dates (A.227-28).

(T.1095). Ms. Walker informed counsel that she knows petitioner, whom she viewed as helpful (T.1096). Ms. Walker observed Tristan McCall with three or four other young men "at a time after the wanted posters [with petitioner's information] had gone up" (*id*.). Ms. Walker overheard one of the young men state, "You shouldn't have done him like that, [or] you shouldn't have done that with the EBT card," and in response Tristan "started chuckling" (*id*.). Counsel offered this statement not to suggest that Tristan committed the robbery, but to support petitioner's testimony that there were rumors that someone else committed this crime and to explain petitioner's reluctance to surrender to the police (T.1098-99). The Court denied counsel's application, ruling that Tristan's chuckle was "neither an admission nor … a declaration against penal interest[,] and the conversation taken as a whole doesn't bear on the petitioner's consciousness of guilt" (T.1101).

Petitioner called several investigators to testify at the trial to describe their efforts to locate Crystal Sanchez-Moore and her family—Debra Estrada, Jocelyn Estrada, and Katherine Estrada (Johnson: Supp.T.6-9). There was no testimony about efforts to locate Tricia McCall.

In closing arguments, defense counsel attacked the identification of her client on multiple grounds. She described the circumstances for Mr. Lopez as

"very stressful," that he was "under incredible amount of stress," and that "when you have a gun that close to you, you're terrified" (T.1186, 1202, 1209). Under the circumstances, which included the consumption of alcohol and only about "14 seconds" to view the perpetrator, "[t]he human mind is incapable under the influence of alcohol of creating an image that is reliable" (T.1210, 1226). Counsel emphasized the suggestive effect of post-event information caused by the discovery of petitioner's benefit cards (T.1196 ["The ID card suggested who did it, but it was a false suggestion … and it led to a misidentification of my client"]; T.1206 ["He found it right in his back seat. He knows the guy was sitting there. It must be him. That's inherently suggestive … He's identifying Clifton Little because he saw Clifton Little's picture on the ID"]). She criticized the lineup identification as inherently suggestive because, as Mr. Lopez explained, he knew that the police were "looking for the guy in the ID, obviously, because I gave it to them" (T.1208). Ms. Tobia argued that the jury should reject Mr. Lopez's identification of the petitioner based on the combination of all these factors:

> [T]he lighting conditions, his intoxication and the incredibly brief duration of this situation makes an I.D. impossible … He's looking behind him for seconds at a time … We are not machines. We are not computers. We are people and making the impression in your mind of another human being in th[is] stressful situation especially after

drinking is extremely difficult … add the utter complete suggestion of the I.D. being found, the chances of this person ever being able to make an accurate I.D. is zero, absolutely zero. It doesn't matter that he believes he can. … It doesn't mean he's accurate. It doesn't mean he's right.

(T.1211).

On June 13, 2013, the jury rendered a guilty verdict against petitioner for Robbery in the First Degree (Penal Law § 160.15[4]) (T.1349).

On July 10, 2013, prior to sentencing, defense counsel alerted the Court that she personally spoke with Crystal Sanchez-Moore after the guilty verdict (A.153-56). Although Ms. Sanchez-Moore was proffered as an alibi witness in the Grand Jury, petitioner had lost contact with her after she stopped visiting him in jail about nine months before the trial (T.870, Little: T.1033). Still, when Tristan McCall asked how petitioner was holding up, she told Tristan that petitioner wasn't holding up very well at all (A.156). Ms. Sanchez-Moore indicated that Tristan McCall began discussing the circumstances of the crime, including watching the boxing fight at Sin City, tucking his braids under a baseball hat, and forcefully pulling a double-finger ring off a "Spanish" kid's hand, causing an injury (A.156-57). Counsel asked for an adjournment, which the Court granted, to speak with Ms. Sanchez-Moore further and to prepare a motion (A.157-59).

Counsel, without explanation, did not file any motion related to the

allegations imparted by Crystal Sanchez-Moore. Instead, on October 11, 2013 counsel adopted petitioner's pro se motion pursuant to CPL 330.30 (A.162), claiming that the failure to preserve the wanted poster or video surveillance in the vicinity of the crime was a *Brady* violation requiring a new trial (A.164-82).

The Court denied petitioner's CPL 330.30 motion in a written decision filed on January 13, 2014 (A.183-85).

On January 17, 2014, the Court adjudicated petitioner a second felony offender and sentenced him to 12 years' incarceration followed by 5 years' postrelease supervision (S.4, 16).

The relevant post-conviction litigation is outlined in the Declaration in Opposition.

## ARGUMENT

## POINT ONE

**THE APPELLATE DIVISION'S REJECTION OF PETITIONER'S CLAIM REGARDING HIS RIGHT TO PROCEED PRO SE WAS NEITHER CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT PRECEDENT, NOR WAS IT BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS.**

On October 5, 2012, petitioner informed Justice Miriam R. Best that he wanted the court to allow him to represent himself (Exhibit 13:Minutes of October 5, 2012, at 5). The court responded, "[t]he issue of whether you will represent yourself has not yet been determined" (id., at 7). The court added, "Now I have a very long calendar today, sir and the inquiry as to whether you are permitted to represent yourself is a long one and I am not going to take the time to do it now. So what I am going to do is put your case over for another day" (id.). The court concluded, "I am going to put this case on the 15th for the Court to inquiry [sic] whether the defendant will be permitted to represent himself" (id., at 10). Petitioner offered no protest to the court's adjournment to resolve the issue.

On October 15, 2012, the attorney newly appearing for petitioner asked if he could have time to talk to petitioner to determine issues in the case

(Exhibit 14: Minutes of October 15, 2012, at 2). The court acceded and adjourned the case to October 17, 2012 (id., at 3). On October 17, 2012, the newly appointed attorney notified the court of his attempt to work with petitioner in achieve effective representation. The court observed that counsel was highly experienced and that petitioner should endeavor to communicate with counsel (Exhibit 15: Minutes of October 17, 2012, at 6). The next court date on which petitioner appeared was November 20, 2012. On that date, counsel informed the court that after attempting to discuss some issues with petitioner, he could not represent him. Counsel noted,

> When the court assigned it to me I had a lists [sic] of things in tasks that I was to accomplish. I've accomplished them. I have given him the information and it took me–I was ready, willing and able to represent Mr. Little. What I am not prepared to do, what I am not prepared to be is to be treated with a degree of indignance inconsistent with my years of experience...

(Exhibit 16:Minutes of November 20, 2012, at 4).

Petitioner then addressed the court and discussed his grievance with counsel. When the court asked if he wanted a new attorney, petitioner stated,

> I don't want no attorney. I am tired of going from–this matter is going from attorney to attorney to attorney when no one is providing accurate,

> consistent counsel at all. Nobody is
> in by best interest. Everybody is
> asking for adjournments for whatever
> reasons.

(Id., at 6).

In response, the court stated to petitioner "before you decide to waive your right to an attorney I want you to have another opportunity to speak to another lawyer and give this very careful consideration" (id., at 7). When petitioner requested to speak, the court stated, "I will take up with you at that time any further request" (id., at 8). Petitioner nonetheless spoke, declaiming, "Oh, y'all, y'all, y'all, y'all a bunch of dick heads in this courtroom. Bunch of fucking dick heads" (id., at 8). The case was adjourned to November 27, 2012 (id.).

On November 27, 2012, while petitioner was present in the courtroom, Maria Tobia, Esq, appeared as assigned counsel. She indicated that she had been recently assigned and would need some time to confer with petitioner (Exhibit 17: Minutes of November 27, 2012, at 2-3). The court adjourned the case to December 12, 2012 (id., at 3). Petitioner then asked if he could address the court. At that juncture, the court recommended that before making any statements, he have the opportunity to speak with Ms. Tobia (id., at 3-4). Petitioner, nonetheless, noted that he had made applications to represent himself. He expressed his dissatisfaction with his prior attorneys and did not "want to take a chance anymore" (id., at 4). He expressed as the basis for his dissatisfaction that he had been deprived of his right to be

released pursuant to CPL § 180.80 (id., at 5).

The court answered petitioner, noting that his previous counsel examined the issue regarding 180.80 and determined that earlier counsel had waived his rights under the statute and that was the reason he was not released. The court told petitioner that his case would not be dismissed for that reason (id., at 6). The court then stated,

> Now, with respect to your application to represent yourself. You do have the right to represent yourself. However, it's not what's called an unqualified right, and in order to protect your rights I need to discuss this decision with you at greater length. So I am not going to take it up with you today, but I will take it up with you on the next date.
>
> In the meantime I am going to continue to encourage you to give Ms. Tobia the opportunity to speak with you further, and in my opinion you will be well-advised to appreciate how experienced she is, how conscientious she is and what a fine job she will do on your behalf.
>
> Having said that, I will adjourn the matter to December 13th and if you want to be heard further on that date we will talk it out.
>
> (Id., at 6).

The court corrected that the adjourn date was December 12 (id., at 7).

On December 12, 2012, Ms. Tobia informed the court that she had

reviewed petitioner's file, spoke with petitioner, his family, and girlfriend, and adopted a motion petitioner made that his rights under 180.80 had been violated because he had never been informed of the waiver (Exhibit 18: Minutes of December 12, 2012, at 2). The court noted that it would grant the request to entertain the motion and stated that it did so in the belief that she was adopting the writ as petitioner's counsel (id., at 3). Petitioner made no interjection. Ms. Tobia, as counsel, made discovery requests (id., at 3-5). The court observed, "Clearly Ms. Tobia you're doing your homework" (id., at 5). The case was adjourned to January 11, 2013, for the People to answer the defense motion and for response to discovery requests (id., at 6).

On January 11, 2013, the court denied the defense application purusant to CPL 180.80 (Exhibit 19: Minutes of January 11, 2013, at 2-3). Ms. Tobia then addressed the court, "Judge, just so the record is clear I believe I was assigned to represent Mr. Little on the 27th of November" (id., at 3). The court stated, "Correct" (id.). Ms. Tobia continued, "I then appeared again on December 12th as his attorney and I am appearing today with his consent as his attorney, as assigned counsel, since he had asked for new counsel. And I believe he would like me to continue to do that" (id.). Petitioner made no interjection.

After petitioner raised this claim on direct appeal, the Appellate Division concluded:

    There was no violation of defendant's right to

17

represent himself. Rather than being unequivocal, each of defendant's requests for self-representation "was made in the context of a claim of dissatisfaction with counsel" (People v. Scivolette, 40 A.D.3d 887, 887, 836 N.Y.S.2d 262 [2d Dept.2007] ). In any event, defendant abandoned his request to appear pro se (see People v. Gillian, 8 N.Y.3d 85, 88, 828 N.Y.S.2d 277, 861 N.E.2d 92 [2006]; People v. Graves, 85 N.Y.2d 1024, 1027, 630 N.Y.S.2d 972, 654 N.E.2d 1220 [1995]; People v. Hirschfeld, 282 A.D.2d 337, 339, 726 N.Y.S.2d 3 [1st Dept.2001], lv. denied 96 N.Y.2d 919, 732 N.Y.S.2d 636, 758 N.E.2d 662 [2001], cert. denied 543 U.S. 1082, 122 S.Ct. 816, 151 L.Ed.2d 699 [2002] ). There was no stage of the proceedings at which a court actually denied, rather than temporarily deferred, a request by defendant for self-representation. Furthermore, after assigning the last in a long series of attorneys, the trial court advised defendant that although he had the right to represent himself, a lengthy colloquy with the court would be required, which the court would conduct at the next adjourned date two weeks later, but that in the meantime defendant should confer with the new attorney to see if defendant might accept her services. The minutes of the ensuing court appearance, as well as the next appearance, clearly establish that defendant was satisfied with the new attorney and no longer wished to represent himself. The record fails to support defendant's present contention that, given the fact that two prior requests for self-representation had been deferred by the court, it would have been futile for defendant to renew his ultimate request on the date on which the court had promised to entertain it.

People v Little, 151 AD3d 531, 531-32. (Exhibit 4).

As the factual recitation above makes clear, in the state court, although petitioner made a request to represent himself, the court never denied this request. Instead, after Ms. Tobia was ultimately assigned to represent him (after several other attorneys had been relieved), petitioner abandoned his request and accepted Ms. Tobia's representation. Adopting the argument raised by respondent, the Appellate Division held that there was no violation of petitioner's right to represent himself and that petitioner abandoned this claim.

The Appellate Division's determination of petitioner's current Ground One was neither contrary to nor an unreasonable application of Supreme Court precedent, as set forth in 28 U.S.C. § 2254 (d)(1) ("AEDPA"). The Supreme Court first addressed this statute in Williams v. Taylor, 529 U.S. 362 (2000); see also Mitchell v. Esparza, 540 U.S. 12 (2003). The Court ruled that the statute imposes a "new constraint" on courts reviewing habeas corpus petitions regarding claims that were reached on the merits by the state court. Williams, 529 U.S. at 412. In addressing 28 U.S.C. § 2254(d)(1), the Court explained that under the "contrary to" clause, a habeas court "may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. In addressing the "unreasonable application" clause, the Court stressed that "unreasonable" does not mean "incorrect" or "erroneous."

Id. at 410-11. Thus, a writ may not issue under that clause if a state court determination is merely incorrect; it may only issue "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id., at 413; Vasquez v. Strack, 228 F.3d 143, 147-48 (2d Cir. 2000); Hill v. Johnson, 210 F.3d 481 (5th Cir. 2000). Indeed, the Second Circuit has interpreted the statute as requiring denial of a habeas corpus petition, even in cases where the state court is incorrect, as long as the state court is not unreasonable. See Jones v. Stinson, 229 F.3d 112, 119-21 (2d Cir. 2000); see also Jimenez v. Walker, 458 F.3d 130, 147 (2nd Cir. 2006), cert. denied 549 U.S. 1133 (2007) (increment beyond error is required for habeas relief).

As to factual questions, 28 U.S.C. § 2254(d)(2) governs, and decrees that a federal court can grant habeas relief only if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." State court determinations of a factual issues are "presumed to be correct," and those presumptions can be rebutted only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). See also Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (state court's factual determinations "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding").

Petitioner has not come close to establishing any entitlement to relief

under the deferential standards set forth in 28 U.S.C. § 2254(d) and (e) since he cannot set forth any Supreme Court precedent that was unreasonably applied by the state court; nor can he establish that the state court's factual findings were unreasonable.

In Faretta v. California, 422 U.S. 806 (1975), the Supreme Court held that a defendant has the right to self-representation at trial, and the state does not have the right to force a lawyer on a defendant. See also, McKaskle v. Wiggins, 465 U.S. 168, 174 (1984). Importantly, however, as the Second Circuit has made clear, the defendant's request must be "unequivocal." Lavalle v Artus, 403 Fed Appx. 607 (2nd Cir. 2010). Indeed, it was the defendant's "clear[] and equivocal[]" request that the Supreme Court found to have been improperly denied in Faretta. 422 U.S. at 835. Judged under these standards, the Appellate Division's decision was neither contrary to nor an unreasonable application of Supreme Court precedent, nor was it based on an unreasonable determination of the facts.

As the Appellate Division held, a review of the various adjourn dates involving petitioner's request to represent himself reveals that the court never refused or denied petitioner's request to proceed pro se. Rather, the trial court indicated that it needed time in order to conduct a proper inquiry of petitioner to determine if he understood the ramifications of proceeding pro-se. Ultimately, petitioner abandoned his request, accepting Ms. Tobia to represent him at trial. The Appellate Division's determination on this point, based on

a reasonable factual finding, is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

Initially, the request was not denied. Instead, petitioner was cautioned that such request was a serious matter requiring further discussion. At no time did the court state that it would refuse to consider his request. To the contrary, at the time Ms. Tobia made her appearance as counsel, the counsel specifically stated to petitioner that it would entertain his application if, after petitioner conferred with her, he still wanted to proceed pro se. It is evident that on December 12, 2012, when Ms. Tobia adopted petitioner's motion concerning 180.80 and made discovery requests, petitioner interposed no objection to her acting as his attorney. This acceptance was underscored on January 11, 2013, when Ms. Tobia specifically brought up her status as petitioner's attorney and stated on the record that it was her belief that petitioner wanted her to continue as counsel, which she, in fact, did, serving as his counsel at the trial and sentencing proceedings.

Consequently, petitioner's argument that he was denied his request for self-representation is simply untrue as is his claim that he never abandoned that request. It is evident from petitioner's comments on the record that he was not timid in speaking his mind to the court and certainly could have communicated his disagreement with the statement of Ms. Tobia and renewed his application for self-representation. There is absolutely no indication that he was coerced to accept Ms. Tobia. It is far more likely that he had

confidence in Ms. Tobia, who was willing to address his main concern about the waiver of 180.80. The Appellate Division's rejection of the constitutional claim was neither contrary to not an unreasonable determination of Supreme Court precedent, nor was it based on an unreasonable application of the facts.

## POINT TWO

**THE APPELLATE DIVISION'S CONCLUSION THAT TRIAL COUNSEL WAS NOT INEFFECTIVE WAS NEITHER CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT PRECEDENT, NOR WAS IT BASED ON UNREASONABLE DETERMINATIONS OF THE FACTS (responding to Ground Two).**

Petitioner claims, as he did in his CPL § 440 motion and again on appeal from the denial of that motion, that his experienced trial attorney, Ms. Tobia, Esq., was ineffective because she failed to consult or call an identification expert. When petitioner raised this claim in the Appellate Division, the Court concluded that "Defendant received effective assistance of counsel under the state and federal standards (see People v Benevento, 91 NY2d 708, 713-714 [1998]; Strickland v Washington, 466 US 668 [1984]). Defendant has not established that his failure to consult or call an expert on eyewitness identification was objectively unreasonable, the trial court would have permitted such an expert to be called, or that there was a reasonable possibility that such expert testimony would have affected the outcome or fairness of the trial." Exhibit 12; People v Little, 192 AD3d 408 (1ˢᵗ Dept. 2021).The Appellate Division's rejection of this claim was a reasonable application of Strickland, and its factual resolutions were fully-grounded in the record. See Cullen v. Pinholster, 131 S. Ct. 1388 (2011) (state court's

summary rejection of ineffective assistance claim not unreasonable under 28 U.S.C. § 2254 [d]).

As the Supreme Court has held, "a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Bobby v. Dixon, 565 U.S. 23, 24 (2011), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011). Put another way by the Supreme Court, the petitioner must show that the state court "erred so transparently that no fairminded jurist could agree with that court's decision." Dixon, 565 U.S. at 24. In the context of a claim of ineffective assistance of counsel, a petitioner must show that his counsel provided deficient representation, and that the petitioner suffered prejudice as a result of that deficiency. See Bell v. Cone, 535 U.S. 685 (2002); Strickland, 466 U.S. at 698; see also Lanfranco v. Murray, 313 F.3d 112 (2d Cir. 2002). To show deficient performance, a petitioner must show "that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688.

However, there exists a strong presumption that counsel's conduct falls within the wide range of reasonable assistance, and the court must consider that, under the circumstances, the challenged action might be considered sound strategy. Strickland, 466 U.S. at 688. The strong presumption of

25

counsel's effectiveness is overcome first by demonstrating that counsel was not reasonably competent. See id. at 689-690. "[J]udicial scrutiny of counsel's performance must be highly deferential . . . . [T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. To establish prejudice, the petitioner is required to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Additionally, "[t[he standards created by Strickland and [28 U.S.C.] § 2254(d) are both 'highly deferential,' . . . , and when the two apply in tandem, review is 'doubly' so . . . ." Harrington v. Richter,562 U.S. at 105 (citations omitted); see Burt v. Titlow, 571 US 12, 15 (2013). Judged under these "doubly" deferential standards, petitioner's claim of ineffective assistance of counsel must be rejected.

Viewing counsel's performance in totality, petitioner has failed to show that he received less than meaningful representation under the applicable state and federal standards. Petitioner's trial counsel put forth a vigorous and consistent misidentification defense, attacking the People's lack of physical evidence and the credibility of the People's sole eyewitness through the same avenues suggested by the identification expert, Dr. Strange. Throughout the

proceedings, Ms. Tobia attacked the identification based on the poor lighting conditions (*see e.g.* Lopez: T.515, 559, 651-52; Summation: T.1210-11), weapon focus (Summation: T.1209-10), stress of the complainant (Summation: T.1186, 1202-03, 1226), time estimation and short exposure time (Lopez: T.539, 594, 598-99; Summation: T.1210), post-event information (H.96; Opening: T.493-94; Lopez: T.585-86, 664; Russo: T.737-38; Summation: T.1196, 1202-03, 1205-06), procedural issues influencing the propriety of the lineup identification (Opening: T.495; Lopez: T.549-50, 585-86, 656; Russo: T.799; Summation: T.1205-08), witness confidence versus accuracy (Opening: T.494; Summation: T.1208-09), confidence malleability and witness feedback (Lopez: T.585-86, 645; Russo: T.742; Summation: T.1204), and the accumulated effect of all these factors combined (Opening: T.595; Summation: T.1210-1211).

**Ms. Tobia was under no duty to consult or call an identification expert.**

In general, a failure to call a witness does not necessarily constitute ineffective assistance of counsel. This is especially true in the context of expert witnesses (Harrington, 562 U.S. at 106 ["it is exceedingly rare that a defense attorney's strategic decision not to present expert testimony amounts

to ineffective assistance of counsel"]). To sustain this claim of ineffective assistance of counsel for failure to consult with/secure testimony from an identification expert, petitioner "would have to show either (1) that trial counsel unreasonably failed to consider consulting an expert, or (2) that trial counsel did consult an expert, but did not call one, (3) that that expert was prepared to provide specific, useful testimony in support of his case, (4) that the trial court would have admitted such testimony, and (5) that the testimony likely would have affected the outcome of his trial" (McDowell v Heath, 09 CIV. 7887, 2013 WL 2896992, at *35 [SDNY June 13, 2013] [habeas corpus review of defendant's CPL 440.10 denial based on, inter alia, failure to present expert on reliability of eyewitness testimony]).[7]

In applying these factors to the current case, it was reasonable for counsel to not consult with an identification expert or call one to testify. Counsel had the difficult task of putting forth a coherent defense theory, while honoring petitioner's right to testify to an alibi that was at odds with his previous admission that he was near Sin City on the night of the robbery and a concession that his prior Grand Jury testimony about simply losing his

---

[7]Copies of unreported cases are being sent to the pro se petitioner pursuant to Local Civil Rule 7.2.

benefit cards was a lie. The motion court recognized this struggle and determined that "counsel's decision not to consult with or call an eye witness expert was entirely reasonable given the particular circumstances presented and defendant's role at trial as the central defense witness" (Exhibit 8, pp. 6-7). Indeed, at trial, petitioner insisted on presenting the same questionable alibi defense previously rejected by the Grand Jury, with no supporting evidence, no alibi witnesses, and a concession that he lied in the Grand Jury concerning his benefit cards. Without any corroboration, petitioner offered a new explanation—later described by this Court as "highly implausible" (Little, 151 AD3d at 532)—for his benefit cards being found in the victim's car after the crime. Counsel attempted to mitigate these weak points by presenting investigative efforts to locate alibi witnesses and attacking Lopez's ability to accurately identify petitioner. Though testimony from an eyewitness expert may have aided the defense, "[t]he question is whether [Ms. Tobia's] representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom" (Strickland, 466 US at 690). Even without an identification expert, counsel was able to attack the identification through cross-examination and closing arguments, capably addressing nearly all of the

points raised by Dr. Strange (*see supra*, pp. 22-23) and aided by the trial court's extended charge of various factors to consider in cases involving one-witness identifications.

Contrary to the cases cited by petitioner in state court, <u>People v Oliveras</u>, 21 NY3d 339 (2013) and <u>Bell v Miller</u>, 500 F3d 149 (2d Cir 2007) Exhibit 9, pp 46-47), counsel was not required to consult with an identification expert or call one to testify. Initially, having been determined by courts other than the United States Supreme Court, these cases are inapposite in this Court's determination of whether the Appellate Division's decision constituted an unreasonable application of <u>Strickland.</u> Indeed, in <u>Bell</u>, the Second Circuit did not apply the deferential standards set forth in 28 U.S.C. 2254 (d), but instead considered the claim <u>de novo</u>, as the state court's ruling was not an adjudication on the merits. <u>Bell</u>, 500 F.3d at 155. Here, there is no question that the Appellate Division's decision constituted a merits determination.

Moreover, these cases present facts requiring competent counsel to consult medical experts or their client's medical records. In <u>Oliveras</u>, counsel "fail[ed] to pursue the minimal investigation required" when arguing that the defendant's mental abilities undermined his admission of guilt (21 NY3d at

348). Instead of investigating documents relating to the defendant's mental illness history, defense counsel introduced testimony of the defendant's mother, an unquestionably biased witness, who testified that the defendant received Social Security benefits, and as a child, the defendant received special education classes and treatment at the Bronx Psychiatric Center (*see id.* at 344, 347). The New York Court of Appeals held that the failure to collect information relating to the defendant's mental history constituted a denial of effective assistance of counsel (*see id.* at 348). Meanwhile, in *Bell,* after the robbery victim was shot in the thigh with a shotgun, lost copious amounts of blood, and was hospitalized under heavy sedation for 11 days, the victim identified the defendant (500 F3d at 152). The only evidence connecting the defendant to the crime was the victim's testimony, while the defendant presented an alibi defense with three separate witnesses (*id.*). Counsel failed to ask the victim about memory loss, which persisted at least a month after the crime, or about the impact of blood loss and hospital medication (*id.* at 156). The Second Circuit held that under such circumstances, counsel was ineffective for failing to consult with a *medical expert* as to the effects of trauma, blood loss, and anxiolytic and amnestic medications on the human brain to facilitate the cross examination of the

victim and treating doctor (*id.* at 157).

Unlike <u>Oliveras</u> and <u>Bell</u>, petitioner does not contend his attorney should have consulted with a medical expert or obtain medical records. Further, far from "fail[ing] to pursue the minimal investigation required," counsel undertook a through investigation of the case, consistent with the misidentification/alibi defense. Ms. Tobia's investigators visited the crime scene to note the lighting and location in an effort to impeach the credibility of Lopez's actions and state of mind to make an accurate identification (T.1073). The investigators attempted to locate multiple alibi witnesses, and the investigators did in fact locate Ms. Walker (though the statements she overheard were deemed inadmissible) and a Sin City employee to impeach Lopez's credibility about how much he had to drink. Counsel's investigation in this case was thorough and proper, and the cited cases did not require her to consult with an identification expert.

**The trial court was not required to permit expert testimony on identification.**

Further, there is no certainty that the trial court would have admitted testimony from an identification expert, nor was it required to do so. Accordingly, since the state court would have had discretion to exclude any

such evidence, petitioner cannot prevail. See Moore v. Hardee, 723 F.3d 488 (4th Cir. 2013) (petitioner not entitled to habeas relief based on his claim that counsel was ineffective for failing to present an expert on the fallibility of eyewitness testimony; trial court would have had the discretion to exclude such an expert). Under New York law, such determination would be left to the sound discretion of the court (People v Lee, 96 NY2d 157, 162 [2001]), and it would not have been an abuse of discretion to deny such an expert because there was ample corroboration of petitioner being the perpetrator of this crime (People v Young, 7 NY3d 40, 45-46 [2006] ["corroborating evidence … significantly diminishes the importance of the proffered expert testimony"]). In Young, where the court denied identification expert testimony, there was sufficient corroboration of the eyewitness's identification when the "stolen property was found in possession of two of defendant's acquaintances; neither of them could have been the robber, since both were women; and one of them pointed to defendant as the person from whom she got the property" (7 NY3d at 46). Likewise, in *Lee*, where the initial identification by the carjacking victim occurred six months after the arrest, it was not an abuse of discretion to deny the testimony from an identification expert because there was sufficient corroboration where the

defendant was arrested driving the victim's vehicle two months after the crime (96 NY2d at 161, 163).

In contrast, in <u>People v Legrand</u>, 8 NY3d 449 (2007), the Court of Appeals held that, where "[t]here was no forensic or other physical evidence connecting defendant to the stabbing" and where the "case turned solely on the accuracy of the witnesses' identification," it was error for the trial court to exclude expert testimony on the reliability of such identifications (*id.* at 453, 457, 459). The Court also held that "[i]n the event that sufficient corroborating evidence is found to exist, an exercise excluding eyewitness expert testimony would not be fatal to a jury verdict convicting defendant" (*id.* at 459). In <u>People v Santiago</u>, 17 NY3d 661 (2011), the Court of Appeals held that an assault victim's identification of the defendant was not sufficiently corroborated by two additional identifications so as to render expert testimony on eyewitness recognition unnecessary (*id.* at 664). There, the victim was assaulted on a subway platform by a stranger, whose "face was concealed from the middle of his top lip, down, from the top of his eyebrows up" (*id.* [internal quotations omitted]). The two additional eyewitnesses to the assault did not corroborate the victim's identification of the defendant. One witness originally claimed he did not recognize anyone in the photo array or

lineup, but later asserted that he recognized the defendant with 80% confidence after viewing a newspaper article depicting defendant in handcuffs and the victim's positive identification (*id.* at 665, 673). Likewise, the second witness's lineup identification one-year after the assault may have been influenced by a police artist's sketch of the assailant (*id.* at 668, 673).

Here, similar to <u>Lee</u> and <u>Young</u>, this case is not one where the identification evidence was weak or lacking in corroboration. The clear and compelling identification testimony from Mr. Lopez established that he had the opportunity and ability to look at defendant's unobstructed face from multiple angles and close enough to "kiss him."  Unlike <u>Legrand</u> and *Santiago*, where eye witness identifications were presented without independent corroboration, here the corroborating evidence includes the physical evidence of petitioner's two benefit cards in the victim's vehicle, petitioner's admitted lie to the Grand Jury about losing those cards, his statement to Det. Russo placing himself outside Sin City at the time of the crime (which itself is corroborated by the *Miranda* sheet and memorialized in DD5 #34 [A.153]), and his three-months long flight from police and parole following this crime. The presence of petitioner's benefit cards alone, located inside Lopez's vehicle following the robbery, constitutes strong

"corroborating evidence connecting the defendant to the crime" (*see* <u>Santiago</u>, 17 NY3d at 669, *quoting* <u>LeGrand</u>, 8 NY3d at 452). So too does his admitted presence in the vicinity of the crime, his flight from parole, and his lying in the Grand Jury. As such, under New York law, it would have been proper to deny testimony from an identification expert.

### Petitioner failed to prove he suffered any prejudice.

Finally, testimony from an identification expert was not likely to have changed the outcome of petitioner's trial. Ms. Tobia avers in her affidavit only that expert testimony on post-event information (without mentioning any other topic) "could have been helpful … to educate the jury about the proper weight to give this evidence" (A.252), but she does not assert that the verdict would likely have been different. On the current trial record, counsel aggressively argued to the jury that the People's strongest piece of evidence—two pieces of petitioner's identification inexplicitly in the back of Mr. Lopez's car—was actually a weakness because it tainted the identification procedure (T.1196, 1206).[8] Though expert testimony on post-

---

[8] Under the defense theory of this case, the potential influences of post-event information and cross-race effects are contradictory to each other. Trial counsel argued that at the lineup, the complainant simply identified the person he saw on the EBT card, which indisputably belonged to petitioner (T.1196, 1206). The complainant's ability to quickly pick petitioner out of a lineup 3-4 months after seeing that card runs counter to the argument there was any cross racial effect in complainant's accuracy and ability to identify because he

event information may have supported counsel's argument, such testimony would not have explained how petitioner's EBT and Care Credit card got into the back of the victim's car. Likewise, an identification expert could not explain why petitioner lied in the Grand Jury about losing his identification cards or corroborate petitioner's alibi defense. Nor could such an expert explain petitioner's avoidance of the police, absconding from parole for months, or his statement placing him near the scene at the time of the crime. Moreover, the prosecution might have called a persuasive rebuttal expert, or the jury, who quickly rejected petitioner's testimony and rendered a guilty verdict without the need for any jury notes, simply might not have agreed with the defense theory of the case even with the support of an identification expert.

In sum, the Appellate Division's finding that petitioner received effective representation of counsel was a reasonable application of Strickland and was not based on an unreasonable application of the facts. Especially under the doubly deferential standards required for this determination, petitioner cannot meet his burden.

## POINT THREE

correctly identified the person in from the ID.

**PETITIONER'S ALLEGATIONS OF ACTUAL INNOCENCE ARE NOT COGNIZABLE AS A STAND-ALONE CLAIM UNDER 28 U.S.C. 2254 AND THE APPELLATE DIVISION DID NOT UNREASONABLY APPLY ANY CLEARLY ESTABLISHED FEDERAL LAW AS SET FORTH BY THE UNITED STATES SUPREME COURT WHEN IT AFFIRMED THE SUMMARY REJECTION OF THE CLAIM WITHOUT A HEARING (addressing Grounds Three and Four).**

In Ground Three, petitioner claims that he was entitled to an evidentiary hearing upon his motion claiming actual innocence, while in Ground Four, he advances a fee-standing claim of actual innocence. The Appellate Division's rejection of Ground Three was neither an unreasonable application of clearly established Supreme Court precedent, nor was it an unreasonable determination of the facts. Moreover, as petitioner recognizes, he did not raise the free-standing actual innocence claim as a separate claim on appeal, rendering it unexhausted. Furthermore, a free-standing claim of actual innocence is not cognizable upon habeas corpus review. Indeed, as the Second Circuit recently held, an actual innocence claim plays a "'procedural, not substantive'" role in a habeas corpus proceeding. Hyman v. Brown, 927 F.3d 639, 655 (2nd Cir. 2021), quoting Rivas v Fischer, 687 F.3d 514, 541 (2nd Cir. 2012). Notwithstanding this state of the law, this Office maintains that no

actually innocent person should remain incarcerated. However, petitioner is not actually innocent. Moreover, even if this Court were to conclude that there is a freestanding claim of actual innocence, the threshold showing of such evidence must be "extraordinarily high." Herrera v. Collins, 506 U.S. 390, 417 (1993) (emphasis added). Viewed under the relevant standards, petitioner cannot prevail on either of these related claims.

A free-standing claim of actual innocence is not cognizable upon habeas review under 28 U.S.C. 2254. As the Supreme Court has stated, "federal habeas cases have treated claims of 'actual innocence,' not as an independent constitutional claim, but as a basis upon which a habeas petitioner may have an independent constitutional claim considered on the merits, even though his habeas petition would otherwise be regarded as successive or abusive." Herrera, 506 U.S. at 416-17. Upon revisiting this topic in House v Bell, 547 U.S. 518 (2006), the Court once again declined, in a capital case, to hold that a persuasive showing of innocence would warrant habeas relief in the absence of an independent constitutional violation. Id., at 554-55. The Court also noted that, if such a claim were cognizable, the showing required to obtain relief would be extraordinarily high and that the petitioner had failed to meet this exacting standard, even when he had "cast

considerable doubt on his guilt" so that it was "more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." <u>Id.</u> [9]

As the Second Circuit recently held in recognizing the unavailability of a free-standing claim of actual innocence to a state petitioner, "[t]his is not to minimize the importance of actual innocence claims." <u>Hyman,</u> 927 F.3d at 655. The injustice that results from the conviction of an innocent person is at the forefront of the criminal justice system. <u>Id.</u>  However, other than allowing for a gateway to an independent constitutional violation in a "narrow class" of "truly extraordinary" cases (<u>Schlup v. Delo</u>, 513 U.S. 298, 315, 338 [1995]), it is well settled that there is no legal basis to grant relief on petitioner's free-standing claim of actual innocence (Ground Four). And  the gateway exception is irrelevant to this proceeding, as the petition is timely filed and there are no procedural hurdles to this Court's consideration of petitioner's cognizable claims set forth in Grounds One and Two.

Additionally, AEDPA poses an additional hurdle for any petitioner seeking relief after a state court has considered and rejected the claim of

---

[9]The Court concluded that, although House satisfied the "gateway exception," he did not satisfy the standard for establishing actual innocence. <u>House,</u> 547 U.S. at 554-55.

innocence on collateral review: relief is precluded as long as that state court decision is not unreasonable. 28 U.S.C. 2254 (d); <u>Jimenez v Stanford</u>, 2021 WL 4199914 (S,D,N.Y. 2021).

Initially, as to Ground Three, the failure to grant an evidentiary hearing does not establish a cognizable claim on habeas review. In determining whether a state procedural rule violates due process, the relevant inquiry is whether the application of the rule "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." <u>Hines v. Miller</u>, 318 F.3d 157, 161-62 (2nd Cir. 2003), quoting <u>Medina v California</u>, 505 U.S. 437, 445 (1992).

Many courts have declined to find any error in the failure to grant a hearing or engage in other particular procedures on collateral review.  Thus, in <u>Hines</u>, the Second Circuit refused to find any constitutional error in failing to afford a  defendant an evidentiary hearing on his motion to withdraw his plea.  Similarly, in <u>Jones v. Duncan</u>, 162 F. Supp.2d 204, 217-18 (S.D.N.Y. 2001) (footnotes omitted), the court held:

> All the circuits that have considered the issue, except one, have held that "federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings." <u>Franza v. Stinson</u>, F. Supp.2d 124, 151 (S.D.N.Y. 1999) (Kaplan, D.J. & Peck, M.J.)(quoting Ortiz v.

Stewart, 149 F.3d 923, 939 (9th Cir. 1998), <u>cert</u>. <u>denied</u>, 526 U.S. 1123, 119 S. Ct. 1777, 143 L. Ed. 2d 806 (1999)); <u>accord</u>, <u>e.g.</u>, <u>Golden v. Kaiser</u>, 2001 U.S. App. LEXIS 195, No. 00-6315, 1 Fed. Appx. 841, 2001 WL 15526 at *1 (10th Cir. 2001) ("Claims relating to alleged deficiencies in [the state's] post-conviction procedures, fail[] to present a viable habeas claim."); <u>Trevino v. Johnson</u>, 168 F.3d 173, 180 (5th Cir.), <u>cert</u>. <u>denied</u>, 527 U.S. 1056, 120 S. Ct. 22, 144 L. Ed. 2d 825 (1999); <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 632 n. 7 (9th Cir. 1997)(claim that petitioner was denied due process in state habeas proceeding is "not addressable in a section 2254 proceeding"), <u>cert</u>. <u>denied</u>, 522 U.S. 1079, 118 S. Ct. 860, 139 L. Ed. 2d 759 (1998); <u>Montgomery v. Meloy</u>, 90 F.3d 1200, 1206 (7th Cir.) (per curiam) ("Unless state collateral review violates some independent constitutional right, such as the Equal Protection Clause, ... errors in state collateral review cannot form the basis for federal habeas corpus relief."), <u>cert</u>. <u>denied</u>, 519 U.S. 907, 117 S. Ct. 266, 136 L. Ed. 2d 190 (1996); <u>Williams-Bey v. Trickey</u>, 894 F.2d 314, 317 (8th Cir.), cert. denied, 495 U.S. 936, 110 S. Ct. 2183, 109 L. Ed. 2d 511 (1990)(cited with approval in <u>Banks v. People of the State of New York</u>, 1994 U.S. Dist. LEXIS 16748, 94 Civ. 555, 1994 WL 661100 at *3 (S.D.N.Y. Nov. 22, 1994)). Only the First Circuit appears to hold to the contrary, <u>see</u>, <u>e.g.</u>, <u>Dickerson v. Walsh</u>, 750 F.2d 150, 152-54 (1st Cir. 1984), and the validity of that decision has been questioned within that circuit.

[D]istrict court decisions within the Circuit (several of which have been affirmed by the Second Circuit) have followed the majority rule. <u>See</u>, <u>e.g.</u>, <u>Diaz v. Greiner</u>, 110 F. Supp.2d 225, 235

(S.D.N.Y. 2000)("Petitioner's unsupported assertion that the trial court denied his (third) [sic] CPL §§ 440.10 motion without a hearing violated due process is not cognizable on federal habeas review."); Lugo v. Kuhlmann, 68 F. Supp.2d 347, 376 n. 15 (S.D.N.Y. 1999) (Patterson, D.J. & Peck, M.J.); Franza v. Stinson, 58 F. Supp.2d at 152; Sparman v. Edwards, 26 F. Supp.2d 450, 468 n. 13 (E.D.N.Y. 1997)("the weight of authority holds that in habeas corpus proceedings federal courts do not have jurisdiction to review state court denials of motions for a new trial"), aff'd, 154 F.3d 51 (2d Cir. 1998); Bellamy v. Cogdell, 802 F. Supp. 760, 772-73 (E.D.N.Y. 1991); Michael v. Dalsheim, 1991 U.S. Dist. LEXIS 7273, No. CV 90-2959, 1991 WL 99368 at *9 (E.D.N.Y. May 22, 1991); Turner v. Sullivan, 661 F. Supp. 535, 540-41 (E.D.N.Y. 1987) (claim that trial court violated due process by denying CPL §§ 440.10 motion without setting out findings, conclusions and its reasoning not cognizable on federal habeas review; "Petitioner has not suggested in what respect the failure to comply with the state rule has violated his federal due process rights. A writ of habeas corpus may not be issued on the basis of a perceived error of state law."), aff'd, 842 F.2d 1288 (2d Cir.), cert. denied, 487 U.S. 1240, 108 S. Ct. 2913, 101 L. Ed. 2d 944 (1988).

Jones, 162 F. Supp.2d at 217-18; see also Khan v. Capra, 2020 WL 6581855 (E.D.N.Y. 2020; Fields v Lee, 2016 WL 889788 (S.D.N.Y. 2016) (Rep. & Rec.), adopted 2016 WL 879319 (S.D.N.Y. 2016); Huffman v. Kirkpatrick, 739 F.Supp.2d 298, 302 (W.D.N.Y. 2010). More broadly speaking, the

Supreme Court has held that "[s]tate prisoners have no federal constitutional right to post-conviction proceedings in state court." <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 557 (1987).

Here, the state courts ran afoul of no firmly rooted principle of justice when it invoked CPL 440.30 in finding the motion unsubstantiated by any non-hearsay allegations that would cast doubt on the verdict, much less the type of allegations that, if true, could even approach the gateway standard for claim of actual innocence or the necessarily higher burden for any free-standing claim.

Initially, it is important to note that petitioner did not set forth new evidence in his 440 motion. Rather than rely on affidavits from Ms. Walker or Ms. Adams, and without explanation, petitioner put forth a hearsay affidavit from an investigator. Ms. Walker at a minimum had spoken freely to Ms. Tobia's investigators three times, Ms. Tobia herself, the OAD investigator, and the CIU. Any documentation that Ms. Walker made statements to these other people was hearsay and remained unsworn by her throughout the proceedings. Likewise, petitioner indicated that he had recent contact with Darshini Little and Crystal Sanchez-Moore (A.277-78 [OAD letter to CIU]), but offered no explanation for the failure to obtain affidavits

from them.[10]   Further, his failure to show any attempt to contact the additional alibi witnesses—Debra Estrada, Jocelyn Estrada, Katherine Estrada, and Tricia McCall—is inexcusable since they are immediate family members and allegedly a friend of Ms. Sanchez-Moore. Petitioner did not proceed on this motion pro se; he had access to the full legal and investigative resources of a highly experienced appellate defender organization.  Yet, the CPL 440 motion—comprising of a 36-page affirmation by counsel, a 33-page memorandum of law, and a 252-page appendix—contained no sworn statements of fact from the witnesses themselves, all of whom were known by petitioner since his trial six years ago.  Indeed, the petitioner's delay in formally raising his claim of actual innocence and lack of direct corroboration from any witnesses leads to the conclusion that there is "no reasonable possibility that such allegation[s are] true" (CPL 440.30[4][d][ii]) under the applicable state law.

Still, there was an insufficient showing of possible merit, and thus a hearing on petitioner's actual innocence claim was unwarranted.  Among Ms. Walker's multiple contradictory statements, the only consistency is that Ms.

---

[10] Petitioner himself did not submit an affidavit for this motion either.  Although petitioner did give sworn testimony at trial and the Grand Jury, his testimony was often contradictory, and he admitted he lied in the Grand Jury (Little: T.988, 991).

Walker claims she overheard several men talking outside her window. The substance of the conversation evolved, first from unknown individuals talking outside her window about an EBT card, then to her learning the participant's names in an unidentified manner several days later (A.225, 227). In the next version, Tristan was merely "chuckling" when others talked about what happened with petitioner's EBT card (T.1096), then years later, Ms. Walker recalled Tristan actively told the others "that he thought he left [petitioner's] *identification* behind *in a cab*" (A.34 [emphasis added]), and finally, that petitioner lent him his EBT card and Tristan accidently left the EBT card in cab (A.35).[11] Further, the timing of the conversation moved from "a time period after the wanted posters had gone up," (T.1096), to late September 2011, according to Ms. Walker's discussions with OAD and CIU (A.34, 35). Simply, Ms. Walker's statements are not credible and did not warrant a hearing, even if there were any constitutional right to one.

Even if Ms. Walker's statements are credited, her proffered statements do not directly address the issue of petitioner's guilt or innocence; at best, they added a modicum of corroboration to petitioner's explanation for the presence his benefit cards in Mr. Lopez's car, an explanation which the

---

[11] Mr. Lopez was employed at a pizzeria (Lopez: T.500), and there is no evidence to suggest that his personal car was a cab in any form.

Appellate Division reasonably called "highly implausible" in its initial decision (Little, 151 AD3d at 532).

It must be underscored that petitioner does not argue that the hearsay allegations constitute newly discovered evidence, likely because they are merely repackaged arguments that were rejected by the jury and are unsupported by any sworn facts. Indeed, petitioner's claim of actual innocence is simply the same version of the defense case theory that was unanimously rejected by the trial jury. On direct appeal, the Appellate Division reasonably concluded that petitioner's explanation for the presence of his benefit cards in the victim's car "was highly implausible" (Little, 151 AD3d at 532). Since that time, petitioner's explanation has not been butressed by any non-hearsay allegations of anyone with first-hand knowledge. Clearly, the state court acted properly in denying petitioner's unauthenticated and manifestly unbelievable statements previously known to him during his trial under the auspices of actual innocence.

Since petitioner fails to set forth a cognizable claim in either Ground Three or Four, these claims must be rejected under the clear language of 28 U.S.C. 2254.

## CONCLUSION

**PETITIONER'S APPLICATION FOR A WRIT OF HABEAS CORPUS SHOULD BE DISMISSED OR DENIED IN ALL RESPECTS.**


BY:

       _____/s_____
NANCY D. KILLIAN
 (NK 0771)
Assistant District Attorney




DARCEL D. CLARK
District Attorney
Bronx County
198 East 161st Street
Bronx, New York 10451
(718) 590- 2156

NANCY D. KILLIAN
Assistant District Attorney
      Of Counsel
NOVEMBER 2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
CHARLES LITTLE,

                                    Petitioner,

                                                    DECLARATION IN
                                                    OPPOSITION
                       -against-                    21 CIV. 4792 (JPC)(KNF)
TYNON,
                              Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
STATE OF NEW YORK )
                            )ss:
COUNTY OF BRONX    )

        NANCY D. KILLIAN, an attorney admitted to practice in the State of New

York, and before this Court, declares under penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that the following statements are true, except those made upon information

and belief, which she believes to be true:

        1.      I am an Assistant District Attorney in the Office of DARCEL D.

CLARK, District Attorney, Bronx County, and submit this declaration in opposition

to petitioner's application for a writ of habeas corpus.

        2.      Pursuant to an agreement with the Office of the Attorney General of the

State of New York, this Office represents respondent in the action.

        3.      This declaration is based upon the records in this matter maintained by

this Office, which I believe to be true and accurate. Although the full facts will be set

forth in the accompanying memorandum of law, in brief, petitioner was convicted of robbing the victim, with his guilt being established by the victim's testimony and the fact that petitioner's benefit card, bearing petitioner's photograph, and his credit or debit card were found in the victim's car in the robbery's aftermath. When petitioner was arrested and questioned by police and shown the cards left at the crime scene, petitioner volunteered that he did not leave them in the back of anyone's car, although the police had not mentioned anything about a car at that point. Petitioner testified and put forth an alibi defense, which the jury rejected. He also testified that the last time he had seen his identification cards at issue was over a week before the robbery, when his friend, Tristan McCall, took the cards from petitioner to secure a debt that petitioner owed him. Petitioner admitted that he had lied to the Grand Jury and that he had not told the Grand Jury about McCall's alleged possession of the cards a week before the crime. During his testimony, defense counsel sought permission to elicit testimony regarding a conversation overheard by Anne Walker, a neighbor of petitioner. According to counsel, Ms. Walker told counsel that at some point in time after the crime, she saw "Tristan McCall" with other young men, one of whom said to McCall "You shouldn't have done like that . . With the EBT card", to which McCall responded by "chuckling." The court denied the application, stating that the chuckle was neither an admission nor a declaration against penal interest. Petitioner

was convicted of Robbery in the First Degree (Penal Law § 160.15[4]) and on January 17, 2014, the Court adjudicated petitioner a second felony offender and sentenced him to 12 years incarceration followed by 5 years postrelease supervision (S.4, 16).[1]

4.    In June 2016, petitioner, represented by Matthew A. Wasserman, Esq., of the Office of the Appellate Defender (OAD), filed a 48-page appellate brief in the Appellate Division, First Department, arguing that:

> (1) Petitioner's constitutional right to represent himself was violated by the trial court's failure to resolve his repeated requests to represent himself; (2) Petitioner was deprived of his right to a fair trial by the prosecution's improper summation, including unsupported speculation about petitioner's "opportunity" to commit this crime, personal denigration of defense witnesses, and distortion of the evidence; (3) Petitioner's conviction was against the weight of the evidence because the testimony of a single inebriated stranger of a different race, unsupported by any forensic evidence, was insufficient to identify him; and (4) Petitioner's sentence is excessive.

(Ex. 1, Def. Brief; *see also* Ex. 2, Respondent's Brief).[2]

---

[1] The minutes of trial are being submitted separately, as is the Appendix submitted by petitioner as part of the CPL 440 motion relevant to this proceeding. References preceded by "H." are to the pre-trial suppression hearing; "T." are to the trial minutes, those preceded by "S." are to the sentencing minutes, and those preceded by "A." are to the Appendix filed by petitioner in support of his pertinent collateral attack in state court.

[2] The appeal was held in abeyance for several months while the Bronx District Attorney's Conviction Integrity Unit (CIU) reviewed petitioner's case. Following "a great deal of consideration" CIU "did not find *credible* evidence establishing that Mr. Little is actually innocent or that he was wrongfully convicted" (A.36 [emphasis in original]).

On June 13, 2017, the First Department unanimously affirmed the judgment of conviction (People v Little, 151 AD3d 531 [1st Dept 2017], lv denied, 30 NY3d 951 [2017]). Pertinently, it held:

> There was no violation of defendant's right to represent himself … The minutes of the ensuing court appearance, as well as the next appearance, clearly establish that defendant was satisfied with the new attorney and no longer wished to represent himself.
>
> …
>
> The verdict was not against the weight of the evidence (*see People v Danielson*, 9 NY3d 342, 348–49 [2007]). There is no basis for disturbing the jury's determinations concerning identification and credibility. During the robbery, two benefit cards belonging to defendant were left in the victim's car, and defendant's explanation for the presence of his cards was highly implausible.
>
> We perceive no basis for reducing the sentence.

(Little, 151 AD3d at 531-32) (Exhibit 3). Leave to appeal to the New York Court of Appeals was then denied. People v Little, 30 NY3d 951 (2017).

5.    Petitioner, through appellate counsel, then filed a motion to vacate his conviction pursuant to NYCPL (hereinafter "CPL") 440.10(1)(h), alleging ineffective assistance of trial counsel, for failure to consult or call an identification expert, and claiming actual innocence. In support of his motion, petitioner submitted an appendix of exhibits, including an affirmation from his

trial counsel (A.251-52), but did not provide affidavits from himself, Ms. Walker, Tristan McCall, or any alibi witness (Exhibit 4: 440 Motion; Exhibit 5: Petitioner's Memorandum of Law; Exhibit 6: People's Response; Exhibit 7: Reply).

6.    In a decision and order dated June 6, 2019, the motion court denied petitioner's motion.  The court noted that petitioner had filed a prior 440 motion, the court exercised its discretion to decide the motion on the merits (Exhibit 8, 15 n 11).[3] The court first analyzed petitioner's claim of ineffective assistance of counsel for failure to consult or call at trial an eyewitness expert under both the applicable state and federal standards (id. at 2-10). The motion court observed that the defense strategy was dictated by petitioner's testimony at trial, wherein he told the jury that a former friend, Tristan McCall, took the benefits card from his wallet prior to the robbery. Petitioner had also admitted to lying before the Grand Jury (id. at 5-6).  Petitioner put forth an alibi defense without any supporting witnesses, though a defense investigator offered testimony concerning attempts to locate alibi witnesses (id. at 6). And petitioner denied telling Det. Russo that he was in the area of Sin City the night of the

---

[3]The Court chose not to invoke the discretionary procedural bar contained in NYCPL 440.10 (3)( c), which allows a court to deny a motion based on a finding that, upon a previous CPL 440.10 motion, the defendant was in a position to adequately raise the ground or issue presented in the second motion, but did not do so.

robbery (id.). Yet, the court noted, "defense counsel argued adroitly on summation [that] the suggestive impact of viewing the single photo of the defendant on the benefits card … led to a misidentification of defendant" (id. at 5). Furthermore, "trial counsel cogently put in issue other factors in the record bearing on the jury's evaluation of the accuracy of the complainant's identification of the defendant, including the lighting conditions, the complainant's emotional state and alleged intoxication, and the brief duration of the incident" (id.). Given "the defendant's role at trial as the central defense witness," it was "entirely reasonable" for counsel not to call or consult an eye witness expert, and the failure to do so did not rise "to a deprivation of defendant's right to  effective representation" (id. at 7).

7.     The court then analyzed petitioner's claim of actual innocence pursuant to People v Jimenez, 142 AD3d 149 (1st Dept 2016) and People v Hamilton, 115 AD3d 12 (2d Dept 2014). The court noted that evidence in support of a claim of actual innocence "must be reliable" and "considered in light of, and alongside, the more general standard applicable on any" CPL 440 motion (id., at 13). Here, petitioner's motion was not supported "by any sworn, nonhearsay allegations by the source," in that the statements attributed to Ms. Walker and Ms. Adams were presented as hearsay, and further, the statements

themselves contain hearsay (id., at 14). Indeed, the hearsay remarks attributed to Tristian McCall—who likewise did not submit an affidavit—did not constitute an admission that he committed the robbery and did not directly exculpate the petitioner (id. at 14). Thus, petitioner's motion failed to make a prima facie showing of actual innocence to warrant a hearing (id., at 15). On October 1, 2019, the Honorable Barbara R. Kapnick of the Appellate Division granted petitioner leave to appeal the denial of his postjudgment motion.

8. On appeal to the Appellate Division, petitioner argued again that counsel was ineffective for failing to consult or call an expert on eyewitness identification and that the hearing court erred in denying his actual innocence claim without a hearing (Exhibit 9: Petitioner's Appellant's Brief [440 Appeal]; Exhibit 10: People's Response [440 Appeal]; Exhibit 11: Petitioner's Reply [440 Appeal]). On March 2, 2021, the Appellate Division rejected the claims, finding that counsel provided effective assistance, and that petitioner's claim of actual innocence was not supported by substantiated facts and was based on multiple levels of hearsay.

In pertinent part, the Court found that:

Defendant's guilt was established by compelling circumstantial evidence that was separate from the victim's identification testimony. After the robbery, the victim found defendant's benefits cards, one which contained defendant's picture, in the

7

back seat of the victim's car; given the circumstances, these cards could only have been left by the person who robbed the victim. A detective testified that defendant made a statement placing himself near the scene of the crime, and that when shown his benefit cards, defendant became visibly upset and volunteered that he had not left them in the back seat of a car (despite not having been told that the robbery took place in a car). At trial, defendant gave testimony, which this Court found "highly implausible" on direct appeal (151 AD3d 531, 532 [1st Dept 2017]), about how his friend had allegedly acquired the cards. Defendant also admitted at trial that he had lied in his grand jury testimony about his cards having been missing.

The court then concluded that, given this evidence, any argument that expert testimony on eyewitness identification should have been permitted or that an expert would have changed the outcome of trial, would be speculative, and it was not unreasonable for counsel to proceed without an identification expert. The Court also noted the "vigorous" nature of counsel's attack upon the victim's identification testimony.

Turning to the claim of actual innocence, and particularly the hearing court's decision to reject the claim without a hearing, the Appellate Division held:

The court providently exercised its discretion in declining to hold a hearing on the branch of defendant's motion that sought to vacate his conviction based on actual innocence, because the motion was not supported by "sworn allegations substantiating or tending to substantiate all the essential facts" (CPL 440.30 [4] [b]). On the motion, defendant offered evidence, similar to

evidence he unsuccessfully sought to present at trial, that allegedly corroborated his story about his friend's acquisition of the cards found in the victim's car. However, this evidence consisted of multiple layers of hearsay, as well as lacking exculpatory value, and it did not require a hearing (see People v Jimenez, 142 AD3d 149, 155-158 [1st Dept 2016]; see also People v Velazquez, 143 AD3d 126, 136-137 [1st Dept 2016], lv denied 28 NY3d 1189 [2017]).

People v Little, 192 AD3d 408 (2001) (Exhibit 12). Petitioner then sought leave to appeal to the New York Court of Appeals, which was denied on May 10, 2021. People v Little, 37 NY3d 958 (2021).

9.    In the current petition, timely filed by petitioner pro se on May 27, 2021, petitioner raises the following Grounds:

    1.  Petitioner was denied is right to self-representation by the trial court's failure to hold an inquiry on petitioner's request to proceed pro se;
    2.  He was denied effective assistance of counsel due to counsel's failure to consult with or hire an expert on eyewitness identifications or seek to introduce expert testimony about the purported unreliability of eyewitness identifications;
    3.  He was improperly denied a hearing on his motion alleging actual innocence; and
    4.  He is actually innocent.


10.   It is respondent's position that the Appellate Division's resolutions of Grounds One and Two were neither contrary to nor unreasonable applications of clearly established Supreme Court precedent, nor were they based on unreasonable determinations of the facts, and that Grounds Three and

Four are not cognizable claims for substantive habeas relief.

WHEREFORE, the People of the State of New York respectfully request that defendant's application be denied.

**WHEREFORE**, respondent respectfully requests that the petition be dismissed or denied in its entirety.

_____/s_____
NANCY D. KILLIAN
(NK0771)
Assistant District Attorney

Bronx, New York
November 23, 2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CHARLES LITTLE,

                              Petitioner,

                                              DECLARATION    IN
                                              OPPOSITION
                    -against-                 21 CIV. 4792(JPC)(KNF)

TYNON,

                              Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


## MEMORANDUM OF LAW

## STATEMENT

This Memorandum of Law is submitted in opposition to the above-captioned habeas corpus petition.

**THE FACTS**

The facts relied upon are contained in the declaration of Nancy D. Killian and in the accompanying exhibits.

As reflected in the testimony at trial, on September 17, 2011, Jonathan Lopez celebrated the birthday of a friend at Sin City strip club (Lopez: T.500-01). Mr. Lopez parked his car near the club, arriving between 10 p.m. and 11 p.m. (Lopez: T.501-02). In the area where he parked his car, Mr. Lopez noticed functioning lights on the street and on the surrounding buildings (Lopez: T.516). Once at the club, Mr. Lopez limited himself to two drinks because they were very expensive (Lopez: T.518). Mr. Lopez and his friend left the club around 1:00 a.m. on September 18, 2011, and once they parted ways, Mr. Lopez walked to his parked car alone (Lopez: T.519).

Mr. Lopez unlocked his car, turned on the ignition, and called his girlfriend to talk about his experience (Lopez: T.521). With his car on, the lights from the gauges, accessories, and large touch screen radio all illuminated the vehicle's interior (Lopez: T.521). Sitting in his car, Mr. Lopez felt something was wrong and told his girlfriend he would call her back (Lopez: T.525). Petitioner entered the vehicle's back seat and pointed a black gun to Mr. Lopez's head (Lopez: T.526-27). Petitioner demanded Mr. Lopez give him

everything in his pockets, his gold chain, and earrings or he would kill Mr. Lopez (Lopez: T.528, 531). Mr. Lopez turned over his wallet, ID and health insurance cards, $100 cash, and his iPhone 4 (Lopez: T.529). During this time, Mr. Lopez stared at petitioner's unobstructed face, to the extent that petitioner told him to stop looking, but Mr. Lopez continued looking at petitioner's face through the rearview mirror (Lopez: T.529, 533-34, 538). Mr. Lopez gave petitioner his chain and earrings, but expressed reluctance in handing over a double-finger ring that his mother had bought him. Petitioner stated, "you better give it to me before I kill you," then grabbed the ring, and pulled it off Mr. Lopez's fingers, causing Mr. Lopez's finger to bleed (Lopez: T.531-32).

Petitioner exited the rear of the vehicle, and sat in the front passenger seat, close enough that Mr. Lopez could "kiss him" (Lopez: T.536-37). Petitioner once again admonished Mr. Lopez to stop looking at him, but Mr. Lopez continued to stare while petitioner removed items from the glove compartment (Lopez: T.536). Petitioner reached towards Mr. Lopez, grabbing the car key from the ignition, and then fled (Lopez: T.536).

The incident "felt like it was never going to end," leaving Mr. Lopez in a state of shock (Lopez: T.539). Without his phone and unable to move his car, he was afraid to leave the area with petitioner potentially around the corner, so

he stayed in his vehicle until daylight (Lopez: T.540). The next morning, when Mr. Lopez felt safe to leave his car, he surveyed the vehicle and observed on the rear passenger seat that petitioner had left behind his benefit card with petitioner's photo and a credit or debit card (Lopez: T.543).

Mr. Lopez found the nearest police precinct and reported being robbed (Lopez: T.547-48). Mr. Lopez met with Detective Anthony Russo, of the 40th Precinct, explained the robbery, and provided the two cards with petitioner's identification (Det. Russo: T.675, 688-89, 702). Mr. Lopez described petitioner as a black male, medium complexion, approximately 5'6'', 160 pounds, with short hair, wearing a black hoody, blue jeans, and black sneakers (A.39 [DD5 #1]). Using a different photograph of petitioner than on the benefit card, Det. Russo created a photo array of six similarly looking individuals, and Mr. Lopez picked the petitioner out as the person who robbed him (H.9, 11).

Multiple efforts to apprehend petitioner were unsuccessful. Officers went to several Bronx addresses to no avail and coordinated with petitioner's parole officer, but petitioner absconded from his parole obligations and a parole warrant was issued (Det. Russo: T.694-702; PO Ancrum: T.837-42).

On or after November 4, 2011, Det. Russo placed about a dozen wanted posters with petitioner's picture and information in the lobby of 1742 Story

Avenue and nearby police precincts (Det. Russo: T.784-86).

On January 3, 2012, Det. Russo was notified that petitioner had been arrested by a different precinct, and Det. Russo took custody of the petitioner and brought him to the 40th Precinct (Det. Russo: T.701). After being informed of and waiving his *Miranda* rights, petitioner told Det. Russo that he was near Sin City at the time of the robbery, but he could not get in, so he was talking to females on the line to get them to go with him instead of into the club (Det. Russo: T.710). Det. Russo then showed petitioner the two cards left in Mr. Lopez's car. Petitioner volunteered that he didn't leave them in the back of anybody's car, though Det. Russo had not mentioned anything about a car in his interview with petitioner (Det. Russo: T.711; H.40). Petitioner became nervous, visibly shaken, and stopped talking (Det. Russo: T.712). That same day, Det. Russo conducted a lineup, during which Mr. Lopez identified petitioner as the person who robbed him (Lopez: T.549-551; Russo: T.715).

Petitioner was arraigned on January 4, 2012, in Criminal Court, Bronx County (Franco, J.). On January 10, 2012, petitioner testified before the Bronx County Grand Jury (A.101-21). Petitioner claimed that he first realized that his benefit card was missing in October 2011, several weeks after the robbery (A.112-13; Little: T.985). He told the Grand Jury that at the time of the

robbery, he was at an apartment with several other individuals watching a boxing match (A.106).[4] Petitioner proffered one witness to the Grand Jury, his then-girlfriend, Crystal Sanchez-Moore,[5] to support his purported alibi (A.107). The prosecutor informed the Grand Jury of the defense proffer, but the Grand Jury elected not to hear from Ms. Sanchez-Moore (A..134-36).

By indictment number 740/2006, filed on January 13, 2012, the Bronx County Grand Jury charged petitioner with Robbery in the First Degree (Penal Law § 160.15[4]) and related charges)(A.42).

On May 20 and May 21, 2013, a combined *Huntley/Wade/Dunaway* hearing was held before the Honorable Denis Boyle. The court denied petitioner's application to suppress his proffered statement and lineup identification. The Court filed a written decision on June 28, 2013 (A.140-52).

On May 30, 2013, the jury trial against petitioner commenced with

---

[4] In the Grand Jury, petitioner stated, "On September 17th, sport even happened [sic], which I was watching with my girlfriend, which is Crystal Sanchez. Her mother, Debra Estrada. Her sister, Jocelyn Estrada, and Katherine Estrada, Darshina Little and Tricia McCall (ph), one of my friends" (A.106 [phonetics marking in original]). At trial, petitioner claimed that Tricia McCall was Crystal's friend, whom he had not seen since the night of September 17, 2011, and that she is not related to Tristan McCall (Little: T.1033-34). In arguing against a potential missing witness charge, defense counsel stated, "My client testified that as to the McCall girl, he has no – he's not friends with her. He didn't really know her. He didn't have her phone number and she was friends with his ex-girlfriend" (T.1122-23).

[5] Crystal Sanchez and Crystal Moore are the same person; the latter being her name after marriage, and the former being her maiden name (T.1286).

opening statements (T.478 [People]; T.486 [Defense]). The People's case, in pertinent part, was presented as described above. Petitioner was represented at trial by Maria S. Tobia, Esq.

During the trial, Ms. Tobia attacked the identification of petitioner, and the petitioner testified in his own defense, putting forth an alibi defense. Petitioner told the trial jury that his former friend Tristan McCall took the EBT and Care Credit card out of petitioner's wallet prior to the robbery (Little: T.908, 911). He acknowledged that despite his oath to tell the truth, he lied in the Grand Jury when he testified that he first realized his EBT card was missing in October 2011 (Little: T.1001). He was aware he was wanted by police, and even called a detective to surrender, but he did not want to turn himself in without a lawyer (Little: T.900). Petitioner testified that a friend named Tanisha, last name unknown, told him that Tristan committed the crime that petitioner was wanted for (Little: T.971). Petitioner denied making Mirandized statements to Det. Russo about being near Sin City at the time of the crime. Rather, he said he stated to Det. Russo "without too much details" that he was with Crystal Sanchez-Moore on September 18, 2011, and then he asked for a lawyer and refused to answer any questions about the EBT and Care Credit card (Little: T.944-45). The first time he saw the wanted poster was after his was

arrested on January 3, 2012 (Little: T.934)

During petitioner's testimony, on June 10, 2013, defense counsel sought permission from the Court to elicit testimony regarding a conversation overheard by Anne Walker, a neighbor of the petitioner. Defense investigators initially located Ms. Walker months earlier (T.1095, A.225-29). In an email dated March 24, 2013, defense investigator Bernard Johnson described an interview with Ms. Walker, wherein she stated that she overheard unnamed individuals "talking about the situation and they were saying that that was not right what they did to him with his ebt [sic] card," and that Ms. Walker would get the names of the people in the conversation (A.225). In a follow up interview, Ms. Walker learned that the boys talking were "Tristan, George, Terrell, and a Nelson" (A.225).[6] Additionally, on June 4, 2013, there is an email from investigator Smith to Johnson stating that Ms. Walker "is willing to testify in court" that she heard Tristan and other boys talking outside her window, and that she did not see the wanted poster (A.229).

In counsel's application to the Court, Ms. Tobia relayed that she personally spoke with Ms. Walker "on a couple of occasions … via telephone"

---

[6] The email to counsel appears to be based on interviews of Ms. Walker conducted by defense investigator Alfred Smith on prior unknown dates (A.227-28).

(T.1095). Ms. Walker informed counsel that she knows petitioner, whom she viewed as helpful (T.1096).  Ms. Walker observed Tristan McCall with three or four other young men "at a time after the wanted posters [with petitioner's information] had gone up" (*id*.).  Ms. Walker overheard one of the young men state, "You shouldn't have done him like that, [or] you shouldn't have done that with the EBT card," and in response Tristan "started chuckling" (*id*.).  Counsel offered this statement not to suggest that Tristan committed the robbery, but to support petitioner's testimony that there were rumors that someone else committed this crime and to explain petitioner's reluctance to surrender to the police (T.1098-99).  The Court denied counsel's application, ruling that Tristan's chuckle was "neither an admission nor … a declaration against penal interest[,] and the conversation taken as a whole doesn't bear on the petitioner's consciousness of guilt" (T.1101).

Petitioner called several investigators to testify at the trial to describe their efforts to locate Crystal Sanchez-Moore and her family—Debra Estrada, Jocelyn Estrada, and Katherine Estrada (Johnson: Supp.T.6-9).  There was no testimony about efforts to locate Tricia McCall.

In closing arguments, defense counsel attacked the identification of her client on multiple grounds. She described the circumstances for Mr. Lopez as

"very stressful," that he was "under incredible amount of stress," and that "when you have a gun that close to you, you're terrified" (T.1186, 1202, 1209). Under the circumstances, which included the consumption of alcohol and only about "14 seconds" to view the perpetrator, "[t]he human mind is incapable under the influence of alcohol of creating an image that is reliable" (T.1210, 1226). Counsel emphasized the suggestive effect of post-event information caused by the discovery of petitioner's benefit cards (T.1196 ["The ID card suggested who did it, but it was a false suggestion … and it led to a misidentification of my client"]; T.1206 ["He found it right in his back seat. He knows the guy was sitting there. It must be him. That's inherently suggestive … He's identifying Clifton Little because he saw Clifton Little's picture on the ID"]). She criticized the lineup identification as inherently suggestive because, as Mr. Lopez explained, he knew that the police were "looking for the guy in the ID, obviously, because I gave it to them" (T.1208). Ms. Tobia argued that the jury should reject Mr. Lopez's identification of the petitioner based on the combination of all these factors:

> [T]he lighting conditions, his intoxication and the incredibly brief duration of this situation makes an I.D. impossible … He's looking behind him for seconds at a time … We are not machines. We are not computers. We are people and making the impression in your mind of another human being in th[is] stressful situation especially after

> drinking is extremely difficult … add the utter complete
> suggestion of the I.D. being found, the chances of this person
> ever being able to make an accurate I.D. is zero, absolutely
> zero.  It doesn't matter that he believes he can. … It doesn't
> mean he's accurate.  It doesn't mean he's right.

(T.1211).

On June 13, 2013, the jury rendered a guilty verdict against petitioner for Robbery in the First Degree (Penal Law § 160.15[4]) (T.1349).

On July 10, 2013, prior to sentencing, defense counsel alerted the Court that she personally spoke with Crystal Sanchez-Moore after the guilty verdict (A.153-56). Although Ms. Sanchez-Moore was proffered as an alibi witness in the Grand Jury, petitioner had lost contact with her after she stopped visiting him in jail about nine months before the trial (T.870, Little: T.1033). Still, when Tristan McCall asked how petitioner was holding up, she told Tristan that petitioner wasn't holding up very well at all (A.156).  Ms. Sanchez-Moore indicated that Tristan McCall began discussing the circumstances of the crime, including watching the boxing fight at Sin City, tucking his braids under a baseball hat, and forcefully pulling a double-finger ring off a "Spanish" kid's hand, causing an injury (A.156-57).  Counsel asked for an adjournment, which the Court granted, to speak with Ms. Sanchez-Moore further and to prepare a motion (A.157-59).

Counsel, without explanation, did not file any motion related to the

allegations imparted by Crystal Sanchez-Moore.  Instead, on October 11, 2013 counsel adopted petitioner's pro se motion pursuant to CPL 330.30 (A.162), claiming that the failure to preserve the wanted poster or video surveillance in the vicinity of the crime was a *Brady* violation requiring a new trial (A.164-82).

The Court denied petitioner's CPL 330.30 motion in a written decision filed on January 13, 2014 (A.183-85).

On January 17, 2014, the Court adjudicated petitioner a second felony offender and sentenced him to 12 years' incarceration followed by 5 years' postrelease supervision (S.4, 16).

The relevant post-conviction litigation is outlined in the Declaration in Opposition.

**ARGUMENT**

**POINT ONE**

**THE APPELLATE DIVISION'S REJECTION OF PETITIONER'S CLAIM REGARDING HIS RIGHT TO PROCEED <u>PRO SE</u> WAS NEITHER CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT PRECEDENT, NOR WAS IT BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS**.

On October 5, 2012, petitioner informed Justice Miriam R. Best that he wanted the court to allow him to represent himself (Exhibit 13:Minutes of October 5, 2012, at 5). The court responded, "[t]he issue of whether you will represent yourself has not yet been determined" (<u>id</u>., at 7). The court added, "Now I have a very long calendar today, sir and the inquiry as to whether you are permitted to represent yourself is a long one and I am not going to take the time to do it now. So what I am going to do is put your case over for another day" (<u>id</u>.). The court concluded, "I am going to put this case on the 15th for the Court to inquiry [sic] whether the defendant will be permitted to represent himself" (<u>id</u>., at 10). Petitioner offered no protest to the court's adjournment to resolve the issue.

On October 15, 2012, the attorney newly appearing for petitioner asked if he could have time to talk to petitioner to determine issues in the case

(Exhibit 14: Minutes of October 15, 2012, at 2). The court acceded and adjourned the case to October 17, 2012 (id., at 3). On October 17, 2012, the newly appointed attorney notified the court of his attempt to work with petitioner in achieve effective representation. The court observed that counsel was highly experienced and that petitioner should endeavor to communicate with counsel (Exhibit 15: Minutes of October 17, 2012, at 6). The next court date on which petitioner appeared was November 20, 2012. On that date, counsel informed the court that after attempting to discuss some issues with petitioner, he could not represent him. Counsel noted,

> When the court assigned it to me I had a lists [sic] of things in tasks that I was to accomplish. I've accomplished them. I have given him the information and it took me–I was ready, willing and able to represent Mr. Little. What I am not prepared to do, what I am not prepared to be is to be treated with a degree of indignance inconsistent with my years of experience...

(Exhibit 16:Minutes of November 20, 2012, at 4).

Petitioner then addressed the court and discussed his grievance with counsel. When the court asked if he wanted a new attorney, petitioner stated,

> I don't want no attorney. I am tired of going from–this matter is going from attorney to attorney to attorney when no one is providing accurate,

> consistent counsel at all. Nobody is
> in by best interest. Everybody is
> asking for adjournments for whatever
> reasons.

(Id., at 6).

In response, the court stated to petitioner "before you decide to waive your right to an attorney I want you to have another opportunity to speak to another lawyer and give this very careful consideration" (id., at 7). When petitioner requested to speak, the court stated, "I will take up with you at that time any further request" (id., at 8). Petitioner nonetheless spoke, declaiming, "Oh, y'all, y'all, y'all, y'all a bunch of dick heads in this courtroom. Bunch of fucking dick heads" (id., at 8). The case was adjourned to November 27, 2012 (id.).

On November 27, 2012, while petitioner was present in the courtroom, Maria Tobia, Esq, appeared as assigned counsel. She indicated that she had been recently assigned and would need some time to confer with petitioner (Exhibit 17: Minutes of November 27, 2012, at 2-3). The court adjourned the case to December 12, 2012 (id., at 3). Petitioner then asked if he could address the court. At that juncture, the court recommended that before making any statements, he have the opportunity to speak with Ms. Tobia (id., at 3-4). Petitioner, nonetheless, noted that he had made applications to represent himself. He expressed his dissatisfaction with his prior attorneys and did not "want to take a chance anymore" (id., at 4). He expressed as the basis for his dissatisfaction that he had been deprived of his right to be

released pursuant to CPL § 180.80 (id., at 5).

The court answered petitioner, noting that his previous counsel examined the issue regarding 180.80 and determined that earlier counsel had waived his rights under the statute and that was the reason he was not released. The court told petitioner that his case would not be dismissed for that reason (id., at 6). The court then stated,

> Now, with respect to your application to represent yourself. You do have the right to represent yourself. However, it's not what's called an unqualified right, and in order to protect your rights I need to discuss this decision with you at greater length. So I am not going to take it up with you today, but I will take it up with you on the next date.
>
> In the meantime I am going to continue to encourage you to give Ms. Tobia the opportunity to speak with you further, and in my opinion you will be well-advised to appreciate how experienced she is, how conscientious she is and what a fine job she will do on your behalf.
>
> Having said that, I will adjourn the matter to December 13th and if you want to be heard further on that date we will talk it out.
>
> (Id., at 6).

The court corrected that the adjourn date was December 12 (id., at 7).

On December 12, 2012, Ms. Tobia informed the court that she had

reviewed petitioner's file, spoke with petitioner, his family, and girlfriend, and adopted a motion petitioner made that his rights under 180.80 had been violated because he had never been informed of the waiver (Exhibit 18: Minutes of December 12, 2012, at 2). The court noted that it would grant the request to entertain the motion and stated that it did so in the belief that she was adopting the writ as petitioner's counsel (id., at 3). Petitioner made no interjection. Ms. Tobia, as counsel, made discovery requests (id., at 3-5). The court observed, "Clearly Ms. Tobia you're doing your homework" (id., at 5). The case was adjourned to January 11, 2013, for the People to answer the defense motion and for response to discovery requests (id., at 6).

On January 11, 2013, the court denied the defense application purusant to CPL 180.80 (Exhibit 19: Minutes of January 11, 2013, at 2-3). Ms. Tobia then addressed the court, "Judge, just so the record is clear I believe I was assigned to represent Mr. Little on the 27th of November" (id., at 3). The court stated, "Correct" (id.). Ms. Tobia continued, "I then appeared again on December 12th as his attorney and I am appearing today with his consent as his attorney, as assigned counsel, since he had asked for new counsel. And I believe he would like me to continue to do that" (id.). Petitioner made no interjection.

After petitioner raised this claim on direct appeal, the Appellate Division concluded:

> There was no violation of defendant's right to

17

represent himself. Rather than being unequivocal, each of defendant's requests for self-representation "was made in the context of a claim of dissatisfaction with counsel" (People v. Scivolette, 40 A.D.3d 887, 887, 836 N.Y.S.2d 262 [2d Dept.2007] ). In any event, defendant abandoned his request to appear pro se (see People v. Gillian, 8 N.Y.3d 85, 88, 828 N.Y.S.2d 277, 861 N.E.2d 92 [2006]; People v. Graves, 85 N.Y.2d 1024, 1027, 630 N.Y.S.2d 972, 654 N.E.2d 1220 [1995]; People v. Hirschfeld, 282 A.D.2d 337, 339, 726 N.Y.S.2d 3 [1st Dept.2001], lv. denied 96 N.Y.2d 919, 732 N.Y.S.2d 636, 758 N.E.2d 662 [2001], cert. denied 543 U.S. 1082, 122 S.Ct. 816, 151 L.Ed.2d 699 [2002] ). There was no stage of the proceedings at which a court actually denied, rather than temporarily deferred, a request by defendant for self-representation. Furthermore, after assigning the last in a long series of attorneys, the trial court advised defendant that although he had the right to represent himself, a lengthy colloquy with the court would be required, which the court would conduct at the next adjourned date two weeks later, but that in the meantime defendant should confer with the new attorney to see if defendant might accept her services. The minutes of the ensuing court appearance, as well as the next appearance, clearly establish that defendant was satisfied with the new attorney and no longer wished to represent himself. The record fails to support defendant's present contention that, given the fact that two prior requests for self-representation had been deferred by the court, it would have been futile for defendant to renew his ultimate request on the date on which the court had promised to entertain it.

People v Little, 151 AD3d 531, 531-32. (Exhibit 4).

As the factual recitation above makes clear, in the state court, although petitioner made a request to represent himself, the court never denied this request. Instead, after Ms. Tobia was ultimately assigned to represent him (after several other attorneys had been relieved), petitioner abandoned his request and accepted Ms. Tobia's representation. Adopting the argument raised by respondent, the Appellate Division held that there was no violation of petitioner's right to represent himself and that petitioner abandoned this claim.

The Appellate Division's determination of petitioner's current Ground One was neither contrary to nor an unreasonable application of Supreme Court precedent, as set forth in 28 U.S.C. § 2254 (d)(1) ("AEDPA"). The Supreme Court first addressed this statute in <u>Williams v. Taylor</u>, 529 U.S. 362 (2000); <u>see also</u> <u>Mitchell v. Esparza</u>, 540 U.S. 12 (2003). The Court ruled that the statute imposes a "new constraint" on courts reviewing habeas corpus petitions regarding claims that were reached on the merits by the state court. <u>Williams</u>, 529 U.S. at 412. In addressing 28 U.S.C. § 2254(d)(1), the Court explained that under the "contrary to" clause, a habeas court "may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412-13. In addressing the "unreasonable application" clause, the Court stressed that "unreasonable" does not mean "incorrect" or "erroneous."

Id. at 410-11. Thus, a writ may not issue under that clause if a state court determination is merely incorrect; it may only issue "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id., at 413; Vasquez v. Strack, 228 F.3d 143, 147-48 (2d Cir. 2000); Hill v. Johnson, 210 F.3d 481 (5th Cir. 2000). Indeed, the Second Circuit has interpreted the statute as requiring denial of a habeas corpus petition, even in cases where the state court is incorrect, as long as the state court is not unreasonable. See Jones v. Stinson, 229 F.3d 112, 119-21 (2d Cir. 2000); see also Jimenez v. Walker, 458 F.3d 130, 147 (2nd Cir. 2006), cert. denied 549 U.S. 1133 (2007) (increment beyond error is required for habeas relief).

As to factual questions, 28 U.S.C. § 2254(d)(2) governs, and decrees that a federal court can grant habeas relief only if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." State court determinations of a factual issues are "presumed to be correct," and those presumptions can be rebutted only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). See also Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (state court's factual determinations "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding").

Petitioner has not come close to establishing any entitlement to relief

under the deferential standards set forth in 28 U.S.C. § 2254(d) and (e) since he cannot set forth any Supreme Court precedent that was unreasonably applied by the state court; nor can he establish that the state court's factual findings were unreasonable.

In Faretta v. California, 422 U.S. 806 (1975), the Supreme Court held that a defendant has the right to self-representation at trial, and the state does not have the right to force a lawyer on a defendant. See also, McKaskle v. Wiggins, 465 U.S. 168, 174 (1984). Importantly, however, as the Second Circuit has made clear, the defendant's request must be "unequivocal." Lavalle v Artus, 403 Fed Appx. 607 (2nd Cir. 2010). Indeed, it was the defendant's "clear[] and equivocal[]" request that the Supreme Court found to have been improperly denied in Faretta. 422 U.S. at 835. Judged under these standards, the Appellate Division's decision was neither contrary to nor an unreasonable application of Supreme Court precedent, nor was it based on an unreasonable determination of the facts.

As the Appellate Division held, a review of the various adjourn dates involving petitioner's request to represent himself reveals that the court never refused or denied petitioner's request to proceed pro se. Rather, the trial court indicated that it needed time in order to conduct a proper inquiry of petitioner to determine if he understood the ramifications of proceeding pro-se. Ultimately, petitioner abandoned his request, accepting Ms. Tobia to represent him at trial. The Appellate Division's determination on this point, based on

a reasonable factual finding, is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

Initially, the request was not denied. Instead, petitioner was cautioned that such request was a serious matter requiring further discussion. At no time did the court state that it would refuse to consider his request. To the contrary, at the time Ms. Tobia made her appearance as counsel, the counsel specifically stated to petitioner that it would entertain his application if, after petitioner conferred with her, he still wanted to proceed pro se. It is evident that on December 12, 2012, when Ms. Tobia adopted petitioner's motion concerning 180.80 and made discovery requests, petitioner interposed no objection to her acting as his attorney. This acceptance was underscored on January 11, 2013, when Ms. Tobia specifically brought up her status as petitioner's attorney and stated on the record that it was her belief that petitioner wanted her to continue as counsel, which she, in fact, did, serving as his counsel at the trial and sentencing proceedings.

Consequently, petitioner's argument that he was denied his request for self-representation is simply untrue as is his claim that he never abandoned that request. It is evident from petitioner's comments on the record that he was not timid in speaking his mind to the court and certainly could have communicated his disagreement with the statement of Ms. Tobia and renewed his application for self-representation. There is absolutely no indication that he was coerced to accept Ms. Tobia. It is far more likely that he had

22

confidence in Ms. Tobia, who was willing to address his main concern about the waiver of 180.80. The Appellate Division's rejection of the constitutional claim was neither contrary to not an unreasonable determination of Supreme Court precedent, nor was it based on an unreasonable application of the facts.

## POINT TWO

**THE APPELLATE DIVISION'S CONCLUSION THAT TRIAL COUNSEL WAS NOT INEFFECTIVE WAS NEITHER CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT PRECEDENT, NOR WAS IT BASED ON UNREASONABLE DETERMINATIONS OF THE FACTS (responding to Ground Two).**

Petitioner claims, as he did in his CPL § 440 motion and again on appeal from the denial of that motion, that his experienced trial attorney, Ms. Tobia, Esq., was ineffective because she failed to consult or call an identification expert. When petitioner raised this claim in the Appellate Division, the Court concluded that "Defendant received effective assistance of counsel under the state and federal standards (see People v Benevento, 91 NY2d 708, 713-714 [1998]; Strickland v Washington, 466 US 668 [1984]). Defendant has not established that his failure to consult or call an expert on eyewitness identification was objectively unreasonable, the trial court would have permitted such an expert to be called, or that there was a reasonable possibility that such expert testimony would have affected the outcome or fairness of the trial." Exhibit 12; People v Little, 192 AD3d 408 (1st Dept. 2021).The Appellate Division's rejection of this claim was a reasonable application of Strickland, and its factual resolutions were fully-grounded in the record. See Cullen v. Pinholster, 131 S. Ct. 1388 (2011) (state court's

24

summary rejection of ineffective assistance claim not unreasonable under 28 U.S.C. § 2254 [d]).

As the Supreme Court has held, "a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Bobby v. Dixon, 565 U.S. 23, 24 (2011), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011). Put another way by the Supreme Court, the petitioner must show that the state court "erred so transparently that no fairminded jurist could agree with that court's decision." Dixon, 565 U.S. at 24. In the context of a claim of ineffective assistance of counsel, a petitioner must show that his counsel provided deficient representation, and that the petitioner suffered prejudice as a result of that deficiency. See Bell v. Cone, 535 U.S. 685 (2002); Strickland, 466 U.S. at 698; see also Lanfranco v. Murray, 313 F.3d 112 (2d Cir. 2002). To show deficient performance, a petitioner must show "that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688.

However, there exists a strong presumption that counsel's conduct falls within the wide range of reasonable assistance, and the court must consider that, under the circumstances, the challenged action might be considered sound strategy. Strickland, 466 U.S. at 688. The strong presumption of

counsel's effectiveness is overcome first by demonstrating that counsel was not reasonably competent. See id. at 689-690. "[J]udicial scrutiny of counsel's performance must be highly deferential . . . . [T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. To establish prejudice, the petitioner is required to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Additionally, "[t[he standards created by Strickland and [28 U.S.C.] § 2254(d) are both 'highly deferential,' . . . , and when the two apply in tandem, review is 'doubly' so . . . ." Harrington v. Richter,562 U.S. at 105 (citations omitted); see Burt v. Titlow, 571 US 12, 15 (2013). Judged under these "doubly" deferential standards, petitioner's claim of ineffective assistance of counsel must be rejected.

Viewing counsel's performance in totality, petitioner has failed to show that he received less than meaningful representation under the applicable state and federal standards. Petitioner's trial counsel put forth a vigorous and consistent misidentification defense, attacking the People's lack of physical evidence and the credibility of the People's sole eyewitness through the same avenues suggested by the identification expert, Dr. Strange. Throughout the

proceedings, Ms. Tobia attacked the identification based on the poor lighting conditions (*see e.g.* Lopez: T.515, 559, 651-52; Summation: T.1210-11), weapon focus (Summation: T.1209-10), stress of the complainant (Summation: T.1186, 1202-03, 1226), time estimation and short exposure time (Lopez: T.539, 594, 598-99; Summation: T.1210), post-event information (H.96; Opening: T.493-94; Lopez: T.585-86, 664; Russo: T.737-38; Summation: T.1196, 1202-03, 1205-06), procedural issues influencing the propriety of the lineup identification (Opening: T.495; Lopez: T.549-50, 585-86, 656; Russo: T.799; Summation: T.1205-08), witness confidence versus accuracy (Opening: T.494; Summation: T.1208-09), confidence malleability and witness feedback (Lopez: T.585-86, 645; Russo: T.742; Summation: T.1204), and the accumulated effect of all these factors combined (Opening: T.595; Summation: T.1210-1211).

**Ms. Tobia was under no duty to consult or call an identification expert.**

In general, a failure to call a witness does not necessarily constitute ineffective assistance of counsel. This is especially true in the context of expert witnesses (Harrington, 562 U.S. at 106 ["it is exceedingly rare that a defense attorney's strategic decision not to present expert testimony amounts

to ineffective assistance of counsel"]). To sustain this claim of ineffective assistance of counsel for failure to consult with/secure testimony from an identification expert, petitioner "would have to show either (1) that trial counsel unreasonably failed to consider consulting an expert, or (2) that trial counsel did consult an expert, but did not call one, (3) that that expert was prepared to provide specific, useful testimony in support of his case, (4) that the trial court would have admitted such testimony, and (5) that the testimony likely would have affected the outcome of his trial" (McDowell v Heath, 09 CIV. 7887, 2013 WL 2896992, at *35 [SDNY June 13, 2013] [habeas corpus review of defendant's CPL 440.10 denial based on, inter alia, failure to present expert on reliability of eyewitness testimony]).[7]

In applying these factors to the current case, it was reasonable for counsel to not consult with an identification expert or call one to testify. Counsel had the difficult task of putting forth a coherent defense theory, while honoring petitioner's right to testify to an alibi that was at odds with his previous admission that he was near Sin City on the night of the robbery and a concession that his prior Grand Jury testimony about simply losing his

---

[7]Copies of unreported cases are being sent to the pro se petitioner pursuant to Local Civil Rule 7.2.

benefit cards was a lie. The motion court recognized this struggle and determined that "counsel's decision not to consult with or call an eye witness expert was entirely reasonable given the particular circumstances presented and defendant's role at trial as the central defense witness" (Exhibit 8, pp. 6-7). Indeed, at trial, petitioner insisted on presenting the same questionable alibi defense previously rejected by the Grand Jury, with no supporting evidence, no alibi witnesses, and a concession that he lied in the Grand Jury concerning his benefit cards. Without any corroboration, petitioner offered a new explanation—later described by this Court as "highly implausible" (Little, 151 AD3d at 532)—for his benefit cards being found in the victim's car after the crime. Counsel attempted to mitigate these weak points by presenting investigative efforts to locate alibi witnesses and attacking Lopez's ability to accurately identify petitioner. Though testimony from an eyewitness expert may have aided the defense, "[t]he question is whether [Ms. Tobia's] representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom" (Strickland, 466 US at 690). Even without an identification expert, counsel was able to attack the identification through cross-examination and closing arguments, capably addressing nearly all of the

points raised by Dr. Strange (*see supra*, pp. 22-23) and aided by the trial court's extended charge of various factors to consider in cases involving one-witness identifications.

Contrary to the cases cited by petitioner in state court, People v Oliveras, 21 NY3d 339 (2013) and Bell v Miller, 500 F3d 149 (2d Cir 2007) Exhibit 9, pp 46-47), counsel was not required to consult with an identification expert or call one to testify. Initially, having been determined by courts other than the United States Supreme Court, these cases are inapposite in this Court's determination of whether the Appellate Division's decision constituted an unreasonable application of Strickland. Indeed, in Bell, the Second Circuit did not apply the deferential standards set forth in 28 U.S.C. 2254 (d), but instead considered the claim de novo, as the state court's ruling was not an adjudication on the merits. Bell, 500 F.3d at 155. Here, there is no question that the Appellate Division's decision constituted a merits determination.

Moreover, these cases present facts requiring competent counsel to consult medical experts or their client's medical records. In Oliveras, counsel "fail[ed] to pursue the minimal investigation required" when arguing that the defendant's mental abilities undermined his admission of guilt (21 NY3d at

348).  Instead of investigating documents relating to the defendant's mental illness history, defense counsel introduced testimony of the defendant's mother, an unquestionably biased witness, who testified that the defendant received Social Security benefits, and as a child, the defendant received special education classes and treatment at the Bronx Psychiatric Center (*see id.* at 344, 347). The New York Court of Appeals held that the failure to collect information relating to the defendant's mental history constituted a denial of effective assistance of counsel (*see id.* at 348).  Meanwhile, in *Bell,* after the robbery victim was shot in the thigh with a shotgun, lost copious amounts of blood, and was hospitalized under heavy sedation for 11 days, the victim identified the defendant (500 F3d at 152).   The only evidence connecting the defendant to the crime was the victim's testimony, while the defendant presented an alibi defense with three separate witnesses (*id.*). Counsel failed to ask the victim about memory loss, which persisted at least a month after the crime, or about the impact of blood loss and hospital medication (*id.* at 156).   The Second Circuit held that under such circumstances, counsel was ineffective for failing to consult with a *medical expert* as to the effects of trauma, blood loss, and anxiolytic and amnestic medications on the human brain to facilitate the cross examination of the

victim and treating doctor (*id.* at 157).

Unlike <u>Oliveras</u> and <u>Bell</u>, petitioner does not contend his attorney should have consulted with a medical expert or obtain medical records. Further, far from "fail[ing] to pursue the minimal investigation required," counsel undertook a through investigation of the case, consistent with the misidentification/alibi defense. Ms. Tobia's investigators visited the crime scene to note the lighting and location in an effort to impeach the credibility of Lopez's actions and state of mind to make an accurate identification (T.1073). The investigators attempted to locate multiple alibi witnesses, and the investigators did in fact locate Ms. Walker (though the statements she overheard were deemed inadmissible) and a Sin City employee to impeach Lopez's credibility about how much he had to drink. Counsel's investigation in this case was thorough and proper, and the cited cases did not require her to consult with an identification expert.

**The trial court was not required to permit expert testimony on identification.**

Further, there is no certainty that the trial court would have admitted testimony from an identification expert, nor was it required to do so. Accordingly, since the state court would have had discretion to exclude any

such evidence, petitioner cannot prevail. <u>See</u> <u>Moore v. Hardee</u>, 723 F.3d 488 (4th Cir. 2013) (petitioner not entitled to habeas relief based on his claim that counsel was ineffective for failing to present an expert on the fallibility of eyewitness testimony; trial court would have had the discretion to exclude such an expert). Under New York law, such determination would be left to the sound discretion of the court (<u>People v Lee</u>, 96 NY2d 157, 162 [2001]), and it would not have been an abuse of discretion to deny such an expert because there was ample corroboration of petitioner being the perpetrator of this crime (<u>People v Young</u>, 7 NY3d 40, 45-46 [2006] ["corroborating evidence … significantly diminishes the importance of the proffered expert testimony"]). In <u>Young</u>, where the court denied identification expert testimony, there was sufficient corroboration of the eyewitness's identification when the "stolen property was found in possession of two of defendant's acquaintances; neither of them could have been the robber, since both were women; and one of them pointed to defendant as the person from whom she got the property" (7 NY3d at 46). Likewise, in *Lee*, where the initial identification by the carjacking victim occurred six months after the arrest, it was not an abuse of discretion to deny the testimony from an identification expert because there was sufficient corroboration where the

defendant was arrested driving the victim's vehicle two months after the crime (96 NY2d at 161, 163).

In contrast, in People v Legrand, 8 NY3d 449 (2007), the Court of Appeals held that, where "[t]here was no forensic or other physical evidence connecting defendant to the stabbing" and where the "case turned solely on the accuracy of the witnesses' identification," it was error for the trial court to exclude expert testimony on the reliability of such identifications (*id.* at 453, 457, 459). The Court also held that "[i]n the event that sufficient corroborating evidence is found to exist, an exercise excluding eyewitness expert testimony would not be fatal to a jury verdict convicting defendant" (*id.* at 459). In People v Santiago, 17 NY3d 661 (2011), the Court of Appeals held that an assault victim's identification of the defendant was not sufficiently corroborated by two additional identifications so as to render expert testimony on eyewitness recognition unnecessary (*id.* at 664). There, the victim was assaulted on a subway platform by a stranger, whose "face was concealed from the middle of his top lip, down, from the top of his eyebrows up" (*id.* [internal quotations omitted]). The two additional eyewitnesses to the assault did not corroborate the victim's identification of the defendant. One witness originally claimed he did not recognize anyone in the photo array or

lineup, but later asserted that he recognized the defendant with 80% confidence after viewing a newspaper article depicting defendant in handcuffs and the victim's positive identification (*id.* at 665, 673). Likewise, the second witness's lineup identification one-year after the assault may have been influenced by a police artist's sketch of the assailant (*id.* at 668, 673).

Here, similar to Lee and Young, this case is not one where the identification evidence was weak or lacking in corroboration. The clear and compelling identification testimony from Mr. Lopez established that he had the opportunity and ability to look at defendant's unobstructed face from multiple angles and close enough to "kiss him."    Unlike Legrand and *Santiago*, where eye witness identifications were presented without independent corroboration, here the corroborating evidence includes the physical evidence of petitioner's two benefit cards in the victim's vehicle, petitioner's admitted lie to the Grand Jury about losing those cards, his statement to Det. Russo placing himself outside Sin City at the time of the crime (which itself is corroborated by the *Miranda* sheet and memorialized in DD5 #34 [A.153]), and his three-months long flight from police and parole following this crime. The presence of petitioner's benefit cards alone, located inside Lopez's vehicle following the robbery, constitutes strong

"corroborating evidence connecting the defendant to the crime" (*see* <u>Santiago</u>, 17 NY3d at 669, *quoting* <u>LeGrand</u>, 8 NY3d at 452). So too does his admitted presence in the vicinity of the crime, his flight from parole, and his lying in the Grand Jury. As such, under New York law, it would have been proper to deny testimony from an identification expert.

### Petitioner failed to prove he suffered any prejudice.

Finally, testimony from an identification expert was not likely to have changed the outcome of petitioner's trial. Ms. Tobia avers in her affidavit only that expert testimony on post-event information (without mentioning any other topic) "could have been helpful … to educate the jury about the proper weight to give this evidence" (A.252), but she does not assert that the verdict would likely have been different. On the current trial record, counsel aggressively argued to the jury that the People's strongest piece of evidence—two pieces of petitioner's identification inexplicitly in the back of Mr. Lopez's car—was actually a weakness because it tainted the identification procedure (T.1196, 1206).[8]  Though expert testimony on post-

---

[8] Under the defense theory of this case, the potential influences of post-event information and cross-race effects are contradictory to each other. Trial counsel argued that at the lineup, the complainant simply identified the person he saw on the EBT card, which indisputably belonged to petitioner (T.1196, 1206). The complainant's ability to quickly pick petitioner out of a lineup 3-4 months after seeing that card runs counter to the argument there was any cross racial effect in complainant's accuracy and ability to identify because he

event information may have supported counsel's argument, such testimony would not have explained how petitioner's EBT and Care Credit card got into the back of the victim's car. Likewise, an identification expert could not explain why petitioner lied in the Grand Jury about losing his identification cards or corroborate petitioner's alibi defense. Nor could such an expert explain petitioner's avoidance of the police, absconding from parole for months, or his statement placing him near the scene at the time of the crime. Moreover, the prosecution might have called a persuasive rebuttal expert, or the jury, who quickly rejected petitioner's testimony and rendered a guilty verdict without the need for any jury notes, simply might not have agreed with the defense theory of the case even with the support of an identification expert.

In sum, the Appellate Division's finding that petitioner received effective representation of counsel was a reasonable application of Strickland and was not based on an unreasonable application of the facts. Especially under the doubly deferential standards required for this determination, petitioner cannot meet his burden.

### POINT THREE

---

correctly identified the person in from the ID.

**PETITIONER'S ALLEGATIONS OF ACTUAL INNOCENCE ARE NOT COGNIZABLE AS A STAND-ALONE CLAIM UNDER 28 U.S.C. 2254 AND THE APPELLATE DIVISION DID NOT UNREASONABLY APPLY ANY CLEARLY ESTABLISHED FEDERAL LAW AS SET FORTH BY THE UNITED STATES SUPREME COURT WHEN IT AFFIRMED THE SUMMARY REJECTION OF THE CLAIM WITHOUT A HEARING (addressing Grounds Three and Four).**

In Ground Three, petitioner claims that he was entitled to an evidentiary hearing upon his motion claiming actual innocence, while in Ground Four, he advances a fee-standing claim of actual innocence. The Appellate Division's rejection of Ground Three was neither an unreasonable application of clearly established Supreme Court precedent, nor was it an unreasonable determination of the facts. Moreover, as petitioner recognizes, he did not raise the free-standing actual innocence claim as a separate claim on appeal, rendering it unexhausted. Furthermore, a free-standing claim of actual innocence is not cognizable upon habeas corpus review. Indeed, as the Second Circuit recently held, an actual innocence claim plays a "'procedural, not substantive'" role in a habeas corpus proceeding. Hyman v. Brown, 927 F.3d 639, 655 (2nd Cir. 2021), quoting Rivas v Fischer, 687 F.3d 514,541 (2nd Cir.2012). Notwithstanding this state of the law, this Office maintains that no

actually innocent person should remain incarcerated. However, petitioner is not actually innocent. Moreover, even if this Court were to conclude that there is a freestanding claim of actual innocence, the threshold showing of such evidence must be "extraordinarily high." Herrera v. Collins, 506 U.S. 390, 417 (1993) (emphasis added). Viewed under the relevant standards, petitioner cannot prevail on either of these related claims.

A free-standing claim of actual innocence is not cognizable upon habeas review under 28 U.S.C. 2254. As the Supreme Court has stated, "federal habeas cases have treated claims of 'actual innocence,' not as an independent constitutional claim, but as a basis upon which a habeas petitioner may have an independent constitutional claim considered on the merits, even though his habeas petition would otherwise be regarded as successive or abusive." Herrera, 506 U.S. at 416-17. Upon revisiting this topic in House v Bell, 547 U.S. 518 (2006), the Court once again declined, in a capital case, to hold that a persuasive showing of innocence would warrant habeas relief in the absence of an independent constitutional violation. Id., at 554-55. The Court also noted that, if such a claim were cognizable, the showing required to obtain relief would be extraordinarily high and that the petitioner had failed to meet this exacting standard, even when he had "cast

considerable doubt on his guilt" so that it was "more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." Id. [9]

As the Second Circuit recently held in recognizing the unavailability of a free-standing claim of actual innocence to a state petitioner, "[t]his is not to minimize the importance of actual innocence claims." Hyman, 927 F.3d at 655. The injustice that results from the conviction of an innocent person is at the forefront of the criminal justice system. Id. However, other than allowing for a gateway to an independent constitutional violation in a "narrow class" of "truly extraordinary" cases (Schlup v. Delo, 513 U.S. 298, 315, 338 [1995]), it is well settled that there is no legal basis to grant relief on petitioner's free-standing claim of actual innocence (Ground Four). And the gateway exception is irrelevant to this proceeding, as the petition is timely filed and there are no procedural hurdles to this Court's consideration of petitioner's cognizable claims set forth in Grounds One and Two.

Additionally, AEDPA poses an additional hurdle for any petitioner seeking relief after a state court has considered and rejected the claim of

---

[9]The Court concluded that, although House satisfied the "gateway exception," he did not satisfy the standard for establishing actual innocence. House, 547 U.S. at 554-55.

innocence on collateral review: relief is precluded as long as that state court decision is not unreasonable. 28 U.S.C. 2254 (d); <u>Jimenez v Stanford</u>, 2021 WL 4199914 (S,D,N.Y. 2021).

Initially, as to Ground Three, the failure to grant an evidentiary hearing does not establish a cognizable claim on habeas review. In determining whether a state procedural rule violates due process, the relevant inquiry is whether the application of the rule "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." <u>Hines v. Miller</u>, 318 F.3d 157, 161-62 (2nd Cir. 2003), quoting <u>Medina v California</u>, 505 U.S. 437, 445 (1992).

Many courts have declined to find any error in the failure to grant a hearing or engage in other particular procedures on collateral review. Thus, in <u>Hines</u>, the Second Circuit refused to find any constitutional error in failing to afford a defendant an evidentiary hearing on his motion to withdraw his plea. Similarly, in <u>Jones v. Duncan</u>, 162 F. Supp.2d 204, 217-18 (S.D.N.Y. 2001) (footnotes omitted), the court held:

> All the circuits that have considered the issue, except one, have held that "federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings." <u>Franza v. Stinson</u>, F. Supp.2d 124, 151 (S.D.N.Y. 1999) (Kaplan, D.J. & Peck, M.J.)(quoting Ortiz v.

Stewart, 149 F.3d 923, 939 (9th Cir. 1998), cert. denied, 526 U.S. 1123, 119 S. Ct. 1777, 143 L. Ed. 2d 806 (1999)); accord, e.g., Golden v. Kaiser, 2001 U.S. App. LEXIS 195, No. 00-6315, 1 Fed. Appx. 841, 2001 WL 15526 at *1 (10th Cir. 2001) ("Claims relating to alleged deficiencies in [the state's] post-conviction procedures, fail[] to present a viable habeas claim."); Trevino v. Johnson, 168 F.3d 173, 180 (5th Cir.), cert. denied, 527 U.S. 1056, 120 S. Ct. 22, 144 L. Ed. 2d 825 (1999); Villafuerte v. Stewart, 111 F.3d 616, 632 n. 7 (9th Cir. 1997)(claim that petitioner was denied due process in state habeas proceeding is "not addressable in a section 2254 proceeding"), cert. denied, 522 U.S. 1079, 118 S. Ct. 860, 139 L. Ed. 2d 759 (1998); Montgomery v. Meloy, 90 F.3d 1200, 1206 (7th Cir.) (per curiam) ("Unless state collateral review violates some independent constitutional right, such as the Equal Protection Clause, ... errors in state collateral review cannot form the basis for federal habeas corpus relief."), cert. denied, 519 U.S. 907, 117 S. Ct. 266, 136 L. Ed. 2d 190 (1996); Williams-Bey v. Trickey, 894 F.2d 314, 317 (8th Cir.), cert. denied, 495 U.S. 936, 110 S. Ct. 2183, 109 L. Ed. 2d 511 (1990)(cited with approval in Banks v. People of the State of New York, 1994 U.S. Dist. LEXIS 16748, 94 Civ. 555, 1994 WL 661100 at *3 (S.D.N.Y. Nov. 22, 1994)). Only the First Circuit appears to hold to the contrary, see, e.g., Dickerson v. Walsh, 750 F.2d 150, 152-54 (1st Cir. 1984), and the validity of that decision has been questioned within that circuit.

[D]istrict court decisions within the Circuit (several of which have been affirmed by the Second Circuit) have followed the majority rule. See, e.g., Diaz v. Greiner, 110 F. Supp.2d 225, 235

(S.D.N.Y. 2000)("Petitioner's unsupported assertion that the trial court denied his (third) [sic] CPL §§ 440.10 motion without a hearing violated due process is not cognizable on federal habeas review."); Lugo v. Kuhlmann, 68 F. Supp.2d 347, 376 n. 15 (S.D.N.Y. 1999) (Patterson, D.J. & Peck, M.J.); Franza v. Stinson, 58 F. Supp.2d at 152; Sparman v. Edwards, 26 F. Supp.2d 450, 468 n. 13 (E.D.N.Y. 1997)("the weight of authority holds that in habeas corpus proceedings federal courts do not have jurisdiction to review state court denials of motions for a new trial"), aff'd, 154 F.3d 51 (2d Cir. 1998); Bellamy v. Cogdell, 802 F. Supp. 760, 772-73 (E.D.N.Y. 1991); Michael v. Dalsheim, 1991 U.S. Dist. LEXIS 7273, No. CV 90-2959, 1991 WL 99368 at *9 (E.D.N.Y. May 22, 1991); Turner v. Sullivan, 661 F. Supp. 535, 540-41 (E.D.N.Y. 1987) (claim that trial court violated due process by denying CPL §§ 440.10 motion without setting out findings, conclusions and its reasoning not cognizable on federal habeas review; "Petitioner has not suggested in what respect the failure to comply with the state rule has violated his federal due process rights. A writ of habeas corpus may not be issued on the basis of a perceived error of state law."), aff'd, 842 F.2d 1288 (2d Cir.), cert. denied, 487 U.S. 1240, 108 S. Ct. 2913, 101 L. Ed. 2d 944 (1988).

Jones, 162 F. Supp.2d at 217-18; see also Khan v. Capra, 2020 WL 6581855 (E.D.N.Y. 2020; Fields v Lee, 2016 WL 889788 (S.D.N.Y. 2016) (Rep. & Rec.), adopted 2016 WL 879319 (S.D.N.Y. 2016); Huffman v. Kirkpatrick, 739 F.Supp.2d 298, 302 (W.D.N.Y. 2010). More broadly speaking, the

Supreme Court has held that "[s]tate prisoners have no federal constitutional right to post-conviction proceedings in state court." <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 557 (1987).

Here, the state courts ran afoul of no firmly rooted principle of justice when it invoked CPL 440.30 in finding the motion unsubstantiated by any non-hearsay allegations that would cast doubt on the verdict, much less the type of allegations that, if true, could even approach the gateway standard for claim of actual innocence or the necessarily higher burden for any free-standing claim.

Initially, it is important to note that petitioner did not set forth new evidence in his 440 motion. Rather than rely on affidavits from Ms. Walker or Ms. Adams, and without explanation, petitioner put forth a hearsay affidavit from an investigator. Ms. Walker at a minimum had spoken freely to Ms. Tobia's investigators three times, Ms. Tobia herself, the OAD investigator, and the CIU. Any documentation that Ms. Walker made statements to these other people was hearsay and remained unsworn by her throughout the proceedings. Likewise, petitioner indicated that he had recent contact with Darshini Little and Crystal Sanchez-Moore (A.277-78 [OAD letter to CIU]), but offered no explanation for the failure to obtain affidavits

from them.[10]    Further, his failure to show any attempt to contact the additional alibi witnesses—Debra Estrada, Jocelyn Estrada, Katherine Estrada, and Tricia McCall—is inexcusable since they are immediate family members and allegedly a friend of Ms. Sanchez-Moore.  Petitioner did not proceed on this motion pro se; he had access to the full legal and investigative resources of a highly experienced appellate defender organization.  Yet, the CPL 440 motion—comprising of a 36-page affirmation by counsel, a 33-page memorandum of law, and a 252-page appendix—contained no sworn statements of fact from the witnesses themselves, all of whom were known by petitioner since his trial six years ago.  Indeed, the petitioner's delay in formally raising his claim of actual innocence and lack of direct corroboration from any witnesses leads to the conclusion that there is "no reasonable possibility that such allegation[s are] true" (CPL 440.30[4][d][ii]) under the applicable state law.

Still, there was an insufficient showing of possible merit, and thus a hearing on petitioner's actual innocence claim was unwarranted.  Among Ms. Walker's multiple contradictory statements, the only consistency is that Ms.

---

[10] Petitioner himself did not submit an affidavit for this motion either.  Although petitioner did give sworn testimony at trial and the Grand Jury, his testimony was often contradictory, and he admitted he lied in the Grand Jury (Little: T.988, 991).

Walker claims she overheard several men talking outside her window. The substance of the conversation evolved, first from unknown individuals talking outside her window about an EBT card, then to her learning the participant's names in an unidentified manner several days later (A.225, 227). In the next version, Tristan was merely "chuckling" when others talked about what happened with petitioner's EBT card (T.1096), then years later, Ms. Walker recalled Tristan actively told the others "that he thought he left [petitioner's] *identification* behind *in a cab*" (A.34 [emphasis added]), and finally, that petitioner lent him his EBT card and Tristan accidently left the EBT card in cab (A.35).[11] Further, the timing of the conversation moved from "a time period after the wanted posters had gone up," (T.1096), to late September 2011, according to Ms. Walker's discussions with OAD and CIU (A.34, 35). Simply, Ms. Walker's statements are not credible and did not warrant a hearing, even if there were any constitutional right to one.

Even if Ms. Walker's statements are credited, her proffered statements do not directly address the issue of petitioner's guilt or innocence; at best, they added a modicum of corroboration to petitioner's explanation for the presence his benefit cards in Mr. Lopez's car, an explanation which the

---

[11] Mr. Lopez was employed at a pizzeria (Lopez: T.500), and there is no evidence to suggest that his personal car was a cab in any form.

Appellate Division reasonably called "highly implausible" in its initial decision (Little, 151 AD3d at 532).

It must be underscored that petitioner does not argue that the hearsay allegations constitute newly discovered evidence, likely because they are merely repackaged arguments that were rejected by the jury and are unsupported by any sworn facts. Indeed, petitioner's claim of actual innocence is simply the same version of the defense case theory that was unanimously rejected by the trial jury. On direct appeal, the Appellate Division reasonably concluded that petitioner's explanation for the presence of his benefit cards in the victim's car "was highly implausible" (Little, 151 AD3d at 532). Since that time, petitioner's explanation has not been butressed by any non-hearsay allegations of anyone with first-hand knowledge. Clearly, the state court acted properly in denying petitioner's unauthenticated and manifestly unbelievable statements previously known to him during his trial under the auspices of actual innocence.

Since petitioner fails to set forth a cognizable claim in either Ground Three or Four, these claims must be rejected under the clear language of 28 U.S.C. 2254.

## **CONCLUSION**

**PETITIONER'S APPLICATION FOR A WRIT OF HABEAS CORPUS SHOULD BE DISMISSED OR DENIED IN ALL RESPECTS.**

BY:

_____/s_____
NANCY D. KILLIAN
 (NK 0771)
Assistant District Attorney

DARCEL D. CLARK
District Attorney
Bronx County
198 East 161st Street
Bronx, New York 10451
(718) 590- 2156

NANCY D. KILLIAN
Assistant District Attorney
        Of Counsel
NOVEMBER 2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
CHARLES LITTLE,

                                        Petitioner,

                                                          DECLARATION IN
                                                          OPPOSITION
                          -against-                       21 CIV. 4792 (JPC)(KNF)
TYNON,
                                        Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
STATE OF NEW YORK )
                              )ss:
COUNTY OF BRONX    )

        NANCY D. KILLIAN, an attorney admitted to practice in the State of New

York, and before this Court, declares under penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that the following statements are true, except those made upon information

and belief, which she believes to be true:

        1.      I am an Assistant District Attorney in the Office of DARCEL D.

CLARK, District Attorney, Bronx County, and submit this declaration in opposition

to petitioner's application for a writ of habeas corpus.

        2.      Pursuant to an agreement with the Office of the Attorney General of the

State of New York, this Office represents respondent in the action.

        3.      This declaration is based upon the records in this matter maintained by

this Office, which I believe to be true and accurate. Although the full facts will be set

forth in the accompanying memorandum of law, in brief, petitioner was convicted of robbing the victim, with his guilt being established by the victim's testimony and the fact that petitioner's benefit card, bearing petitioner's photograph, and his credit or debit card were found in the victim's car in the robbery's aftermath. When petitioner was arrested and questioned by police and shown the cards left at the crime scene, petitioner volunteered that he did not leave them in the back of anyone's car, although the police had not mentioned anything about a car at that point. Petitioner testified and put forth an alibi defense, which the jury rejected. He also testified that the last time he had seen his identification cards at issue was over a week before the robbery, when his friend, Tristan McCall, took the cards from petitioner to secure a debt that petitioner owed him. Petitioner admitted that he had lied to the Grand Jury and that he had not told the Grand Jury about McCall's alleged possession of the cards a week before the crime. During his testimony, defense counsel sought permission to elicit testimony regarding a conversation overheard by Anne Walker, a neighbor of petitioner. According to counsel, Ms. Walker told counsel that at some point in time after the crime, she saw "Tristan McCall" with other young men, one of whom said to McCall "You shouldn't have done like that . . With the EBT card", to which McCall responded by "chuckling." The court denied the application, stating that the chuckle was neither an admission nor a declaration against penal interest. Petitioner

was convicted of Robbery in the First Degree (Penal Law § 160.15[4]) and on January 17, 2014, the Court adjudicated petitioner a second felony offender and sentenced him to 12 years incarceration followed by 5 years postrelease supervision (S.4, 16).[1]

4.    In June 2016, petitioner, represented by Matthew A. Wasserman, Esq., of the Office of the Appellate Defender (OAD), filed a 48-page appellate brief in the Appellate Division, First Department, arguing that:

> (1) Petitioner's constitutional right to represent himself was violated by the trial court's failure to resolve his repeated requests to represent himself; (2) Petitioner was deprived of his right to a fair trial by the prosecution's improper summation, including unsupported speculation about petitioner's "opportunity" to commit this crime, personal denigration of defense witnesses, and distortion of the evidence; (3) Petitioner's conviction was against the weight of the evidence because the testimony of a single inebriated stranger of a different race, unsupported by any forensic evidence, was insufficient to identify him; and (4) Petitioner's sentence is excessive.

(Ex. 1, Def. Brief; *see also* Ex. 2, Respondent's Brief).[2]

---

[1] The minutes of trial are being submitted separately, as is the Appendix submitted by petitioner as part of the CPL 440 motion relevant to this proceeding. References preceded by "H." are to the pre-trial suppression hearing; "T." are to the trial minutes, those preceded by "S." are to the sentencing minutes, and those preceded by "A." are to the Appendix filed by petitioner in support of his pertinent collateral attack in state court.

[2] The appeal was held in abeyance for several months while the Bronx District Attorney's Conviction Integrity Unit (CIU) reviewed petitioner's case. Following "a great deal of consideration" CIU "did not find *credible* evidence establishing that Mr. Little is actually innocent or that he was wrongfully convicted" (A.36 [emphasis in original]).

On June 13, 2017, the First Department unanimously affirmed the judgment of

conviction (People v Little, 151 AD3d 531 [1st Dept 2017], lv denied, 30 NY3d 951

[2017]). Pertinently, it held:

> There was no violation of defendant's right to represent
> himself … The minutes of the ensuing court appearance, as
> well as the next appearance, clearly establish that defendant
> was satisfied with the new attorney and no longer wished to
> represent himself.
>
> …
>
> The verdict was not against the weight of the evidence (*see
> People v Danielson*, 9 NY3d 342, 348–49 [2007]). There is no
> basis for disturbing the jury's determinations concerning
> identification and credibility. During the robbery, two benefit
> cards belonging to defendant were left in the victim's car, and
> defendant's explanation for the presence of his cards was
> highly implausible.
>
> We perceive no basis for reducing the sentence.

(Little, 151 AD3d at 531-32) (Exhibit 3). Leave to appeal to the New York

Court of Appeals was then denied. People v Little, 30 NY3d 951 (2017).


5.      Petitioner, through appellate counsel, then filed a motion to vacate

his conviction pursuant to NYCPL (hereinafter "CPL") 440.10(1)(h), alleging

ineffective assistance of trial counsel, for failure to consult or call an

identification expert, and claiming actual innocence. In support of his motion,

petitioner submitted an appendix of exhibits, including an affirmation from his

trial counsel (A.251-52), but did not provide affidavits from himself, Ms. Walker, Tristan McCall, or any alibi witness (Exhibit 4: 440 Motion; Exhibit 5: Petitioner's Memorandum of Law; Exhibit 6: People's Response; Exhibit 7: Reply).

6.    In a decision and order dated June 6, 2019, the motion court denied petitioner's motion.  The court noted that petitioner had filed a prior 440 motion, the court exercised its discretion to decide the motion on the merits (Exhibit 8, 15 n 11).[3] The court first analyzed petitioner's claim of ineffective assistance of counsel for failure to consult or call at trial an eyewitness expert under both the applicable state and federal standards (id. at 2-10). The motion court observed that the defense strategy was dictated by petitioner's testimony at trial, wherein he told the jury that a former friend, Tristan McCall, took the benefits card from his wallet prior to the robbery. Petitioner had also admitted to lying before the Grand Jury (id. at 5-6).  Petitioner put forth an alibi defense without any supporting witnesses, though a defense investigator offered testimony concerning attempts to locate alibi witnesses (id. at 6). And petitioner denied telling Det. Russo that he was in the area of Sin City the night of the

---

[3]The Court chose not to invoke the discretionary procedural bar contained in NYCPL 440.10 (3)( c), which allows a court to deny a motion based on a finding that, upon a previous CPL 440.10 motion, the defendant was in a position to adequately raise the ground or issue presented in the second motion, but did not do so.

robbery (id.).  Yet, the court noted, "defense counsel argued adroitly on summation [that] the suggestive impact of viewing the single photo of the defendant on the benefits card … led to a misidentification of defendant" (id. at 5).  Furthermore, "trial counsel cogently put in issue other factors in the record bearing on the jury's evaluation of the accuracy of the complainant's identification of the defendant, including the lighting conditions, the complainant's emotional state and alleged intoxication, and the brief duration of the incident" (id.).  Given "the defendant's role at trial as the central defense witness," it was "entirely reasonable" for counsel not to call or consult an eye witness expert, and the failure to do so did not rise "to a deprivation of defendant's right to  effective representation" (id. at 7).

7.     The court then analyzed petitioner's claim of actual innocence pursuant to People v Jimenez, 142 AD3d 149 (1st Dept 2016) and People v Hamilton, 115 AD3d 12 (2d Dept 2014).  The court noted that evidence in support of a claim of actual innocence "must be reliable" and "considered in light of, and alongside, the more general standard applicable on any" CPL 440 motion (id., at 13).  Here, petitioner's motion was not supported "by any sworn, nonhearsay allegations by the source," in that the statements attributed to Ms. Walker and Ms. Adams were presented as hearsay, and further, the statements

themselves contain hearsay (id., at 14). Indeed, the hearsay remarks attributed to Tristian McCall—who likewise did not submit an affidavit—did not constitute an admission that he committed the robbery and did not directly exculpate the petitioner (id. at 14). Thus, petitioner's motion failed to make a prima facie showing of actual innocence to warrant a hearing (id., at 15). On October 1, 2019, the Honorable Barbara R. Kapnick of the Appellate Division granted petitioner leave to appeal the denial of his postjudgment motion.

8.    On appeal to the Appellate Division, petitioner argued again that counsel was ineffective for failing to consult or call an expert on eyewitness identification and that the hearing court erred in denying his actual innocence claim without a hearing (Exhibit 9: Petitioner's Appellant's Brief [440 Appeal]; Exhibit 10: People's Response [440 Appeal]; Exhibit 11: Petitioner's Reply [440 Appeal]). On March 2, 2021, the Appellate Division rejected the claims, finding that counsel provided effective assistance, and that petitioner's claim of actual innocence was not supported by substantiated facts and was based on multiple levels of hearsay.

In pertinent part, the Court found that:

Defendant's guilt was established by compelling circumstantial evidence that was separate from the victim's identification testimony. After the robbery, the victim found defendant's benefits cards, one which contained defendant's picture, in the

back seat of the victim's car; given the circumstances, these cards could only have been left by the person who robbed the victim. A detective testified that defendant made a statement placing himself near the scene of the crime, and that when shown his benefit cards, defendant became visibly upset and volunteered that he had not left them in the back seat of a car (despite not having been told that the robbery took place in a car). At trial, defendant gave testimony, which this Court found "highly implausible" on direct appeal (151 AD3d 531, 532 [1st Dept 2017]), about how his friend had allegedly acquired the cards. Defendant also admitted at trial that he had lied in his grand jury testimony about his cards having been missing.

The court then concluded that, given this evidence, any argument that expert testimony on eyewitness identification should have been permitted or that an expert would have changed the outcome of trial, would be speculative, and it was not unreasonable for counsel to proceed without an identification expert. The Court also noted the "vigorous" nature of counsel's attack upon the victim's identification testimony.

Turning to the claim of actual innocence, and particularly the hearing court's decision to reject the claim without a hearing, the Appellate Division held:

> The court providently exercised its discretion in declining to hold a hearing on the branch of defendant's motion that sought to vacate his conviction based on actual innocence, because the motion was not supported by "sworn allegations substantiating or tending to substantiate all the essential facts" (CPL 440.30 [4] [b]). On the motion, defendant offered evidence, similar to

evidence he unsuccessfully sought to present at trial, that allegedly corroborated his story about his friend's acquisition of the cards found in the victim's car. However, this evidence consisted of multiple layers of hearsay, as well as lacking exculpatory value, and it did not require a hearing (see People v Jimenez, 142 AD3d 149, 155-158 [1st Dept 2016]; see also People v Velazquez, 143 AD3d 126, 136-137 [1st Dept 2016], lv denied 28 NY3d 1189 [2017]).

People v Little, 192 AD3d 408 (2001) (Exhibit 12). Petitioner then sought leave to appeal to the New York Court of Appeals, which was denied on May 10, 2021. People v Little, 37 NY3d 958 (2021).

9.    In the current petition, timely filed by petitioner pro se on May 27, 2021, petitioner raises the following Grounds:

1.  Petitioner was denied is right to self-representation by the trial court's failure to hold an inquiry on petitioner's request to proceed pro se;
2.  He was denied effective assistance of counsel due to counsel's failure to consult with or hire an expert on eyewitness identifications or seek to introduce expert testimony about the purported unreliability of eyewitness identifications;
3.  He was improperly denied a hearing on his motion alleging actual innocence; and
4.  He is actually innocent.

10.   It is respondent's position that the Appellate Division's resolutions of Grounds One and Two were neither contrary to nor unreasonable applications of clearly established Supreme Court precedent, nor were they based on unreasonable determinations of the facts, and that Grounds Three and

Four are not cognizable claims for substantive habeas relief.

WHEREFORE, the People of the State of New York respectfully request that defendant's application be denied.

**WHEREFORE**, respondent respectfully requests that the petition be dismissed or denied in its entirety.

_____/s_____
NANCY D. KILLIAN
(NK0771)
Assistant District Attorney

Bronx, New York
November 23, 2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CHARLES LITTLE,

                Petitioner,

                                  <u>DECLARATION   IN OPPOSITION</u>

              -against-                21 CIV. 4792(JPC)(KNF)

TYNON,

                Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

<u>**MEMORANDUM OF LAW**</u>

<u>**STATEMENT**</u>

     This Memorandum of Law is submitted in opposition to the above-captioned habeas corpus petition.

## THE FACTS

The facts relied upon are contained in the declaration of Nancy D. Killian and in the accompanying exhibits.

As reflected in the testimony at trial, on September 17, 2011, Jonathan Lopez celebrated the birthday of a friend at Sin City strip club (Lopez: T.500-01).  Mr. Lopez parked his car near the club, arriving between 10 p.m. and 11 p.m. (Lopez: T.501-02).  In the area where he parked his car, Mr. Lopez noticed functioning lights on the street and on the surrounding buildings (Lopez: T.516). Once at the club, Mr. Lopez limited himself to two drinks because they were very expensive (Lopez: T.518).  Mr. Lopez and his friend left the club around 1:00 a.m. on September 18, 2011, and once they parted ways, Mr. Lopez walked to his parked car alone (Lopez: T.519).

Mr. Lopez unlocked his car, turned on the ignition, and called his girlfriend to talk about his experience (Lopez: T.521).  With his car on, the lights from the gauges, accessories, and large touch screen radio all illuminated the vehicle's interior (Lopez: T.521).  Sitting in his car, Mr. Lopez felt something was wrong and told his girlfriend he would call her back (Lopez: T.525).  Petitioner entered the vehicle's back seat and pointed a black gun to Mr. Lopez's head (Lopez: T.526-27). Petitioner demanded Mr. Lopez give him

everything in his pockets, his gold chain, and earrings or he would kill Mr. Lopez (Lopez: T.528, 531). Mr. Lopez turned over his wallet, ID and health insurance cards, $100 cash, and his iPhone 4 (Lopez: T.529). During this time, Mr. Lopez stared at petitioner's unobstructed face, to the extent that petitioner told him to stop looking, but Mr. Lopez continued looking at petitioner's face through the rearview mirror (Lopez: T.529, 533-34, 538). Mr. Lopez gave petitioner his chain and earrings, but expressed reluctance in handing over a double-finger ring that his mother had bought him. Petitioner stated, "you better give it to me before I kill you," then grabbed the ring, and pulled it off Mr. Lopez's fingers, causing Mr. Lopez's finger to bleed (Lopez: T.531-32).

Petitioner exited the rear of the vehicle, and sat in the front passenger seat, close enough that Mr. Lopez could "kiss him" (Lopez: T.536-37). Petitioner once again admonished Mr. Lopez to stop looking at him, but Mr. Lopez continued to stare while petitioner removed items from the glove compartment (Lopez: T.536). Petitioner reached towards Mr. Lopez, grabbing the car key from the ignition, and then fled (Lopez: T.536).

The incident "felt like it was never going to end," leaving Mr. Lopez in a state of shock (Lopez: T.539). Without his phone and unable to move his car, he was afraid to leave the area with petitioner potentially around the corner, so

he stayed in his vehicle until daylight (Lopez: T.540). The next morning, when Mr. Lopez felt safe to leave his car, he surveyed the vehicle and observed on the rear passenger seat that petitioner had left behind his benefit card with petitioner's photo and a credit or debit card (Lopez: T.543).

Mr. Lopez found the nearest police precinct and reported being robbed (Lopez: T.547-48). Mr. Lopez met with Detective Anthony Russo, of the 40th Precinct, explained the robbery, and provided the two cards with petitioner's identification (Det. Russo: T.675, 688-89, 702). Mr. Lopez described petitioner as a black male, medium complexion, approximately 5'6'', 160 pounds, with short hair, wearing a black hoody, blue jeans, and black sneakers (A.39 [DD5 #1]). Using a different photograph of petitioner than on the benefit card, Det. Russo created a photo array of six similarly looking individuals, and Mr. Lopez picked the petitioner out as the person who robbed him (H.9, 11).

Multiple efforts to apprehend petitioner were unsuccessful. Officers went to several Bronx addresses to no avail and coordinated with petitioner's parole officer, but petitioner absconded from his parole obligations and a parole warrant was issued (Det. Russo: T.694-702; PO Ancrum: T.837-42).

On or after November 4, 2011, Det. Russo placed about a dozen wanted posters with petitioner's picture and information in the lobby of 1742 Story

4

Avenue and nearby police precincts (Det. Russo: T.784-86).

On January 3, 2012, Det. Russo was notified that petitioner had been arrested by a different precinct, and Det. Russo took custody of the petitioner and brought him to the 40th Precinct (Det. Russo: T.701). After being informed of and waiving his *Miranda* rights, petitioner told Det. Russo that he was near Sin City at the time of the robbery, but he could not get in, so he was talking to females on the line to get them to go with him instead of into the club (Det. Russo: T.710). Det. Russo then showed petitioner the two cards left in Mr. Lopez's car. Petitioner volunteered that he didn't leave them in the back of anybody's car, though Det. Russo had not mentioned anything about a car in his interview with petitioner (Det. Russo: T.711; H.40). Petitioner became nervous, visibly shaken, and stopped talking (Det. Russo: T.712). That same day, Det. Russo conducted a lineup, during which Mr. Lopez identified petitioner as the person who robbed him (Lopez: T.549-551; Russo: T.715).

Petitioner was arraigned on January 4, 2012, in Criminal Court, Bronx County (Franco, J.). On January 10, 2012, petitioner testified before the Bronx County Grand Jury (A.101-21). Petitioner claimed that he first realized that his benefit card was missing in October 2011, several weeks after the robbery (A.112-13; Little: T.985). He told the Grand Jury that at the time of the

robbery, he was at an apartment with several other individuals watching a boxing match (A.106).[4]  Petitioner proffered one witness to the Grand Jury, his then-girlfriend, Crystal Sanchez-Moore,[5] to support his purported alibi (A.107). The prosecutor informed the Grand Jury of the defense proffer, but the Grand Jury elected not to hear from Ms. Sanchez-Moore (A..134-36).

By indictment number 740/2006, filed on January 13, 2012, the Bronx County Grand Jury charged petitioner with Robbery in the First Degree (Penal Law § 160.15[4]) and related charges)(A.42).

On May 20 and May 21, 2013, a combined *Huntley/Wade/Dunaway* hearing was held before the Honorable Denis Boyle. The court denied petitioner's application to suppress his proffered statement and lineup identification.  The Court filed a written decision on June 28, 2013 (A.140-52).

On May 30, 2013, the jury trial against petitioner commenced with

---

[4] In the Grand Jury, petitioner stated, "On September 17th, sport even happened [sic], which I was watching with my girlfriend, which is Crystal Sanchez.  Her mother, Debra Estrada. Her sister, Jocelyn Estrada, and Katherine Estrada, Darshina Little and Tricia McCall (ph), one of my friends" (A.106 [phonetics marking in original]).  At trial, petitioner claimed that Tricia McCall was Crystal's friend, whom he had not seen since the night of September 17, 2011, and that she is not related to Tristan McCall (Little: T.1033-34).  In arguing against a potential missing witness charge, defense counsel stated, "My client testified that as to the McCall girl, he has no – he's not friends with her.  He didn't really know her. He didn't have her phone number and she was friends with his ex-girlfriend" (T.1122-23).

[5] Crystal Sanchez and Crystal Moore are the same person; the latter being her name after marriage, and the former being her maiden name (T.1286).

opening statements (T.478 [People]; T.486 [Defense]). The People's case, in pertinent part, was presented as described above. Petitioner was represented at trial by Maria S. Tobia, Esq.

During the trial, Ms. Tobia attacked the identification of petitioner, and the petitioner testified in his own defense, putting forth an alibi defense. Petitioner told the trial jury that his former friend Tristan McCall took the EBT and Care Credit card out of petitioner's wallet prior to the robbery (Little: T.908, 911). He acknowledged that despite his oath to tell the truth, he lied in the Grand Jury when he testified that he first realized his EBT card was missing in October 2011 (Little: T.1001). He was aware he was wanted by police, and even called a detective to surrender, but he did not want to turn himself in without a lawyer (Little: T.900). Petitioner testified that a friend named Tanisha, last name unknown, told him that Tristan committed the crime that petitioner was wanted for (Little: T.971). Petitioner denied making Mirandized statements to Det. Russo about being near Sin City at the time of the crime. Rather, he said he stated to Det. Russo "without too much details" that he was with Crystal Sanchez-Moore on September 18, 2011, and then he asked for a lawyer and refused to answer any questions about the EBT and Care Credit card (Little: T.944-45). The first time he saw the wanted poster was after his was

arrested on January 3, 2012 (Little: T.934)

During petitioner's testimony, on June 10, 2013, defense counsel sought permission from the Court to elicit testimony regarding a conversation overheard by Anne Walker, a neighbor of the petitioner. Defense investigators initially located Ms. Walker months earlier (T.1095, A.225-29). In an email dated March 24, 2013, defense investigator Bernard Johnson described an interview with Ms. Walker, wherein she stated that she overheard unnamed individuals "talking about the situation and they were saying that that was not right what they did to him with his ebt [sic] card," and that Ms. Walker would get the names of the people in the conversation (A.225). In a follow up interview, Ms. Walker learned that the boys talking were "Tristan, George, Terrell, and a Nelson" (A.225).[6] Additionally, on June 4, 2013, there is an email from investigator Smith to Johnson stating that Ms. Walker "is willing to testify in court" that she heard Tristan and other boys talking outside her window, and that she did not see the wanted poster (A.229).

In counsel's application to the Court, Ms. Tobia relayed that she personally spoke with Ms. Walker "on a couple of occasions … via telephone"

---

[6] The email to counsel appears to be based on interviews of Ms. Walker conducted by defense investigator Alfred Smith on prior unknown dates (A.227-28).

(T.1095). Ms. Walker informed counsel that she knows petitioner, whom she viewed as helpful (T.1096). Ms. Walker observed Tristan McCall with three or four other young men "at a time after the wanted posters [with petitioner's information] had gone up" (*id*.). Ms. Walker overheard one of the young men state, "You shouldn't have done him like that, [or] you shouldn't have done that with the EBT card," and in response Tristan "started chuckling" (*id*.). Counsel offered this statement not to suggest that Tristan committed the robbery, but to support petitioner's testimony that there were rumors that someone else committed this crime and to explain petitioner's reluctance to surrender to the police (T.1098-99). The Court denied counsel's application, ruling that Tristan's chuckle was "neither an admission nor … a declaration against penal interest[,] and the conversation taken as a whole doesn't bear on the petitioner's consciousness of guilt" (T.1101).

Petitioner called several investigators to testify at the trial to describe their efforts to locate Crystal Sanchez-Moore and her family—Debra Estrada, Jocelyn Estrada, and Katherine Estrada (Johnson: Supp.T.6-9). There was no testimony about efforts to locate Tricia McCall.

In closing arguments, defense counsel attacked the identification of her client on multiple grounds. She described the circumstances for Mr. Lopez as

"very stressful," that he was "under incredible amount of stress," and that "when you have a gun that close to you, you're terrified" (T.1186, 1202, 1209). Under the circumstances, which included the consumption of alcohol and only about "14 seconds" to view the perpetrator, "[t]he human mind is incapable under the influence of alcohol of creating an image that is reliable" (T.1210, 1226). Counsel emphasized the suggestive effect of post-event information caused by the discovery of petitioner's benefit cards (T.1196 ["The ID card suggested who did it, but it was a false suggestion … and it led to a misidentification of my client"]; T.1206 ["He found it right in his back seat. He knows the guy was sitting there. It must be him. That's inherently suggestive … He's identifying Clifton Little because he saw Clifton Little's picture on the ID"]). She criticized the lineup identification as inherently suggestive because, as Mr. Lopez explained, he knew that the police were "looking for the guy in the ID, obviously, because I gave it to them" (T.1208). Ms. Tobia argued that the jury should reject Mr. Lopez's identification of the petitioner based on the combination of all these factors:

> [T]he lighting conditions, his intoxication and the incredibly brief duration of this situation makes an I.D. impossible … He's looking behind him for seconds at a time … We are not machines. We are not computers. We are people and making the impression in your mind of another human being in th[is] stressful situation especially after

drinking is extremely difficult … add the utter complete suggestion of the I.D. being found, the chances of this person ever being able to make an accurate I.D. is zero, absolutely zero. It doesn't matter that he believes he can. … It doesn't mean he's accurate. It doesn't mean he's right.

(T.1211).

On June 13, 2013, the jury rendered a guilty verdict against petitioner for Robbery in the First Degree (Penal Law § 160.15[4]) (T.1349).

On July 10, 2013, prior to sentencing, defense counsel alerted the Court that she personally spoke with Crystal Sanchez-Moore after the guilty verdict (A.153-56). Although Ms. Sanchez-Moore was proffered as an alibi witness in the Grand Jury, petitioner had lost contact with her after she stopped visiting him in jail about nine months before the trial (T.870, Little: T.1033). Still, when Tristan McCall asked how petitioner was holding up, she told Tristan that petitioner wasn't holding up very well at all (A.156). Ms. Sanchez-Moore indicated that Tristan McCall began discussing the circumstances of the crime, including watching the boxing fight at Sin City, tucking his braids under a baseball hat, and forcefully pulling a double-finger ring off a "Spanish" kid's hand, causing an injury (A.156-57). Counsel asked for an adjournment, which the Court granted, to speak with Ms. Sanchez-Moore further and to prepare a motion (A.157-59).

Counsel, without explanation, did not file any motion related to the

allegations imparted by Crystal Sanchez-Moore. Instead, on October 11, 2013 counsel adopted petitioner's pro se motion pursuant to CPL 330.30 (A.162), claiming that the failure to preserve the wanted poster or video surveillance in the vicinity of the crime was a *Brady* violation requiring a new trial (A.164-82).

The Court denied petitioner's CPL 330.30 motion in a written decision filed on January 13, 2014 (A.183-85).

On January 17, 2014, the Court adjudicated petitioner a second felony offender and sentenced him to 12 years' incarceration followed by 5 years' postrelease supervision (S.4, 16).

The relevant post-conviction litigation is outlined in the Declaration in Opposition.

# ARGUMENT

## POINT ONE

**THE APPELLATE DIVISION'S REJECTION OF PETITIONER'S CLAIM REGARDING HIS RIGHT TO PROCEED <u>PRO SE</u> WAS NEITHER CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT PRECEDENT, NOR WAS IT BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS**.

On October 5, 2012, petitioner informed Justice Miriam R. Best that he wanted the court to allow him to represent himself (Exhibit 13:Minutes of October 5, 2012, at 5). The court responded, "[t]he issue of whether you will represent yourself has not yet been determined" (<u>id</u>., at 7). The court added, "Now I have a very long calendar today, sir and the inquiry as to whether you are permitted to represent yourself is a long one and I am not going to take the time to do it now. So what I am going to do is put your case over for another day" (<u>id</u>.). The court concluded, "I am going to put this case on the 15th for the Court to inquiry [sic] whether the defendant will be permitted to represent himself" (<u>id</u>., at 10). Petitioner offered no protest to the court's adjournment to resolve the issue.

On October 15, 2012, the attorney newly appearing for petitioner asked if he could have time to talk to petitioner to determine issues in the case

(Exhibit 14: Minutes of October 15, 2012, at 2). The court acceded and adjourned the case to October 17, 2012 (id., at 3). On October 17, 2012, the newly appointed attorney notified the court of his attempt to work with petitioner in achieve effective representation. The court observed that counsel was highly experienced and that petitioner should endeavor to communicate with counsel (Exhibit 15: Minutes of October 17, 2012, at 6). The next court date on which petitioner appeared was November 20, 2012. On that date, counsel informed the court that after attempting to discuss some issues with petitioner, he could not represent him. Counsel noted,

> When the court assigned it to me I had a lists [sic] of things in tasks that I was to accomplish. I've accomplished them. I have given him the information and it took me–I was ready, willing and able to represent Mr. Little. What I am not prepared to do, what I am not prepared to be is to be treated with a degree of indignance inconsistent with my years of experience...

(Exhibit 16:Minutes of November 20, 2012, at 4).

Petitioner then addressed the court and discussed his grievance with counsel. When the court asked if he wanted a new attorney, petitioner stated,

> I don't want no attorney. I am tired of going from–this matter is going from attorney to attorney to attorney when no one is providing accurate,

> consistent counsel at all. Nobody is
> in by best interest. Everybody is
> asking for adjournments for whatever
> reasons.

(Id., at 6).

In response, the court stated to petitioner "before you decide to waive your right to an attorney I want you to have another opportunity to speak to another lawyer and give this very careful consideration" (id., at 7). When petitioner requested to speak, the court stated, "I will take up with you at that time any further request" (id., at 8). Petitioner nonetheless spoke, declaiming, "Oh, y'all, y'all, y'all, y'all a bunch of dick heads in this courtroom. Bunch of fucking dick heads" (id., at 8). The case was adjourned to November 27, 2012 (id.).

On November 27, 2012, while petitioner was present in the courtroom, Maria Tobia, Esq, appeared as assigned counsel. She indicated that she had been recently assigned and would need some time to confer with petitioner (Exhibit 17: Minutes of November 27, 2012, at 2-3). The court adjourned the case to December 12, 2012 (id., at 3). Petitioner then asked if he could address the court. At that juncture, the court recommended that before making any statements, he have the opportunity to speak with Ms. Tobia (id., at 3-4). Petitioner, nonetheless, noted that he had made applications to represent himself. He expressed his dissatisfaction with his prior attorneys and did not "want to take a chance anymore" (id., at 4). He expressed as the basis for his dissatisfaction that he had been deprived of his right to be

released pursuant to CPL § 180.80 (id., at 5).

The court answered petitioner, noting that his previous counsel examined the issue regarding 180.80 and determined that earlier counsel had waived his rights under the statute and that was the reason he was not released. The court told petitioner that his case would not be dismissed for that reason (id., at 6). The court then stated,

> Now, with respect to your application to represent yourself. You do have the right to represent yourself. However, it's not what's called an unqualified right, and in order to protect your rights I need to discuss this decision with you at greater length. So I am not going to take it up with you today, but I will take it up with you on the next date.
>
> In the meantime I am going to continue to encourage you to give Ms. Tobia the opportunity to speak with you further, and in my opinion you will be well-advised to appreciate how experienced she is, how conscientious she is and what a fine job she will do on your behalf.
>
> Having said that, I will adjourn the matter to December 13th and if you want to be heard further on that date we will talk it out.
>
> (Id., at 6).

The court corrected that the adjourn date was December 12 (id., at 7).

On December 12, 2012, Ms. Tobia informed the court that she had

reviewed petitioner's file, spoke with petitioner, his family, and girlfriend, and adopted a motion petitioner made that his rights under 180.80 had been violated because he had never been informed of the waiver (Exhibit 18: Minutes of December 12, 2012, at 2). The court noted that it would grant the request to entertain the motion and stated that it did so in the belief that she was adopting the writ as petitioner's counsel (id., at 3). Petitioner made no interjection. Ms. Tobia, as counsel, made discovery requests (id., at 3-5). The court observed, "Clearly Ms. Tobia you're doing your homework" (id., at 5). The case was adjourned to January 11, 2013, for the People to answer the defense motion and for response to discovery requests (id., at 6).

On January 11, 2013, the court denied the defense application purusant to CPL 180.80 (Exhibit 19: Minutes of January 11, 2013, at 2-3). Ms. Tobia then addressed the court, "Judge, just so the record is clear I believe I was assigned to represent Mr. Little on the 27th of November" (id., at 3). The court stated, "Correct" (id.). Ms. Tobia continued, "I then appeared again on December 12th as his attorney and I am appearing today with his consent as his attorney, as assigned counsel, since he had asked for new counsel. And I believe he would like me to continue to do that" (id.). Petitioner made no interjection.

After petitioner raised this claim on direct appeal, the Appellate Division concluded:

There was no violation of defendant's right to

17

represent himself. Rather than being unequivocal, each of defendant's requests for self-representation "was made in the context of a claim of dissatisfaction with counsel" (People v. Scivolette, 40 A.D.3d 887, 887, 836 N.Y.S.2d 262 [2d Dept.2007] ). In any event, defendant abandoned his request to appear pro se (see People v. Gillian, 8 N.Y.3d 85, 88, 828 N.Y.S.2d 277, 861 N.E.2d 92 [2006]; People v. Graves, 85 N.Y.2d 1024, 1027, 630 N.Y.S.2d 972, 654 N.E.2d 1220 [1995]; People v. Hirschfeld, 282 A.D.2d 337, 339, 726 N.Y.S.2d 3 [1st Dept.2001], lv. denied 96 N.Y.2d 919, 732 N.Y.S.2d 636, 758 N.E.2d 662 [2001], cert. denied 543 U.S. 1082, 122 S.Ct. 816, 151 L.Ed.2d 699 [2002] ). There was no stage of the proceedings at which a court actually denied, rather than temporarily deferred, a request by defendant for self-representation. Furthermore, after assigning the last in a long series of attorneys, the trial court advised defendant that although he had the right to represent himself, a lengthy colloquy with the court would be required, which the court would conduct at the next adjourned date two weeks later, but that in the meantime defendant should confer with the new attorney to see if defendant might accept her services. The minutes of the ensuing court appearance, as well as the next appearance, clearly establish that defendant was satisfied with the new attorney and no longer wished to represent himself. The record fails to support defendant's present contention that, given the fact that two prior requests for self-representation had been deferred by the court, it would have been futile for defendant to renew his ultimate request on the date on which the court had promised to entertain it.

People v Little, 151 AD3d 531, 531-32. (Exhibit 4).

18

As the factual recitation above makes clear, in the state court, although petitioner made a request to represent himself, the court never denied this request. Instead, after Ms. Tobia was ultimately assigned to represent him (after several other attorneys had been relieved), petitioner abandoned his request and accepted Ms. Tobia's representation. Adopting the argument raised by respondent, the Appellate Division held that there was no violation of petitioner's right to represent himself and that petitioner abandoned this claim.

The Appellate Division's determination of petitioner's current Ground One was neither contrary to nor an unreasonable application of Supreme Court precedent, as set forth in 28 U.S.C. § 2254 (d)(1) ("AEDPA"). The Supreme Court first addressed this statute in <u>Williams v. Taylor</u>, 529 U.S. 362 (2000); <u>see also</u> <u>Mitchell v. Esparza</u>, 540 U.S. 12 (2003). The Court ruled that the statute imposes a "new constraint" on courts reviewing habeas corpus petitions regarding claims that were reached on the merits by the state court. <u>Williams</u>, 529 U.S. at 412. In addressing 28 U.S.C. § 2254(d)(1), the Court explained that under the "contrary to" clause, a habeas court "may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412-13. In addressing the "unreasonable application" clause, the Court stressed that "unreasonable" does not mean "incorrect" or "erroneous."

Id. at 410-11. Thus, a writ may not issue under that clause if a state court determination is merely incorrect; it may only issue "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id., at 413; Vasquez v. Strack, 228 F.3d 143, 147-48 (2d Cir. 2000); Hill v. Johnson, 210 F.3d 481 (5th Cir. 2000). Indeed, the Second Circuit has interpreted the statute as requiring denial of a habeas corpus petition, even in cases where the state court is incorrect, as long as the state court is not unreasonable. See Jones v. Stinson, 229 F.3d 112, 119-21 (2d Cir. 2000); see also Jimenez v. Walker, 458 F.3d 130, 147 (2nd Cir. 2006), cert. denied 549 U.S. 1133 (2007) (increment beyond error is required for habeas relief).

As to factual questions, 28 U.S.C. § 2254(d)(2) governs, and decrees that a federal court can grant habeas relief only if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." State court determinations of a factual issues are "presumed to be correct," and those presumptions can be rebutted only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). See also Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (state court's factual determinations "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding").

Petitioner has not come close to establishing any entitlement to relief

under the deferential standards set forth in 28 U.S.C. § 2254(d) and (e) since he cannot set forth any Supreme Court precedent that was unreasonably applied by the state court; nor can he establish that the state court's factual findings were unreasonable.

In Faretta v. California, 422 U.S. 806 (1975), the Supreme Court held that a defendant has the right to self-representation at trial, and the state does not have the right to force a lawyer on a defendant. See also, McKaskle v. Wiggins, 465 U.S. 168, 174 (1984). Importantly, however, as the Second Circuit has made clear, the defendant's request must be "unequivocal." Lavalle v Artus, 403 Fed Appx. 607 (2nd Cir. 2010). Indeed, it was the defendant's "clear[] and equivocal[]" request that the Supreme Court found to have been improperly denied in Faretta. 422 U.S. at 835. Judged under these standards, the Appellate Division's decision was neither contrary to nor an unreasonable application of Supreme Court precedent, nor was it based on an unreasonable determination of the facts.

As the Appellate Division held, a review of the various adjourn dates involving petitioner's request to represent himself reveals that the court never refused or denied petitioner's request to proceed pro se. Rather, the trial court indicated that it needed time in order to conduct a proper inquiry of petitioner to determine if he understood the ramifications of proceeding pro-se. Ultimately, petitioner abandoned his request, accepting Ms. Tobia to represent him at trial. The Appellate Division's determination on this point, based on

a reasonable factual finding, is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

Initially, the request was not denied. Instead, petitioner was cautioned that such request was a serious matter requiring further discussion. At no time did the court state that it would refuse to consider his request. To the contrary, at the time Ms. Tobia made her appearance as counsel, the counsel specifically stated to petitioner that it would entertain his application if, after petitioner conferred with her, he still wanted to proceed pro se. It is evident that on December 12, 2012, when Ms. Tobia adopted petitioner's motion concerning 180.80 and made discovery requests, petitioner interposed no objection to her acting as his attorney. This acceptance was underscored on January 11, 2013, when Ms. Tobia specifically brought up her status as petitioner's attorney and stated on the record that it was her belief that petitioner wanted her to continue as counsel, which she, in fact, did, serving as his counsel at the trial and sentencing proceedings.

Consequently, petitioner's argument that he was denied his request for self-representation is simply untrue as is his claim that he never abandoned that request. It is evident from petitioner's comments on the record that he was not timid in speaking his mind to the court and certainly could have communicated his disagreement with the statement of Ms. Tobia and renewed his application for self-representation. There is absolutely no indication that he was coerced to accept Ms. Tobia. It is far more likely that he had

confidence in Ms. Tobia, who was willing to address his main concern about the waiver of 180.80. The Appellate Division's rejection of the constitutional claim was neither contrary to not an unreasonable determination of Supreme Court precedent, nor was it based on an unreasonable application of the facts.

## POINT TWO

**THE APPELLATE DIVISION'S CONCLUSION THAT TRIAL COUNSEL WAS NOT INEFFECTIVE WAS NEITHER CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT PRECEDENT, NOR WAS IT BASED ON UNREASONABLE DETERMINATIONS OF THE FACTS (responding to Ground Two).**

Petitioner claims, as he did in his CPL § 440 motion and again on appeal from the denial of that motion, that his experienced trial attorney, Ms. Tobia, Esq., was ineffective because she failed to consult or call an identification expert. When petitioner raised this claim in the Appellate Division, the Court concluded that "Defendant received effective assistance of counsel under the state and federal standards (see People v Benevento, 91 NY2d 708, 713-714 [1998]; Strickland v Washington, 466 US 668 [1984]). Defendant has not established that his failure to consult or call an expert on eyewitness identification was objectively unreasonable, the trial court would have permitted such an expert to be called, or that there was a reasonable possibility that such expert testimony would have affected the outcome or fairness of the trial." Exhibit 12; People v Little, 192 AD3d 408 (1ˢᵗ Dept. 2021).The Appellate Division's rejection of this claim was a reasonable application of Strickland, and its factual resolutions were fully-grounded in the record. See Cullen v. Pinholster, 131 S. Ct. 1388 (2011) (state court's

summary rejection of ineffective assistance claim not unreasonable under 28 U.S.C. § 2254 [d]).

As the Supreme Court has held, "a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Bobby v. Dixon, 565 U.S. 23, 24 (2011), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011). Put another way by the Supreme Court, the petitioner must show that the state court "erred so transparently that no fairminded jurist could agree with that court's decision." Dixon, 565 U.S. at 24. In the context of a claim of ineffective assistance of counsel, a petitioner must show that his counsel provided deficient representation, and that the petitioner suffered prejudice as a result of that deficiency. See Bell v. Cone, 535 U.S. 685 (2002); Strickland, 466 U.S. at 698; see also Lanfranco v. Murray, 313 F.3d 112 (2d Cir. 2002). To show deficient performance, a petitioner must show "that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688.

However, there exists a strong presumption that counsel's conduct falls within the wide range of reasonable assistance, and the court must consider that, under the circumstances, the challenged action might be considered sound strategy. Strickland, 466 U.S. at 688. The strong presumption of

counsel's effectiveness is overcome first by demonstrating that counsel was not reasonably competent. See id. at 689-690. "[J]udicial scrutiny of counsel's performance must be highly deferential . . . . [T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. To establish prejudice, the petitioner is required to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Additionally, "[t[he standards created by Strickland and [28 U.S.C.] § 2254(d) are both 'highly deferential,' . . . , and when the two apply in tandem, review is 'doubly' so . . . ." Harrington v. Richter,562 U.S. at 105 (citations omitted); see Burt v. Titlow, 571 US 12, 15 (2013). Judged under these "doubly" deferential standards, petitioner's claim of ineffective assistance of counsel must be rejected.

Viewing counsel's performance in totality, petitioner has failed to show that he received less than meaningful representation under the applicable state and federal standards. Petitioner's trial counsel put forth a vigorous and consistent misidentification defense, attacking the People's lack of physical evidence and the credibility of the People's sole eyewitness through the same avenues suggested by the identification expert, Dr. Strange. Throughout the

proceedings, Ms. Tobia attacked the identification based on the poor lighting conditions (*see e.g.* Lopez: T.515, 559, 651-52; Summation: T.1210-11), weapon focus (Summation: T.1209-10), stress of the complainant (Summation: T.1186, 1202-03, 1226), time estimation and short exposure time (Lopez: T.539, 594, 598-99; Summation: T.1210), post-event information (H.96; Opening: T.493-94; Lopez: T.585-86, 664; Russo: T.737-38; Summation: T.1196, 1202-03, 1205-06), procedural issues influencing the propriety of the lineup identification (Opening: T.495; Lopez: T.549-50, 585-86, 656; Russo: T.799; Summation: T.1205-08), witness confidence versus accuracy (Opening: T.494; Summation: T.1208-09), confidence malleability and witness feedback (Lopez: T.585-86, 645; Russo: T.742; Summation: T.1204), and the accumulated effect of all these factors combined (Opening: T.595; Summation: T.1210-1211).

**Ms. Tobia was under no duty to consult or call an identification expert.**

In general, a failure to call a witness does not necessarily constitute ineffective assistance of counsel. This is especially true in the context of expert witnesses (Harrington, 562 U.S. at 106 ["it is exceedingly rare that a defense attorney's strategic decision not to present expert testimony amounts

to ineffective assistance of counsel"]). To sustain this claim of ineffective assistance of counsel for failure to consult with/secure testimony from an identification expert, petitioner "would have to show either (1) that trial counsel unreasonably failed to consider consulting an expert, or (2) that trial counsel did consult an expert, but did not call one, (3) that that expert was prepared to provide specific, useful testimony in support of his case, (4) that the trial court would have admitted such testimony, and (5) that the testimony likely would have affected the outcome of his trial" (McDowell v Heath, 09 CIV. 7887, 2013 WL 2896992, at *35 [SDNY June 13, 2013] [habeas corpus review of defendant's CPL 440.10 denial based on, inter alia, failure to present expert on reliability of eyewitness testimony]).[7]

In applying these factors to the current case, it was reasonable for counsel to not consult with an identification expert or call one to testify. Counsel had the difficult task of putting forth a coherent defense theory, while honoring petitioner's right to testify to an alibi that was at odds with his previous admission that he was near Sin City on the night of the robbery and a concession that his prior Grand Jury testimony about simply losing his

---

[7]Copies of unreported cases are being sent to the pro se petitioner pursuant to Local Civil Rule 7.2.

benefit cards was a lie. The motion court recognized this struggle and determined that "counsel's decision not to consult with or call an eye witness expert was entirely reasonable given the particular circumstances presented and defendant's role at trial as the central defense witness" (Exhibit 8, pp. 6-7). Indeed, at trial, petitioner insisted on presenting the same questionable alibi defense previously rejected by the Grand Jury, with no supporting evidence, no alibi witnesses, and a concession that he lied in the Grand Jury concerning his benefit cards. Without any corroboration, petitioner offered a new explanation—later described by this Court as "highly implausible" (Little, 151 AD3d at 532)—for his benefit cards being found in the victim's car after the crime. Counsel attempted to mitigate these weak points by presenting investigative efforts to locate alibi witnesses and attacking Lopez's ability to accurately identify petitioner. Though testimony from an eyewitness expert may have aided the defense, "[t]he question is whether [Ms. Tobia's] representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom" (Strickland, 466 US at 690). Even without an identification expert, counsel was able to attack the identification through cross-examination and closing arguments, capably addressing nearly all of the

points raised by Dr. Strange (*see supra*, pp. 22-23) and aided by the trial court's extended charge of various factors to consider in cases involving one-witness identifications.

Contrary to the cases cited by petitioner in state court, People v Oliveras, 21 NY3d 339 (2013) and Bell v Miller, 500 F3d 149 (2d Cir 2007) Exhibit 9, pp 46-47), counsel was not required to consult with an identification expert or call one to testify. Initially, having been determined by courts other than the United States Supreme Court, these cases are inapposite in this Court's determination of whether the Appellate Division's decision constituted an unreasonable application of Strickland. Indeed, in Bell, the Second Circuit did not apply the deferential standards set forth in 28 U.S.C. 2254 (d), but instead considered the claim de novo, as the state court's ruling was not an adjudication on the merits. Bell, 500 F.3d at 155. Here, there is no question that the Appellate Division's decision constituted a merits determination.

Moreover, these cases present facts requiring competent counsel to consult medical experts or their client's medical records. In Oliveras, counsel "fail[ed] to pursue the minimal investigation required" when arguing that the defendant's mental abilities undermined his admission of guilt (21 NY3d at

348). Instead of investigating documents relating to the defendant's mental illness history, defense counsel introduced testimony of the defendant's mother, an unquestionably biased witness, who testified that the defendant received Social Security benefits, and as a child, the defendant received special education classes and treatment at the Bronx Psychiatric Center (*see id.* at 344, 347). The New York Court of Appeals held that the failure to collect information relating to the defendant's mental history constituted a denial of effective assistance of counsel (*see id.* at 348). Meanwhile, in *Bell,* after the robbery victim was shot in the thigh with a shotgun, lost copious amounts of blood, and was hospitalized under heavy sedation for 11 days, the victim identified the defendant (500 F3d at 152). The only evidence connecting the defendant to the crime was the victim's testimony, while the defendant presented an alibi defense with three separate witnesses (*id.*). Counsel failed to ask the victim about memory loss, which persisted at least a month after the crime, or about the impact of blood loss and hospital medication (*id.* at 156). The Second Circuit held that under such circumstances, counsel was ineffective for failing to consult with a *medical expert* as to the effects of trauma, blood loss, and anxiolytic and amnestic medications on the human brain to facilitate the cross examination of the

victim and treating doctor (*id.* at 157).

Unlike <u>Oliveras</u> and <u>Bell</u>, petitioner does not contend his attorney should have consulted with a medical expert or obtain medical records. Further, far from "fail[ing] to pursue the minimal investigation required," counsel undertook a through investigation of the case, consistent with the misidentification/alibi defense. Ms. Tobia's investigators visited the crime scene to note the lighting and location in an effort to impeach the credibility of Lopez's actions and state of mind to make an accurate identification (T.1073). The investigators attempted to locate multiple alibi witnesses, and the investigators did in fact locate Ms. Walker (though the statements she overheard were deemed inadmissible) and a Sin City employee to impeach Lopez's credibility about how much he had to drink. Counsel's investigation in this case was thorough and proper, and the cited cases did not require her to consult with an identification expert.

**The trial court was not required to permit expert testimony on identification.**

Further, there is no certainty that the trial court would have admitted testimony from an identification expert, nor was it required to do so. Accordingly, since the state court would have had discretion to exclude any

such evidence, petitioner cannot prevail. See Moore v. Hardee, 723 F.3d 488 (4th Cir. 2013) (petitioner not entitled to habeas relief based on his claim that counsel was ineffective for failing to present an expert on the fallibility of eyewitness testimony; trial court would have had the discretion to exclude such an expert). Under New York law, such determination would be left to the sound discretion of the court (People v Lee, 96 NY2d 157, 162 [2001]), and it would not have been an abuse of discretion to deny such an expert because there was ample corroboration of petitioner being the perpetrator of this crime (People v Young, 7 NY3d 40, 45-46 [2006] ["corroborating evidence … significantly diminishes the importance of the proffered expert testimony"]). In Young, where the court denied identification expert testimony, there was sufficient corroboration of the eyewitness's identification when the "stolen property was found in possession of two of defendant's acquaintances; neither of them could have been the robber, since both were women; and one of them pointed to defendant as the person from whom she got the property" (7 NY3d at 46). Likewise, in Lee, where the initial identification by the carjacking victim occurred six months after the arrest, it was not an abuse of discretion to deny the testimony from an identification expert because there was sufficient corroboration where the

defendant was arrested driving the victim's vehicle two months after the crime (96 NY2d at 161, 163).

In contrast, in <u>People v Legrand</u>, 8 NY3d 449 (2007), the Court of Appeals held that, where "[t]here was no forensic or other physical evidence connecting defendant to the stabbing" and where the "case turned solely on the accuracy of the witnesses' identification," it was error for the trial court to exclude expert testimony on the reliability of such identifications (*id.* at 453, 457, 459). The Court also held that "[i]n the event that sufficient corroborating evidence is found to exist, an exercise excluding eyewitness expert testimony would not be fatal to a jury verdict convicting defendant" (*id.* at 459). In <u>People v Santiago</u>, 17 NY3d 661 (2011), the Court of Appeals held that an assault victim's identification of the defendant was not sufficiently corroborated by two additional identifications so as to render expert testimony on eyewitness recognition unnecessary (*id.* at 664). There, the victim was assaulted on a subway platform by a stranger, whose "face was concealed from the middle of his top lip, down, from the top of his eyebrows up" (*id.* [internal quotations omitted]). The two additional eyewitnesses to the assault did not corroborate the victim's identification of the defendant. One witness originally claimed he did not recognize anyone in the photo array or

lineup, but later asserted that he recognized the defendant with 80% confidence after viewing a newspaper article depicting defendant in handcuffs and the victim's positive identification (*id.* at 665, 673). Likewise, the second witness's lineup identification one-year after the assault may have been influenced by a police artist's sketch of the assailant (*id.* at 668, 673).

Here, similar to <u>Lee</u> and <u>Young</u>, this case is not one where the identification evidence was weak or lacking in corroboration. The clear and compelling identification testimony from Mr. Lopez established that he had the opportunity and ability to look at defendant's unobstructed face from multiple angles and close enough to "kiss him."    Unlike <u>Legrand</u> and *Santiago*, where eye witness identifications were presented without independent corroboration, here the corroborating evidence includes the physical evidence of petitioner's two benefit cards in the victim's vehicle, petitioner's admitted lie to the Grand Jury about losing those cards, his statement to Det. Russo placing himself outside Sin City at the time of the crime (which itself is corroborated by the *Miranda* sheet and memorialized in DD5 #34 [A.153]), and his three-months long flight from police and parole following this crime. The presence of petitioner's benefit cards alone, located inside Lopez's vehicle following the robbery, constitutes strong

"corroborating evidence connecting the defendant to the crime" (*see* <u>Santiago</u>, 17 NY3d at 669, *quoting* <u>LeGrand</u>, 8 NY3d at 452). So too does his admitted presence in the vicinity of the crime, his flight from parole, and his lying in the Grand Jury. As such, under New York law, it would have been proper to deny testimony from an identification expert.

### Petitioner failed to prove he suffered any prejudice.

Finally, testimony from an identification expert was not likely to have changed the outcome of petitioner's trial. Ms. Tobia avers in her affidavit only that expert testimony on post-event information (without mentioning any other topic) "could have been helpful … to educate the jury about the proper weight to give this evidence" (A.252), but she does not assert that the verdict would likely have been different. On the current trial record, counsel aggressively argued to the jury that the People's strongest piece of evidence—two pieces of petitioner's identification inexplicitly in the back of Mr. Lopez's car—was actually a weakness because it tainted the identification procedure (T.1196, 1206).[8] Though expert testimony on post-

---

[8] Under the defense theory of this case, the potential influences of post-event information and cross-race effects are contradictory to each other. Trial counsel argued that at the lineup, the complainant simply identified the person he saw on the EBT card, which indisputably belonged to petitioner (T.1196, 1206). The complainant's ability to quickly pick petitioner out of a lineup 3-4 months after seeing that card runs counter to the argument there was any cross racial effect in complainant's accuracy and ability to identify because he

event information may have supported counsel's argument, such testimony would not have explained how petitioner's EBT and Care Credit card got into the back of the victim's car. Likewise, an identification expert could not explain why petitioner lied in the Grand Jury about losing his identification cards or corroborate petitioner's alibi defense. Nor could such an expert explain petitioner's avoidance of the police, absconding from parole for months, or his statement placing him near the scene at the time of the crime. Moreover, the prosecution might have called a persuasive rebuttal expert, or the jury, who quickly rejected petitioner's testimony and rendered a guilty verdict without the need for any jury notes, simply might not have agreed with the defense theory of the case even with the support of an identification expert.

In sum, the Appellate Division's finding that petitioner received effective representation of counsel was a reasonable application of Strickland and was not based on an unreasonable application of the facts. Especially under the doubly deferential standards required for this determination, petitioner cannot meet his burden.

## POINT THREE

---

correctly identified the person in from the ID.

**PETITIONER'S ALLEGATIONS OF ACTUAL INNOCENCE ARE NOT COGNIZABLE AS A STAND-ALONE CLAIM UNDER 28 U.S.C. 2254 AND THE APPELLATE DIVISION DID NOT UNREASONABLY APPLY ANY CLEARLY ESTABLISHED FEDERAL LAW AS SET FORTH BY THE UNITED STATES SUPREME COURT WHEN IT AFFIRMED THE SUMMARY REJECTION OF THE CLAIM WITHOUT A HEARING (addressing Grounds Three and Four).**

In Ground Three, petitioner claims that he was entitled to an evidentiary hearing upon his motion claiming actual innocence, while in Ground Four, he advances a fee-standing claim of actual innocence. The Appellate Division's rejection of Ground Three was neither an unreasonable application of clearly established Supreme Court precedent, nor was it an unreasonable determination of the facts. Moreover, as petitioner recognizes, he did not raise the free-standing actual innocence claim as a separate claim on appeal, rendering it unexhausted. Furthermore, a free-standing claim of actual innocence is not cognizable upon habeas corpus review. Indeed, as the Second Circuit recently held, an actual innocence claim plays a "'procedural, not substantive'" role in a habeas corpus proceeding. Hyman v. Brown, 927 F.3d 639, 655 (2nd Cir. 2021), quoting Rivas v Fischer, 687 F.3d 514,541 (2nd Cir.2012). Notwithstanding this state of the law, this Office maintains that no

actually innocent person should remain incarcerated. However, petitioner is not actually innocent. Moreover, even if this Court were to conclude that there is a freestanding claim of actual innocence, the threshold showing of such evidence must be "extraordinarily high." Herrera v. Collins, 506 U.S. 390, 417 (1993) (emphasis added). Viewed under the relevant standards, petitioner cannot prevail on either of these related claims.

A free-standing claim of actual innocence is not cognizable upon habeas review under 28 U.S.C. 2254. As the Supreme Court has stated, "federal habeas cases have treated claims of 'actual innocence,' not as an independent constitutional claim, but as a basis upon which a habeas petitioner may have an independent constitutional claim considered on the merits, even though his habeas petition would otherwise be regarded as successive or abusive." Herrera, 506 U.S. at 416-17. Upon revisiting this topic in House v Bell, 547 U.S. 518 (2006), the Court once again declined, in a capital case, to hold that a persuasive showing of innocence would warrant habeas relief in the absence of an independent constitutional violation. Id., at 554-55. The Court also noted that, if such a claim were cognizable, the showing required to obtain relief would be extraordinarily high and that the petitioner had failed to meet this exacting standard, even when he had "cast

considerable doubt on his guilt" so that it was "more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." Id. [9]

As the Second Circuit recently held in recognizing the unavailability of a free-standing claim of actual innocence to a state petitioner, "[t]his is not to minimize the importance of actual innocence claims." Hyman, 927 F.3d at 655. The injustice that results from the conviction of an innocent person is at the forefront of the criminal justice system. Id. However, other than allowing for a gateway to an independent constitutional violation in a "narrow class" of "truly extraordinary" cases (Schlup v. Delo, 513 U.S. 298, 315, 338 [1995]), it is well settled that there is no legal basis to grant relief on petitioner's free-standing claim of actual innocence (Ground Four). And the gateway exception is irrelevant to this proceeding, as the petition is timely filed and there are no procedural hurdles to this Court's consideration of petitioner's cognizable claims set forth in Grounds One and Two.

Additionally, AEDPA poses an additional hurdle for any petitioner seeking relief after a state court has considered and rejected the claim of

---

[9]The Court concluded that, although House satisfied the "gateway exception," he did not satisfy the standard for establishing actual innocence. House, 547 U.S. at 554-55.

innocence on collateral review: relief is precluded as long as that state court decision is not unreasonable. 28 U.S.C. 2254 (d); <u>Jimenez v Stanford</u>, 2021 WL 4199914 (S,D,N.Y. 2021).

Initially, as to Ground Three, the failure to grant an evidentiary hearing does not establish a cognizable claim on habeas review. In determining whether a state procedural rule violates due process, the relevant inquiry is whether the application of the rule "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." <u>Hines v. Miller</u>, 318 F.3d 157, 161-62 (2nd Cir. 2003), quoting <u>Medina v California</u>, 505 U.S. 437, 445 (1992).

Many courts have declined to find any error in the failure to grant a hearing or engage in other particular procedures on collateral review. Thus, in <u>Hines</u>, the Second Circuit refused to find any constitutional error in failing to afford a defendant an evidentiary hearing on his motion to withdraw his plea. Similarly, in <u>Jones v. Duncan</u>, 162 F. Supp.2d 204, 217-18 (S.D.N.Y. 2001) (footnotes omitted), the court held:

> All the circuits that have considered the issue, except one, have held that "federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings." <u>Franza v. Stinson</u>, F. Supp.2d 124, 151 (S.D.N.Y. 1999) (Kaplan, D.J. & Peck, M.J.)(quoting Ortiz v.

Stewart, 149 F.3d 923, 939 (9th Cir. 1998), <u>cert</u>. <u>denied</u>, 526 U.S. 1123, 119 S. Ct. 1777, 143 L. Ed. 2d 806 (1999)); <u>accord</u>, <u>e.g.</u>, <u>Golden v. Kaiser</u>, 2001 U.S. App. LEXIS 195, No. 00-6315, 1 Fed. Appx. 841, 2001 WL 15526 at *1 (10th Cir. 2001) ("Claims relating to alleged deficiencies in [the state's] post-conviction procedures, fail[] to present a viable habeas claim."); <u>Trevino v. Johnson</u>, 168 F.3d 173, 180 (5th Cir.), <u>cert</u>. <u>denied</u>, 527 U.S. 1056, 120 S. Ct. 22, 144 L. Ed. 2d 825 (1999); <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 632 n. 7 (9th Cir. 1997)(claim that petitioner was denied due process in state habeas proceeding is "not addressable in a section 2254 proceeding"), <u>cert</u>. <u>denied</u>, 522 U.S. 1079, 118 S. Ct. 860, 139 L. Ed. 2d 759 (1998); <u>Montgomery v. Meloy</u>, 90 F.3d 1200, 1206 (7th Cir.) (per curiam) ("Unless state collateral review violates some independent constitutional right, such as the Equal Protection Clause, ... errors in state collateral review cannot form the basis for federal habeas corpus relief."), <u>cert</u>. <u>denied</u>, 519 U.S. 907, 117 S. Ct. 266, 136 L. Ed. 2d 190 (1996); <u>Williams-Bey v. Trickey</u>, 894 F.2d 314, 317 (8th Cir.), cert. denied, 495 U.S. 936, 110 S. Ct. 2183, 109 L. Ed. 2d 511 (1990)(cited with approval in <u>Banks v. People of the State of New York</u>, 1994 U.S. Dist. LEXIS 16748, 94 Civ. 555, 1994 WL 661100 at *3 (S.D.N.Y. Nov. 22, 1994)). Only the First Circuit appears to hold to the contrary, <u>see</u>, <u>e.g.</u>, <u>Dickerson v. Walsh</u>, 750 F.2d 150, 152-54 (1st Cir. 1984), and the validity of that decision has been questioned within that circuit.

[D]istrict court decisions within the Circuit (several of which have been affirmed by the Second Circuit) have followed the majority rule. <u>See</u>, <u>e.g.</u>, <u>Diaz v. Greiner</u>, 110 F. Supp.2d 225, 235

(S.D.N.Y. 2000)("Petitioner's unsupported assertion that the trial court denied his (third) [sic] CPL §§ 440.10 motion without a hearing violated due process is not cognizable on federal habeas review."); Lugo v. Kuhlmann, 68 F. Supp.2d 347, 376 n. 15 (S.D.N.Y. 1999) (Patterson, D.J. & Peck, M.J.); Franza v. Stinson, 58 F. Supp.2d at 152; Sparman v. Edwards, 26 F. Supp.2d 450, 468 n. 13 (E.D.N.Y. 1997)("the weight of authority holds that in habeas corpus proceedings federal courts do not have jurisdiction to review state court denials of motions for a new trial"), aff'd, 154 F.3d 51 (2d Cir. 1998); Bellamy v. Cogdell, 802 F. Supp. 760, 772-73 (E.D.N.Y. 1991); Michael v. Dalsheim, 1991 U.S. Dist. LEXIS 7273, No. CV 90-2959, 1991 WL 99368 at *9 (E.D.N.Y. May 22, 1991); Turner v. Sullivan, 661 F. Supp. 535, 540-41 (E.D.N.Y. 1987) (claim that trial court violated due process by denying CPL §§ 440.10 motion without setting out findings, conclusions and its reasoning not cognizable on federal habeas review; "Petitioner has not suggested in what respect the failure to comply with the state rule has violated his federal due process rights. A writ of habeas corpus may not be issued on the basis of a perceived error of state law."), aff'd, 842 F.2d 1288 (2d Cir.), cert. denied, 487 U.S. 1240, 108 S. Ct. 2913, 101 L. Ed. 2d 944 (1988).

Jones, 162 F. Supp.2d at 217-18; see also Khan v. Capra, 2020 WL 6581855 (E.D.N.Y. 2020; Fields v Lee, 2016 WL 889788 (S.D.N.Y. 2016) (Rep. & Rec.), adopted 2016 WL 879319 (S.D.N.Y. 2016); Huffman v. Kirkpatrick, 739 F.Supp.2d 298, 302 (W.D.N.Y. 2010). More broadly speaking, the

Supreme Court has held that "[s]tate prisoners have no federal constitutional right to post-conviction proceedings in state court." <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 557 (1987).

Here, the state courts ran afoul of no firmly rooted principle of justice when it invoked CPL 440.30 in finding the motion unsubstantiated by any non-hearsay allegations that would cast doubt on the verdict, much less the type of allegations that, if true, could even approach the gateway standard for claim of actual innocence or the necessarily higher burden for any free-standing claim.

Initially, it is important to note that petitioner did not set forth new evidence in his 440 motion. Rather than rely on affidavits from Ms. Walker or Ms. Adams, and without explanation, petitioner put forth a hearsay affidavit from an investigator. Ms. Walker at a minimum had spoken freely to Ms. Tobia's investigators three times, Ms. Tobia herself, the OAD investigator, and the CIU. Any documentation that Ms. Walker made statements to these other people was hearsay and remained unsworn by her throughout the proceedings. Likewise, petitioner indicated that he had recent contact with Darshini Little and Crystal Sanchez-Moore (A.277-78 [OAD letter to CIU]), but offered no explanation for the failure to obtain affidavits

from them.[10]     Further, his failure to show any attempt to contact the additional alibi witnesses—Debra Estrada, Jocelyn Estrada, Katherine Estrada, and Tricia McCall—is inexcusable since they are immediate family members and allegedly a friend of Ms. Sanchez-Moore. Petitioner did not proceed on this motion pro se; he had access to the full legal and investigative resources of a highly experienced appellate defender organization.  Yet, the CPL 440 motion—comprising of a 36-page affirmation by counsel, a 33-page memorandum of law, and a 252-page appendix—contained no sworn statements of fact from the witnesses themselves, all of whom were known by petitioner since his trial six years ago.  Indeed, the petitioner's delay in formally raising his claim of actual innocence and lack of direct corroboration from any witnesses leads to the conclusion that there is "no reasonable possibility that such allegation[s are] true" (CPL 440.30[4][d][ii]) under the applicable state law.

Still, there was an insufficient showing of possible merit, and thus a hearing on petitioner's actual innocence claim was unwarranted.  Among Ms. Walker's multiple contradictory statements, the only consistency is that Ms.

---

[10] Petitioner himself did not submit an affidavit for this motion either.  Although petitioner did give sworn testimony at trial and the Grand Jury, his testimony was often contradictory, and he admitted he lied in the Grand Jury (Little: T.988, 991).

Walker claims she overheard several men talking outside her window. The substance of the conversation evolved, first from unknown individuals talking outside her window about an EBT card, then to her learning the participant's names in an unidentified manner several days later (A.225, 227). In the next version, Tristan was merely "chuckling" when others talked about what happened with petitioner's EBT card (T.1096), then years later, Ms. Walker recalled Tristan actively told the others "that he thought he left [petitioner's] *identification* behind *in a cab*" (A.34 [emphasis added]), and finally, that petitioner lent him his EBT card and Tristan accidently left the EBT card in cab (A.35).[11] Further, the timing of the conversation moved from "a time period after the wanted posters had gone up," (T.1096), to late September 2011, according to Ms. Walker's discussions with OAD and CIU (A.34, 35). Simply, Ms. Walker's statements are not credible and did not warrant a hearing, even if there were any constitutional right to one.

Even if Ms. Walker's statements are credited, her proffered statements do not directly address the issue of petitioner's guilt or innocence; at best, they added a modicum of corroboration to petitioner's explanation for the presence his benefit cards in Mr. Lopez's car, an explanation which the

---

[11] Mr. Lopez was employed at a pizzeria (Lopez: T.500), and there is no evidence to suggest that his personal car was a cab in any form.

Appellate Division reasonably called "highly implausible" in its initial decision (Little, 151 AD3d at 532).

It must be underscored that petitioner does not argue that the hearsay allegations constitute newly discovered evidence, likely because they are merely repackaged arguments that were rejected by the jury and are unsupported by any sworn facts. Indeed, petitioner's claim of actual innocence is simply the same version of the defense case theory that was unanimously rejected by the trial jury. On direct appeal, the Appellate Division reasonably concluded that petitioner's explanation for the presence of his benefit cards in the victim's car "was highly implausible" (Little, 151 AD3d at 532). Since that time, petitioner's explanation has not been butressed by any non-hearsay allegations of anyone with first-hand knowledge. Clearly, the state court acted properly in denying petitioner's unauthenticated and manifestly unbelievable statements previously known to him during his trial under the auspices of actual innocence.

Since petitioner fails to set forth a cognizable claim in either Ground Three or Four, these claims must be rejected under the clear language of 28 U.S.C. 2254.

## CONCLUSION

**PETITIONER'S APPLICATION FOR A WRIT OF HABEAS CORPUS SHOULD BE DISMISSED OR DENIED IN ALL RESPECTS.**

BY:

_____/s_____

NANCY D. KILLIAN
(NK 0771)
Assistant District Attorney

DARCEL D. CLARK
District Attorney
Bronx County
198 East 161st Street
Bronx, New York 10451
(718) 590- 2156

NANCY D. KILLIAN
Assistant District Attorney
Of Counsel
NOVEMBER 2021